Notice of Removal
EXHIBIT F            .

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

ROBIN L. HINKLE,

       PLAINTIFF,

vs.                                    CIVIL ACTION NO. 12-C-202

CASEY JOE MATTHEWS, TIMOTHY
MAY and CONNIE MAY, husband and wife,
SANTANDER CONSUMER, USA, INC., an
Illinois corporation; SAFE-GUARD PRODUCTS
INTERNATIONAL, LLC, a Georgia limited
liability company; and JOHNNY HINKLE,

       DEFENDANTS.

## SAFE-GUARD PRODUCTS INTERNATIONAL, LLC'S MOTION TO DISMISS AND ANSWER TO PLAINTIFF'S COMPLAINT

COMES NOW Safe-Guard Products International, LLC ("Safe-Guard"), by and through

counsel, James A. Varner, Sr., Debra T. Varner, Jeffrey D. Van Volkenburg, and the law firm of

McNeer, Highland, McMunn and Varner, L.C., and moves, pursuant to Rule 12(b) of the West

Virginia Rules of Civil Procedure to dismiss this action and further Answer the Complaint filed by

Plaintiff, Robin L. Hinkle.

## MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

### I.) INTRODUCTION

Plaintiff Robin Hinkle's Complaint has requested recovery from Safe-Guard arising from

her entry into an agreement at the time of the purchase of the automobile that was the subject of the

accident, which led to the filing of this civil action. Safe-Guard administers loss protection plans,

whereby the purchaser of an automobile would be relieved of an outstanding balance due on an

automobile loan in the event of an accident or event resulting in a total loss of the vehicle. The plan

is subject to the clear and conspicuous terms and conditions of the Total Loss Protection Plan

("Plan"), which is provided to the automobile purchaser at the time of purchase.  As will be explained below, the Plan has several clear and conspicuous conditions associated with its application, which negate any obligation for Safe-Guard to cancel any indebtedness of Plaintiff still remaining on her automobile loan at the time of her accident on June 1, 2011. In fact, irrespective of Plaintiff's claims against other parties, Safe-Guard has no obligation to cancel any indebtedness for Plaintiff as only the lender or its assignee has that responsibility, pursuant to the terms of the Plan.  A review of the Plan demonstrates the following: (1) Safe-Guard was not the guarantor of the debt cancellation; (2) Plaintiff failed to timely make significant numbers of payments under the automobile loan.  Based on the terms of the automobile loan and her insurance recovery, she should have had any debt to cancel.  Plaintiff's remaining balance on her auto loans, after receiving her insurance proceeds, was solely because Plaintiff did not pay all required payments of the loan. There can be no obligation by Safe-Guard due to Plaintiff's failure to make her necessary payments.  Dismissal of Plaintiff's claims against Safe-Guard is fully required by application of settled law to the facts of this case.

## II.) FACTUAL HISTORY AND BACKGROUND INFORMATION

Plaintiff Robin Hinkle and Defendant Johnny Hinkle purchased a 2006 Chevrolet Monte Carlo in July 2006 from C & O Motors located in St. Albans, West Virginia. See, *Complaint*, at ¶ 16.  Plaintiff and Defendant Hinkle financed the purchase by entering into a "Retail Installment Contract and Security Agreement" with C & O Motors.  ("Auto Loan") *Id*.  At the time of the purchase, the Hinkles paid four hundred ninety-five dollars ($495.00) for the purchase of a Gap

Coverage Plan ("Plan"), administered by Defendant Safe-Guard.[1]   The "Plan" constituted an

addendum to the Auto Loan entered into by the Hinkles. Attached hereto as *Ex. A*, is the Safe-Guard

Plan that was executed by Plaintiff. See, *Ex. A*. Under the section titled "COVERAGE" the plan

clearly states the following:

> The named Customer is responsible to the named Dealer/Assignee under the terms of the
> described Installment Sales Contract/Loan/Lease Agreement for the amount of any early
> termination liability resulting from a Total Loss of the Vehicle. Due to this Addendum being
> in effect, the Dealer/Assignee agrees to cancel a portion of the Customer's indebtedness in
> the event of a Total Loss of the Vehicle as defined herein.  The Deficiency Waiver
> Addendum will waive the amount equal to the unpaid Net Balance less the Actual Cash
> Value (ACV) of the Vehicle, both as defined herein, subject to the ACV not having been
> reduced by more than $1,000 as a result of the application of the Customer's primary
> insurance deductible.  Any deductible amount in excess of $1,000 remains the Customer's
> responsibility . . . .

See, *Ex. A*, p. 1.

Without the benefit of the Plan, the Plaintiff/Customer was responsible to the car dealer or

its assignee for the amount of any liability on the subject automobile loan following an event which

led to the Total Loss of the Vehicle. See, *Ex. A*. The Plan modified this agreement so that "[d]ue

to this Addendum being in effect, the Dealer/Assignee agrees to cancel a portion of the Customer's

indebtedness in the event of a Total Loss of the Vehicle." See, *Ex. A*. Simply stated, if the terms

of the Plan were followed and Plaintiff was in an accident, which resulted in a total loss of her

vehicle, a portion of any remaining balance on her automobile loan at that time would be waived.

The cancellation of the remaining portion of the automobile loan on the vehicle, by the

seller/assignee, was defined in a section of definitions titled: "Unpaid Net Balance."  It stated:

---

[1] Plaintiff's Complaint continuously refers to the Safe-Guard product as "Gap-Insurance." See,
Complaint, at ¶¶ 16-18; 21; 23-25; 28-29 and 32. The "plan" is not "insurance."  As will be demonstrated
below, Safe-Guard respectfully requests dismissal, in part, because this plan is not an insurance policy
and therefore cannot be the subject of common-law bad faith and unfair trade practices act claims.

3

means the amount owed by the Customer to clear the outstanding Installment Sales/Contract/Loan/Lease account as of Date of Loss subject to Paragraph 2(b). *This amount shall not include any and all unearned and/or future interest or rental charges, finance or lease charges, late charges, delinquent payments, deferred payments, uncollected service charges,* refundable prepaid taxes and fees, disposition fees, termination fees, *penalty fees* or any proceeds which may be recovered by cancelling any insurance coverages, service contracts and/or warranties, credit life, accident and health insurance or other cancelable items.

*Ex. A*, p. 2. This section makes clear that if the purchaser (Plaintiff) did not make all payments pursuant to the payment schedule for the automobile loan, or incurred penalty fees, late charges or had delinquent payments, the waiver of the remaining balance due on the automobile loan may not occur. Pursuant to the terms of the Plan, the amount due on an automobile loan at a date of loss is established through the calculation of the amount that would be owed if all payments had been timely made by the purchaser. In this instance, Plaintiff's amount outstanding on the loan should have been much lower than the payment that she received from insurance proceeds. Simply stated, had Plaintiff complied with the loan terms, there would have been nothing left to pay on the loan when she received her insurance settlement.[2] See, *Ex. A*. During the life of the automobile loan at issue, Plaintiff was repeatedly late with payments, incurred additional charges or simply did not make significant numbers of payments for her automobile after the time she purchased it in 2006.

The principal balance, including late charges and additional fees remaining at the date of loss was Eleven Thousand Six Hundred Twenty-Six Dollars and Ninety Eight Cents ($11,626.98). See, *Ex. B, Santander Consumer Payment History*, at pg. 1. Following Plaintiff's automobile accident on June 1, 2011, State Farm Insurance paid a sum total of Seven Thousand Two Hundred Eighty-

---

[2] This provision allows for the providers of plans such as the Total Loss Protection Plan to permit some certainty into the loss calculation that they may be responsible for in the event of a total loss. If providers of Total Loss Protection Plans could be responsible for late fees and/or delinquent payments, their potential liability would be uncapped leading to a fatally flawed business model.

Five Dollars and Fifty Cents ($7,285.50) on behalf of Plaintiff to Santander Corporation for the Plaintiff's automobile. See, *State Farm Insurance Total Loss Central Sheet*, attached as *Ex. C.* Santander was the lien holder on Plaintiff's automobile loan at the time of the accident. The actual market value for the automobile at the date of loss was $7400.00. See, *Ex. C.* Because the remaining balance on Plaintiff's automobile loan at the time of the accident was $11,626.98 and the lien holder only received a check in the amount of $7,285.50, Plaintiff was still responsible to Santander, as lien holder for the difference, which amounted to Four Thousand Three Hundred Forty-One Dollars and Forty Eight Cents ($4,341.48).[3] Had Plaintiff complied with the payment terms of the automobile loan, there would have not been any amount left to pay on her automobile loan following receipt of the insurance proceeds from the automobile accident.

As explained in the July 21, 2011 letter to Plaintiff, attached as *Exhibit D*, based on the inconsistent payment history by Plaintiff, and fees occurring as a result of failure to follow the terms of the automobile loan, the automobile loan was re-amortized to Five Thousand Two Hundred Eighty-Three Dollars and Sixty-Eight Cents ($5,283.68), which would have been the amount that should have remained on the automobile loan at the date of loss, had all payments been timely made by Plaintiff.[4]

Plaintiff received Seven Thousand Two Hundred Eighty-Five Dollars ($7,285.00) from insurance proceeds for the loss of her vehicle. See, *Ex. C.* Consequently, Plaintiff's recovery from

---

[3] Safe-Guard notes that this amount is slightly different than the deficiency amount listed in paragraph fourteen (14) of Plaintiff's Complaint. For purposes of this motion, the exact figure is not relevant to overall consideration of the motion. Safe-Guard does not dispute Plaintiff's representation of the amount she believed to be owed on her automobile loan.

[4] Safe-Guard is not the lien holder for the automobile loan and never held any lien for the automobile loan. Safe-Guard had no role in negotiating the terms of the automobile loan.

insurance proceeds was excess of the amount of what she should have owed on her automobile loan had she complied with the terms of the automobile loan. However, because she did not make all her payments pursuant to the terms of her automobile loan, Plaintiff cannot recover for any remaining payments still due on the loan because it is solely through her inaction and non-payment that she continues to owe money on said loan.

## II.) STANDARD OF REVIEW

A motion filed pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure is designed "to test the sufficiency of the complaint." *Roth v. Defelicecare, Inc.*, 700 S.E.2d 183, 188, ___ W. Va. ___, ___ (2010) (citing *Cantley v. Lincoln County Comm'n*, 221 W.Va. 468, 470, 655 S.E.2d 490, 492 (2007)). "A trial court considering a motion to dismiss under Rule 12(b)(6) must liberally construe the complaint so as to do substantial justice." *Id.* (citing *Cantley v. Lincoln County Comm'n*, 221 W. Va. 468, 470, 655 S.E.2d 490, 492 (2007)). In reviewing the motion to dismiss and the complaint, the trial court must "construe the complaint in the light most favorable to the plaintiff, taking all allegations as true." *Id.* (citing *Sedlock v. Moyle*, 222 W. Va. 547, 550, 668 S.E.2d 176, 179 (2008). Finally, a "trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him (or her) to relief." *Id.* (citing *Chapman v. Kane Transfer Co.*, 160 W. Va. 530, 236 S.E.2d 207, syl. pt. 3. (1977)). The current case is one of the cases in which a motion to dismiss is proper because Plaintiff cannot, as a matter law, plead a successful cause of action and has alleged no facts or other basis which would support said cause of action.

## III.) ARGUMENT

**A.)     Plaintiff Failure To Comply With The Repayment Terms of Her Automobile Purchase Led To The Shortfall For Which She Now Seeks Recovery**

As noted above, Plaintiff did not comply with the repayment terms of her automobile loan, resulting in violation of the clear and conspicuous terms of Plan.  See, *Ex. D.*  Plaintiff's violation of the terms of repayment for her automobile loan led to a much larger residual balance on the time of the date of loss, than would have been present had she complied with the terms of her automobile loan.  The actual amount that should have remained on the automobile purchase on the date of loss was Five Thousand Two Hundred Eighty Three Dollars and Sixty-Eight Cents.  If Plaintiff had made all payments required of her in a timely manner, she would have been able to pay off her automobile loan in full with funds received from State Farm.  Because Plaintiff failed to make all payments pursuant to the terms of her auto loan, she is not entitled to recovery pursuant to the Plan.  West Virginia courts have been clear that "[w]here the terms of a contract are clear and unambiguous, they must be applied and not construed."  Syl. Pt. 3, *Waddy v. Riggleman*, 216 W. Va. 250, 606 S.E.2d 222 (2004).  Applying the terms of the Plan requires dismissal of Plaintiff's suit against Safe-Guard.

**B.)     Safe-Guard Is Not Responsible For Any Recovery Plaintiff Seeks Pursuant To The Terms of the Plan Because Santander is The Obligor For The Relief Plaintiff Requests**

Plaintiff has filed suit against both Safe-Guard and Santander, alleging claims of breach of contract, violations of the Unfair Trade Practices Act and common law bad-faith.  See, Complaint, at ¶¶ 16-33.  As a matter of law, all of Plaintiff's claims against Safe-Guard fail because Safe-Guard was not responsible for any repayment or payment of any balance to Plaintiff.  The terms of the Plan only provided that Plaintiff's remaining money owed under the purchase agreement would be cancelled if the terms of the Agreement were met.  Specifically, the Agreement provided that "Due

7

to this Addendum being in effect, *the Dealer/Assignee* agrees to cancel a portion of the Customer's indebtedness in the event of a Total Loss of the Vehicle as defined herein." See, *Ex. A.* (emphasis added). Safe-Guard is neither the "dealer" or the "assignee" as defined in the Agreement. The "dealer/assignee" for purposes of this Agreement is Santander, who was the assignee of the original automobile loan originator. Consequently, if there is any obligation owed to Plaintiff to relieve her obligations under the purchase agreement, such obligation is owed to Plaintiff from Santander.[5] West Virginia jurisprudence has long been clear that for a contract:

> [t]he fundamentals of a legal contract are competent parties, legal subject-matter, valuable consideration and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement.

Syl. Pt. 5, *Virginia Exp. Coal Co. v. Rowland Land Co.*, 100 W. Va. 559, 131 S.E. 253 (1926). Here, the valuable consideration for Plaintiff – the waiver of remaining payments under the automobile loan – was not the obligation of Safe-Guard, as the contract clearly states that the "Dealer/Assignee" agrees to cancel a portion of the Customer's indebtedness. There was no mutual assent on the part of Safe-Guard to cancel any payments due pursuant to Plaintiff's automobile loan.

WHEREFORE, Safe-Guard respectfully requests dismissal of Plaintiff's Complaint against it, as Plaintiff cannot recover against Safe-Guard for the claims asserted herein.

## GENERAL RESPONSE AND PREAMBLE FOR ANSWER TO PLAINTIFF'S COMPLAINT

This responsive pleading has been prepared, served and filed by counsel for Safe-Guard,

---

[5] Safe-Guard notes the arguments contained herein, which demonstrate clearly and unequivocally that Plaintiff is not entitled to recover under the Plan from any party due to breach of the terms of the Plan.

under the West Virginia Rules of Civil Procedure.

As permitted by Rule 8(e)(2), defenses to the claims made in Plaintiff Hinkle's complaint are being asserted alternatively and, in some cases, hypothetically. Defenses are being asserted regardless of apparent consistency and are based both on legal and equitable grounds.

As the facts of this civil action are fully developed through the discovery process, certain defenses may be abandoned, modified, or amended as permitted by and consistent with the West Virginia Rules of Civil Procedure.

Because no discovery has been conducted to date in the above-captioned civil action and in order to preserve important legal rights and protections, Safe-Guard sets forth below certain affirmative defenses, which, based upon the information set forth in the Plaintiff Hinkle's complaint, it believes do or may apply to some or all of the claims raised therein. Safe-Guard reserves the right to withdraw, modify or amend some or all of the affirmative defenses set forth below, in whole or in part, depending on the outcome of discovery in this civil action.

### First Affirmative Defense

Safe-Guard affirmatively asserts that it had full and legal license to act as it did and, therefore, no action may be maintained against it.

### Second Affirmative Defense

Safe-Guard has, at all times, acted within its legal rights in the conduct of all of its activities and with just cause.

### Third Affirmative Defense

Safe-Guard's conduct was, at all times relevant to the matters set forth in the complaint, privileged, proper, and justified.

### Fourth Affirmative Defense

Safe-Guard has not breached any insurance contract between Safe-Guard and Plaintiff Hinkle.

### Fifth Affirmative Defense

Safe-Guard's actions herein met the test of reasonableness in all fashions and, as a result thereof, no action in bad faith is maintainable.

### Sixth Affirmative Defense

Safe-Guard exercised its statutory rights and obligations reasonably, fairly, and in good faith based on the information available to it.  At no time did Safe-Guard act arbitrarily, unreasonably, unfairly, or in bad faith.

### Seventh Affirmative Defense

There has been no breach or violation of the West Virginia Unfair Claims Settlement Practices Act, W. Va. Code § 33-11-4(9), by Safe-Guard.

### Eighth Affirmative Defense

All conduct and activities of Safe-Guard relating to the matters alleged in the Plaintiff Hinkle's complaint conformed to the statutory law promulgated in West Virginia and, therefore, no cause of action against Safe-Guard for alleged violations of the West Virginia Unfair Claims Settlement Practices Act, W. Va. Code § 33-11-4(9), may be maintained.

### Ninth Affirmative Defense

All of the acts of Safe-Guard were performed in a careful, reasonable, and prudent manner and the Plaintiff Hinkle is not entitled to recover either compensatory or punitive damages from Safe-Guard under the West Virginia Unfair Claims Settlement Practices Act, W. Va. Code

Notice of Removal

Case 2:15-cv-13856   Document 1-6   Filed 10/09/15   Page 11 of 166 PageID #: 95
EXHIBIT F          .

§ 33-11-4(9).

### Tenth Affirmative Defense

Safe-Guard's alleged conduct did not constitute a "general business practice" as contemplated by W. Va. Code § 33-11-4(9).

### Eleventh Affirmative Defense

There is no private cause of action for a violation of the insurance regulations promulgated by the Insurance Commissioner in the State of West Virginia as said regulations are administrative in nature to be enforced by the Insurance Commissioner.

### Twelfth Affirmative Defense

Plaintiff Hinkle's own acts or omissions, or both, were the sole cause of the damages of which they complain.

### Thirteenth Affirmative Defense

The damages of which Plaintiff Hinkle complains were not the proximate result of any act of omission or commission on the part of Safe-Guard.

### Fourteenth Affirmative Defense

The negligence or fault of another other than Safe-Guard was either the sole proximate cause of or proximately caused or contributed to the damages allegedly sustained by Plaintiff Hinkle.

### Fifteenth Affirmative Defense

The negligence or fault of Plaintiff Hinkle proximately contributed to their alleged damages and, furthermore, the negligence or fault of Plaintiff Hinkle equaled or exceeded the negligence or fault, if any, of Safe-Guard and of all Defendants to this action, the existence of such negligence or fault on behalf of Safe-Guard being denied.

## Sixteenth Affirmative Defense

Plaintiff Hinkle's Complaint fails to allege, nor can Plaintiff Hinkle prove, the necessary predicates or conditions in order to establish the threshold requirements for the recovery of punitive damages.

## Seventeenth Affirmative Defense

Safe-Guard did not engage in any intentional, willful, malicious, or outrageous act or acts which proximately caused or contributed to the damages allegedly sustained by Plaintiff Hinkle. Plaintiff Hinkle is thereby prohibited from recovering any punitive damages from Safe-Guard.

## Eighteenth Affirmative Defense

To the extent that the Complaint seeks punitive and/or exemplary damages, Safe-Guard asserts that such claims for punitive and/or exemplary damages violate its constitutional rights to due process under the United States Constitution because such claims create an unnecessary and undue risk of an improper verdict on the issue of liability, on the measure of damages, on the issue of punitive damages, and on the measure of punitive damages.

## Nineteenth Affirmative Defense

To the extent that Plaintiff Hinkle's Complaint seeks punitive and/or exemplary damages, Safe-Guard asserts that such claims for punitive and/or exemplary damages violate its rights to procedural due process and constitute "excessive fines." Plaintiff Hinkle's claims in this regard are unconstitutional and, therefore, barred by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

## Twentieth Affirmative Defense

Any award of punitive damages violates the guarantee of due process found in the West

Virginia and United States Constitution because of the lack of objective guidelines upon which a finder of fact might base its award and, further, because the guidelines which do exist are arbitrary and void for vagueness.

### Twenty-First Affirmative Defense

Punitive damages are unavailable in this case based on the absence of actual malice as required by West Virginia law.

### Twenty-Second Affirmative Defense

Safe-Guard asserts all affirmative defenses available under Rules 8(c), 9(b), and 12(b) of the West Virginia Rules of Civil Procedure as the facts of this case may so develop.

### Twenty-Third Affirmative Defense

Safe-Guard denies that it breached any duty to Plaintiff Hinkle and does not, by asserting affirmative defenses, assume the burden of proof which remains with Safe-Guard.

### Twenty-Fourth Affirmative Defense

Safe-Guard asserts that certain claims of Plaintiff Hinkle's may be barred by the applicable statute of limitations and reserves the right to assert those claims at a later date after discovery has been completed in this civil action.

### Twenty-Fifth Affirmative Defense

Safe-Guard reserves the right to amend its answer and affirmative defenses and to assert any additional affirmative defenses as may become apparent during discovery or trial of this civil action.

### Twenty-Sixth Affirmative Defense

Safe-Guard reserves the right to assert such counterclaims, cross-claims, or impleader actions in this matter as the facts of the case and discovery so develop.

13

## Twenty-Seventh Affirmative Defense

1.      Safe-Guard incorporates herein, by reference, all of the Affirmative Defenses hereinabove set forth as if the same were herein set forth verbatim.

2.      Each allegation not specifically admitted is hereby denied.

3.      This Defendant is without sufficient information to admit or deny the assertion contained in paragraph one (1) of Plaintiff's Complaint.

4.      This Defendant is without sufficient information to admit or deny the assertion contained in paragraph two (2) of Plaintiff's Complaint.

5.      This Defendant is without sufficient information to admit or deny the assertion contained in paragraph three (3) of Plaintiff's Complaint.

6.      This Defendant admits, upon information and belief, that Defendant Santander Consumer USA, Inc. ("Santander") is a corporation organized under the laws of the State of Illinois and further that Santander is and was licensed and authorized to engage in business in the State of West Virginia. This Defendant is without sufficient information to admit or deny that Santander was doing business in Mingo County, West Virginia.

7.      Pursuant to paragraph five (5) of Plaintiff's Complaint, Safe-Guard admits that it is a limited liability company organized under the laws of the State of Georgia, and further admits that it is and was, at all times relevant, licensed and authorized to do business in the State of West Virginia. Safe-Guard is without sufficient information to admit or deny whether it is, in fact doing business in Mingo County, West Virginia as that assertion is understood.

8.      This Defendant is unable to admit or deny the assertions contained in paragraph six (6) of Plaintiff's Complaint, as worded, and therefore denies the same and demands strict proof

thereof. This Defendant further notes that paragraph six (6) of Plaintiff's Complaint contains a legal conclusion to which no response is required.

9.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph seven (7) of Plaintiff's Complaint.

10.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph eight (8) of Plaintiff's Complaint.

11.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph nine (9) of Plaintiff's Complaint.

12.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph ten (10) of Plaintiff's Complaint.

13.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph eleven (11) of Plaintiff's Complaint.

14.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph twelve (12) of Plaintiff's Complaint. To the extent the allegations contained in paragraph twelve (12) of Plaintiff's Complaint can be read to assert a claim against this Defendant, it is denied and strict proof is demanded.

15.    This Defendant is without sufficient information to admit or deny the assertions contained in paragraph thirteen (13) of Plaintiff's Complaint. To the extent the allegations contained in paragraph thirteen (13) of Plaintiff's Complaint can be read to assert a claim against this Defendant, it is denied and strict proof is demanded.

16.    This Defendant denies the allegations contained in paragraph fourteen (14) of Plaintiff's Complaint to the extent that they are intended to assert a claim against this Defendant and

15

Notice of Removal
EXHIBIT F        .

strict proof is demanded.

17.     This Defendant is without sufficient information to admit or deny the assertions contained in paragraph fifteen (15) of Plaintiff's Complaint. To the extent the allegations contained in paragraph fifteen (15) of Plaintiff's Complaint can be read to assert a claim against this Defendant, it is denied and strict proof is demanded.

This Defendant is without sufficient information to admit or deny the claims for relief contained in the "Wherefore" paragraph of Count I of Plaintiff's Complaint. To the extent that the "Wherefore" paragraph of Plaintiff's Complaint can be read to assert a claim against this Defendant, it is denied and strict proof is demanded.

## COUNT II

18.     This Defendant reincorporates its responses to paragraphs one (1) to fifteen (15) of Plaintiff's Complaint as if stated verbatim herein.

19.     This Defendant admits, upon information and belief, that Plaintiff Robin L. Hinkel and Defendant Johnny Hinkle purchased a 2006 Chevrolet Monte Carlo in July 2006, which was financed through C & O Motors of St. Albans, West Virginia. This Defendant denies the remaining assertions contained in paragraph sixteen (16) of Plaintiff's Complaint as worded.

20.     This Defendant denies the assertions contained in paragraph seventeen (17) of Plaintiff's Complaint as worded. Defendant further responds that paragraph seventeen (17) of Plaintiff's Complaint references the GAP Agreement, which contains terms that speak for themselves and do not require a response.

21.     This Defendant denies the assertions contained in paragraph eighteen (18) of Plaintiff's Complaint as worded.  Defendant further responds that paragraph eighteen (18) of

16

Plaintiff's Complaint references the GAP Agreement, which contains terms that speak for themselves and do not require a response.

22.     This Defendant is without sufficient information to admit or deny the assertions contained in paragraph nineteen (19) of Plaintiff's Complaint.

23.     This Defendant is without sufficient information to admit or deny the entirety of assertions contained in paragraph twenty (20) of Plaintiff's Complaint.

24.     This Defendant denies the assertions contained in paragraph twenty-one (21) of Plaintiff's Complaint as worded and demands strict proof of the same.

25.     This Defendant denies the assertions and allegations contained in paragraph twenty-two (22) of Plaintiff's Complaint as worded and demands strict proof of how this Defendant "wrongfully" refused to provide benefits to Plaintiff.

26.     This Defendant denies the assertions contained in paragraph twenty-three (23) of Plaintiff's Complaint to the extent it utilizes incorrect terminology to describe the Gap Plan.  This Defendant is without sufficient information to admit or deny the remaining assertions contained in paragraph twenty-three (23) of Plaintiff's Complaint.

27.     Paragraph twenty-four (24) of Plaintiff's Complaint does not contain an allegation or assertion against this Defendant, therefore no response is required.  To the extent that paragraph twenty-four (24) can be read to include a claim for relief against this Defendant, it is denied and strict proof is demanded.

## COUNT IIA - BREACH OF CONTRACT

28.     This Defendant reincorporates the responses to paragraphs one (1) through twenty-four (24) as if restated verbatim herein.

17

29.     This Defendant denies the allegations contained in paragraph twenty-five (25) of Plaintiff's Complaint and demands strict proof thereof.  This Defendant further denies that it is jointly or severally liable with any other party named in this civil action.

## COUNT IIB - COMMON LAW BAD FAITH

30.     This Defendant reincorporates the responses to paragraphs one (1) through twenty-five (25) as if restated verbatim herein.

31.     Paragraph twenty-six (26) of Plaintiff's Complaint contains a legal conclusion to which this Defendant need not respond.  To the extent that paragraph twenty-six (26) can be read to assert a claim for relief against this Defendant, it is denied and strict proof is demanded.

32.     This Defendant denies the allegations contained in paragraph twenty-seven (27) of Plaintiff's Complaint and demands strict proof thereof.  This Defendant further denies that it is jointly or severally liable with any other party named in this civil action.

## COUNT IIC - UNFAIR TRADE PRACTICES

33.     This Defendant reincorporates the responses to paragraphs one (1) through twenty-seven (27) as if restated verbatim herein.

34.     Paragraph twenty-eight (28) of Plaintiff's Complaint constitutes a legal conclusion to which no response is required.

35.     This Defendant denies the allegations and assertions contained in paragraph twenty-nine (29) of Plaintiff's Complaint, as worded, and demands strict proof thereof.

36.     This Defendant denies the allegations contained in paragraph thirty (30) of Plaintiff's Complaint, including subparts (a) through (d) and demands strict proof thereof.  This Defendant further denies that it is jointly or severally liable with any other party named in this civil action.

Notice of Removal
EXHIBIT F       .

37.    This Defendant denies the allegations contained in paragraph thirty-one (31) of Plaintiff's Complaint, and demands strict proof thereof.

## COUNT IID – DECLARATORY JUDGMENT

35.    This Defendant reincorporates the responses to paragraphs one (1) through thirty-one (31) as if restated verbatim herein.

36.    This Defendant denies that Plaintiff and/or Defendant Johnny Hinkle are entitled to the declaratory relief requested in paragraph thirty-two (32) of Plaintiff's Complaint and demands strict proof thereof.

## COUNT IIE – PUNITIVE DAMAGES

37.    This Defendant reincorporates the responses to paragraphs one (1) through thirty-two (32) as if restated verbatim herein.

38.    This Defendant denies the allegations contained in paragraph thirty-three (33) of Plaintiff's Complaint and this Defendant further denies that Plaintiff is entitled to punitive damages as requested in paragraph thirty-three (33) of Plaintiff's Complaint and demands strict proof thereof.

This Defendant further denies the Plaintiff is entitled to the relief requested in the "Wherefore" paragraph of the Complaint and demands strict proof thereof.

Notice of Removal
EXHIBIT F          .

SAFE-GUARD PRODUCTS INTERNATIONAL, LLC
By Counsel:

_____

James A. Varner, Sr.                    (WV State Bar #3853)
Debra T. Varner                         (WV State Bar # 6501)
Jeffrey D. Van Volkenburg               (WV State Bar #10227)
Empire Building - 400 West Main Street
P. O. Drawer 2040
Clarksburg, WV 26302-2040
Telephone: (304) 626-1100
Facsimile: (304) 623-3035

McNeer, Highland, McMunn and Varner, L.C.
    Of Counsel

Notice of Removal
EXHIBIT F          .

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

ROBIN L. HINKLE,

        PLAINTIFF,

vs.                                  CIVIL ACTION NO. 12-C-202

CASEY JOE MATTHEWS, TIMOTHY
MAY and CONNIE MAY, husband and wife,
SANTANDER CONSUMER, USA, INC., an
Illinois corporation; SAFE-GUARD PRODUCTS
INTERNATIONAL, LLC, a Georgia limited
liability company; and JOHNNY HINKLE

        DEFENDANTS.

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2012, I served the foregoing *"SAFE-GUARD PRODUCTS INTERNATIONAL, LLC'S MOTION TO DISMISS AND ANSWER TO PLAINTIFF'S COMPLAINT"* upon counsel of record by depositing true copies thereof in the United States mail, postage prepaid, in an envelopes addressed as follows:

Howard M. Persinger, III, Esquire
Persinger & Persinger, L.C.
101 Dickinson Street
Williamson, WV 25661

C. William Davis, Esquire
Richardson & Davis, PLLC
307 Federal Street, Suite 602
Post Office Box 1778
Bluefield, WV 24701

Todd A. Mount, Esquire
Shaffer & Shaffer
P.O. Box 38
Madison, WV 25130-0038

Gap Contract

VIN 9301365

# SAFE-GAP
## TOTAL LOSS PROTECTION PLC

## CUSTOMER (BORROWER/LESSEE) INFORMATION

Last Name _HINKLE_____ First Name _JOHNNY_____ Middle Initial _L_
                                              ROBIN                        L

Street Address _____ Apt # _____

City _RT 3 BOX 435_____ State _____ Zip Code _____

Home Phone # _DELBARTON_____ Bus. Phone # _WV_____ _25670_
              (304)475-3109

## COVERED VEHICLE INFORMATION

Manufacturer _____ Model _____ Year _____

Vehicle ID # _CHEVROLET_____ _MONTE CARLO_____ _2006_
              2G1WJ15K069301365

Charge to CUSTOMER for DEFICIENCY WAIVER ADDENDUM $ _____ Original Date of CONTRACT _____

Installment Sales ☐  Balloon   Amount Financed/          _495.00_      New Vehicle ☐  _07/14/2006_  Used Vehicle ☐
Contract/Loan ☐   Loan/Lease ☐   Lease Cap $ _____ Term (in Months) _____

## DEALER INFORMATION         _19718.20_       _72_        _XX_

Dealer # _____ Dealership _____

Street Address _____ _C & O MOTORS, INC._____

City _ST ALBANS_____ State _WV_ Zip Code _25177_

## ASSIGNEE INFORMATION

Assignee _____ Installment Sales Contract/Loan/Lease Acct. # _____

Street Address _CITIFINANCIAL AUTO_____

City _P.O. BOX 3449_____ State _____ Zip Code _____
     _COPPELL_                          _TX_      _75019_

I (CUSTOMER), WHOSE SIGNATURE APPEARS BELOW, ACKNOWLEDGE THAT THE INFORMATION CONTAINED ABOVE IS, TO THE BEST OF MY KNOWLEDGE, TRUE. I HAVE READ THE FRONT AND BACK OF THIS DEFICIENCY WAIVER ADDENDUM IN ITS ENTIRETY, AGREE TO ALL OF ITS PROVISIONS, TERMS AND CONDITIONS, AND AM REQUESTING COVERAGE. THE PURCHASE OF THE DEFICIENCY WAIVER ADDENDUM IS VOLUNTARY AND IS NOT REQUIRED TO OBTAIN CREDIT. I UNDERSTAND I MAY OBTAIN DEFICIENCY WAIVER/GAP PROTECTION FROM AN ALTERNATE SOURCE. I UNDERSTAND THAT A CANCELLATION REQUESTED WITHIN SIXTY (60) DAYS OF PURCHASE IS ELIGIBLE FOR A FULL REFUND. I UNDERSTAND THAT A CANCELLATION REQUEST RECEIVED AFTER SIXTY (60) DAYS OF PURCHASE WILL BE REFUNDED PRO-RATA, UNLESS OTHERWISE REQUIRED BY APPLICABLE LAW.

Date _____ Customer's Signature _____ Dealer's Signature _____
07/14/06

## COVERAGE

The named Customer is responsible to the named Dealer/Assignee under the terms of the described Installment Sales Contract/Loan/Lease Agreement for the amount of any early termination liability resulting from a Total Loss of the Vehicle. Due to this Addendum being in effect, the Dealer/Assignee agrees to cancel a portion of the Customer's indebtedness in the event of a Total Loss of the Vehicle as defined herein. The Deficiency Waiver Addendum will waive the amount equal to the Unpaid Net Balance less the Actual Cash Value (ACV) of the Vehicle, both as defined herein, subject to the ACV not having been reduced by more than $1,000 as a result of the application of the Customer's primary insurance deductible. Any deductible amount in excess of $1,000 remains the Customer's responsibility. There is no deductible coverage available for (a) vehicles financed or leased in Arkansas or (b) vehicles leased in Illinois. It is further agreed that the maximum claim payment is limited to $50,000.

## DECLINATION OF DEFICIENCY WAIVER ADDENDUM

☐  I DO NOT CHOOSE TO PURCHASE THE DEFICIENCY WAIVER ADDENDUM. I UNDERSTAND THAT BY NOT ACCEPTING THE DEFICIENCY WAIVER ADDENDUM, I AM NOT ENTITLED TO ANY OF THE BENEFITS IN THE EVENT OF A TOTAL LOSS OF THE VEHICLE.

Date _____ Customer's Signature _____ Dealer's Signature _____

### SAFE-GUARD PRODUCTS INTERNATIONAL, INC.
3500 Piedmont Road NE, Suite 400
Atlanta, Georgia 30305
800-742-7896

133SG7/25/00          White: CUSTOMER       Yellow: SAFE-GUARD       Pink: DEALER       Goldenrod: LENDER       Rev 3/05

Exhibit A

## TERMS AND CONDITIONS

1. **DEFINITIONS:**

   For the purpose of this Deficiency Waiver Addendum ("Addendum") the following terms shall mean:

   **Customer** means the purchaser of the Vehicle, as listed in the application section of this Addendum.

   **Vehicle** means the four-wheeled private passenger vehicle, van, pickup or light truck not to exceed 1 3/4 ton capacity, as listed in the application section of this Addendum.

   **Date of Loss** means the date on which the actual physical loss or damage occurred to the Vehicle. If such date is indeterminable, the Date of Loss shall be either the date established by the primary insurance carrier or the date the occurrence was reported to the police, whichever is the earlier.

   **Actual Cash Value** means the retail value of the covered Vehicle on the Date of Loss, prior to its physical damage or theft, as determined by the primary insurance carrier or the then current region-specific National Automobile Dealers Association (NADA) Official Used Car Guide, with the appropriate adjustments for mileage, options and condition, whichever is greater. If no primary insurance carrier exists or the primary insurance carrier has been declared insolvent, the retail value will be determined using the National Automobile Dealer's Association (NADA) Official Used Car Guide, based on the best information available on the Vehicle's options and condition.

   **Total Loss** means a total or constructive total loss as defined by the individual Customer's primary automobile physical damage carrier. If no primary physical damage carrier exists, then a Total Loss shall mean when the repair cost exceeds the Actual Cash Value or, in the event of a theft, when the Vehicle has not been recovered after a minimum period of 30 days from the date of the original police theft report.

   **Unpaid Net Balance** means the amount owed by the Customer to clear the outstanding Installment Sales Contract/Loan/Lease account as of Date of Loss subject to Paragraph 2(b). This amount shall not include any and all unearned and/or future interest or rental charges, finance or lease charges, late charges, delinquent payments, deferred payments, uncollected service charges, refundable prepaid taxes and fees, disposition fees, termination fees, penalty fees or any proceeds which may be recovered by canceling any insurance coverages, service contracts and/or warranties, credit life, accident and health insurance or other cancelable items.

2. **DISCLAIMERS:**

   (a) No coverage is provided for any Installment Sales Contract/Loan/Lease when the original term exceeds 84 months. Installment Sales Contracts/Loans/Leases must have uniform monthly repayment terms for the full period of the agreement with the exception of incidental differences in the first and/or last payments.

   (b) No coverage is provided for that portion of the Unpaid Net Balance that results from the amount financed/lease cap cost exceeding 150% of the Manufacturer's Suggested Retail Price (M.S.R.P.) for New Vehicles or 150% of N.A.D.A. Official Used Car Guide's "Retail" value for Used Vehicles, at the inception date of the Installment Sales Contract/Loan/Lease. These Installment Sales Contracts/Loans/Leases will not be disqualified from coverage, however, the Unpaid Net Balance will be determined based on this maximum limit.

   (c) Primary Insurance: Should the Customer not have collectible physical damage insurance on the Date of Loss, it is the responsibility of the Customer to advise Safe-Guard Products in writing immediately when the loss is discovered and Safe-Guard Products will calculate the Actual Cash Value of the Vehicle immediately prior to the loss.

   (d) This Deficiency Waiver Addendum is transferable if there is a transfer of the Vehicle. However, this Addendum is valid only while payments are due to the original Assignee lender under the original Installment Sales Contract. This Addendum terminates upon (a) refinancing the Vehicle's Installment Sales Contract with an Assignee lender who is not the original one or (b) payment in full of the original Installment Sales Contract.

   (e) This Deficiency Waiver Addendum is cancelable upon written notice to Safe-Guard Products. The effective date of such cancellation is the date such written notice is received by Safe-Guard Products. This Addendum may be canceled with full refund within sixty (60) days of the date of this Addendum. After sixty (60) days any refunds will be calculated pro-rata, unless otherwise required by applicable state law. However, in the event of Total Loss to the Covered Vehicle, this Addendum will be deemed as fully earned and no refund will be due or paid to the Customer.

   (f) This Addendum shall be void if any material fact(s) have been concealed or misrepresented, or in the case of fraud.

3. **EXCLUSIONS:**

   This Addendum does not apply to loss of or damage to the Vehicle:

   (a) Resulting directly or indirectly from fraudulent act or due to the legal confiscation of the Vehicle by a public official;

   (b) Resulting directly or indirectly from any dishonest, fraudulent or illegal act by the Customer;

   (c) Caused by a wilful, wanton or recklessly negligent act by the Customer;

   (d) That is part of a fleet that is intended for use as a public or livery conveyance, or any vehicle for commercial use;

   (e) Due to wear and tear, freezing, mechanical or electrical breakdown or failure; or

   (f) Which occurs outside the United States, its territories or Canada.

   (g) GAP Waiver does not apply when the total loss or theft is resulting directly or indirectly from forgery or any dishonest, fraudulent or criminal act by you.

4. **CLAIM REQUIREMENTS:**

   IN THE EVENT OF A CLAIM, the Customer must provide, within 90 days of the Date of Loss, to Safe-Guard Products at 3500 Piedmont Road NE, Suite 400, Atlanta, GA 30305, 800-890-7211, the following documentation before any payment under this Addendum can be processed. Failure to provide this documentation within 90 days of the Date of Loss will VOID this Addendum.

   (a) Complete documentation from the Customer's primary insurance company substantiating the date of and cause of the Total Loss of the Vehicle, gross settlement amount, deductible, the net settlement amount and proof of payment. Should the Customer not have collectible physical damage insurance on the Date of Loss, it is the Customer's responsibility to advise Safe-Guard Products in writing immediately when the Total Loss is discovered and Safe-Guard Products will calculate the Actual Cash Value of the Vehicle immediately prior to the Total Loss. The cost of the appraisal will be deducted from the amount of any claim settlement and will be payable to Safe-Guard Products from the Customer in the event no claim settlement is due.

   (b) Complete documentation from the Dealer/Assignee showing the exact Unpaid Net Balance as defined herein.

   (c) Copy of Deficiency Waiver Addendum.

   (d) Copy of Bill of Sale (Invoice) for the purchase of the Vehicle substantiating Vehicle make, model, year, options, and accessories, any cancelable items purchased, total purchase price and amount financed.

   (e) Copy of the police report (theft losses only).

   (f) Documentation showing refund amounts of any cancelable items purchased.

   PLEASE MAKE SURE all documents are totally legible, otherwise payment will be suspended until legible copies can be obtained.



### Santander
CONSUMER

P.O. BOX 961245
Fort Worth, TX 76161-1245

Date: June 14, 2011
To:  JOHNNY HINKLE JR
Fax: (304) 235-3018
From: Santander Consumer USA, Inc.

*Full Payment History*
*VIN: 9301365*

Comments:

This is an attempt to collect a debt and any information obtained will be used for that purpose. This communication is from a debt collector.

**NOTICE TO CALIFORNIA RESIDENTS**: You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligation.

**NOTICE TO MAINE RESIDENTS**: Hours of operation: 7 a.m. to 9 p.m. Central Time, Monday through Friday. Our toll free telephone number is 1.888.222.4227.

**NOTICE TO MASSACHUSETTS RESIDENTS**: Hours of operation: 7 a.m. to 9 p.m. Central Time, Monday through Friday. Our toll free telephone number is 1.888.222.4227.

**Notice of Important Rights:**You have the right to make a written or oral request that telephone calls regarding your debt not be made to you at your place of employment. Any such oral request will be valid for only ten (10) days unless you provide written confirmation of the request postmarked or delivered within seven (7) days of such request. You may terminate this request by writing to Santander Consumer USA.

**NOTICE TO BUFFALO RESIDENTS**: This collection agency is licensed by the City of Buffalo, New York License Number 556975.

**NOTICE TO NEW YORK CITY RESIDENTS**: This collection agency is licensed by the New York City Department of Consumer Affairs License Number 1343310.

**Confidentiality Notice:** The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual(s) or entity named in this document. If the reader is not the intended

recipient, he/she is hereby notified that any dissemination, distribution or copy of this facsimile is strictly prohibited.



## Santander

### CONSUMER

P.O. BOX 961245
Fort Worth, TX 76161-1245

**Account Number:** 3232653      **Primary Name:** JOHNNY HINKLE JR

| Good Through | Total Payoff | Principal | Interest | Late Fees | Misc. Fees | |
|---|---|---|---|---|---|---|
| Jun 29, 2011 | $11,983.81 | $11,626.98 | $326.83 | $30.00 | $0.00 | |

| Effective Date | Amount | Principal | Interest | Late Fees | Misc. Fees | Principal Balance |
|---|---|---|---|---|---|---|
| Jun 09, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $11,626.98 |
| Late charge assessment System Generated Transaction | | | | | | |
| May 10, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $11,626.98 |
| Late charge assessment System Generated Transaction | | | | | | |
| Apr 18, 2011 | $-376.33 | $-208.85 | $-152.48 | $0.00 | $-15.00 | $11,626.98 |
| System allocated payment Money Gram Payment 54287848 | | | | | | |
| Apr 09, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $11,835.83 |
| Late charge assessment System Generated Transaction | | | | | | |
| Mar 21, 2011 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $11,835.83 |
| One month extension Manual Extension | | | | | | |
| Mar 16, 2011 | $-425.00 | $-249.57 | $-160.43 | $0.00 | $-15.00 | $11,835.83 |
| System allocated payment IVR - ACH | | | | | | |
| Mar 16, 2011 | $-10.95 | $0.00 | $0.00 | $0.00 | $-10.95 | $12,085.40 |
| Miscellaneous fee payment IVR - ACH | | | | | | |
| Mar 16, 2011 | $10.95 | $0.00 | $0.00 | $0.00 | $10.95 | $12,085.40 |
| Miscellaneous fee asessment IVR - ACH | | | | | | |
| Mar 12, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,085.40 |
| Late charge assessment | | | | | | |

Notice of Removal
EXHIBIT F

System Generated Transaction

| Date | | | | | | Balance |
|---|---|---|---|---|---|---|
| Feb 10, 2011 | $-411.38 | $-352.68 | $-43.70 | $0.00 | $-15.00 | $12,085.40 |
| System allocated payment Drive Collector - ACH | | | | | | |
| Feb 10, 2011 | $-10.95 | $0.00 | $0.00 | $0.00 | $-10.95 | $12,438.08 |
| Miscellaneous fee payment Drive Collector - ACH | | | | | | |
| Feb 10, 2011 | $10.95 | $0.00 | $0.00 | $0.00 | $10.95 | $12,438.08 |
| Miscellaneous fee asessment Drive Collector - ACH | | | | | | |
| Feb 09, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,438.08 |
| Late charge assessment System Generated Transaction | | | | | | |
| Feb 01, 2011 | $-411.38 | $-7.25 | $-374.13 | $0.00 | $-30.00 | $12,438.08 |
| System allocated payment Drive Collector - ACH | | | | | | |
| Feb 01, 2011 | $-10.95 | $0.00 | $0.00 | $0.00 | $-10.95 | $12,445.33 |
| Miscellaneous fee payment Drive Collector - ACH | | | | | | |
| Feb 01, 2011 | $10.95 | $0.00 | $0.00 | $0.00 | $10.95 | $12,445.33 |
| Miscellaneous fee asessment Drive Collector - ACH | | | | | | |
| Jan 09, 2011 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,445.33 |
| Late charge assessment System Generated Transaction | | | | | | |
| Dec 10, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,445.33 |
| Late charge assessment System Generated Transaction | | | | | | |
| Nov 16, 2010 | $-411.38 | $-184.16 | $-197.22 | $0.00 | $-30.00 | $12,445.33 |
| System allocated payment Drive Collector - ACH | | | | | | |
| Nov 16, 2010 | $-10.95 | $0.00 | $0.00 | $0.00 | $-10.95 | $12,629.49 |
| Miscellaneous fee payment Drive Collector - ACH | | | | | | |
| Nov 16, 2010 | $10.95 | $0.00 | $0.00 | $0.00 | $10.95 | $12,629.49 |
| Miscellaneous fee asessment Drive Collector - ACH | | | | | | |
| Nov 09, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,629.49 |
| Late charge assessment System Generated Transaction | | | | | | |
| Nov 05, 2010 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,629.49 |
| One month extension | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Manual Extension | | | | | |
| Oct 10, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,629.49 |
| Late charge assessment System Generated Transaction | | | | | |
| Oct 07, 2010 | $-420.00 | $-165.23 | $-239.77 | $0.00 | $-15.00 | $12,629.49 |
| System allocated payment Money Gram Payment 62481773 | | | | | |
| Sep 07, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $12,794.72 |
| Late charge assessment System Generated Transaction | | | | | |
| Aug 20, 2010 | $-27.81 | $-27.81 | $0.00 | $0.00 | $0.00 | $12,794.72 |
| System allocated payment Converted Regular Payment | | | | | |
| Aug 20, 2010 | $-384.19 | $-302.21 | $-81.98 | $0.00 | $0.00 | $12,822.53 |
| System allocated payment Converted Regular Payment | | | | | |
| Aug 04, 2010 | $-27.19 | $-27.19 | $0.00 | $0.00 | $0.00 | $13,124.74 |
| System allocated payment Converted Regular Payment | | | | | |
| Aug 04, 2010 | $-392.81 | $-210.22 | $-182.59 | $0.00 | $0.00 | $13,151.93 |
| System allocated payment Converted Regular Payment | | | | | |
| Jun 30, 2010 | $-18.57 | $-18.57 | $0.00 | $0.00 | $0.00 | $13,362.15 |
| System allocated payment Converted Regular Payment | | | | | |
| Jun 30, 2010 | $-381.43 | $-139.46 | $-226.97 | $0.00 | $-15.00 | $13,380.72 |
| System allocated payment Converted Regular Payment | | | | | |
| Jun 07, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $13,520.18 |
| Late charge assessment Late Fee | | | | | |
| May 18, 2010 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $13,520.18 |
| System allocated payment Converted Regular Payment | | | | | |
| May 18, 2010 | $-411.38 | $-411.38 | $0.00 | $0.00 | $0.00 | $13,550.13 |
| System allocated payment Converted Regular Payment | | | | | |
| May 18, 2010 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $14,137.02 |
| Miscellaneous fee payment Converted Regular Payment | | | | | |
| May 18, 2010 | $-350.57 | $-175.51 | $-160.06 | $0.00 | $-15.00 | $13,961.51 |

| Description / Date | | | | | | Balance |
|---|---|---|---|---|---|---|
| System allocated payment Converted Regular Payment | | | | | | |
| May 18, 2010 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $14,137.02 |
| Miscellaneous fee assessment Deficiency Payments | | | | | | |
| May 10, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,137.02 |
| Late charge assessment Late Fee | | | | | | |
| Apr 19, 2010 | $-45.86 | $-45.86 | $0.00 | $0.00 | $0.00 | $14,137.02 |
| System allocated payment Converted Regular Payment | | | | | | |
| Apr 19, 2010 | $-374.14 | $-124.54 | $-234.60 | $0.00 | $-15.00 | $14,182.88 |
| System allocated payment Converted Regular Payment | | | | | | |
| Apr 07, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,307.42 |
| Late charge assessment Late Fee | | | | | | |
| Mar 08, 2010 | $-37.24 | $-37.24 | $0.00 | $0.00 | $0.00 | $14,307.42 |
| System allocated payment Converted Regular Payment | | | | | | |
| Mar 08, 2010 | $-382.76 | $-229.14 | $-153.62 | $0.00 | $0.00 | $14,344.66 |
| System allocated payment Converted Regular Payment | | | | | | |
| Feb 09, 2010 | $-28.62 | $-28.62 | $0.00 | $0.00 | $0.00 | $14,573.80 |
| System allocated payment Converted Regular Payment | | | | | | |
| Feb 09, 2010 | $-391.38 | $-41.22 | $-320.16 | $0.00 | $-30.00 | $14,602.42 |
| System allocated payment Converted Regular Payment | | | | | | |
| Feb 08, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,643.64 |
| Late charge assessment Late Fee | | | | | | |
| Jan 07, 2010 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,643.64 |
| Late charge assessment Late Fee | | | | | | |
| Dec 15, 2009 | $-20.00 | $-20.00 | $0.00 | $0.00 | $0.00 | $14,643.64 |
| System allocated payment Converted Regular Payment | | | | | | |
| Dec 15, 2009 | $-380.00 | $-327.33 | $-52.67 | $0.00 | $0.00 | $14,663.64 |
| System allocated payment Converted Regular Payment | | | | | | |
| Dec 07, 2009 | $-31.38 | $-3.42 | $-27.96 | $0.00 | $0.00 | $14,990.97 |

| Date | | | | | |
|---|---|---|---|---|---|
| System allocated payment Converted Regular Payment | | | | | |
| Dec 07, 2009 | $-368.62 | $0.00 | $-368.62 | $0.00 | $0.00 | $14,994.39 |
| System allocated payment Converted Regular Payment | | | | | |
| Nov 02, 2009 | $-42.76 | $0.00 | $-42.76 | $0.00 | $0.00 | $14,994.39 |
| System allocated payment Converted Regular Payment | | | | | |
| Nov 02, 2009 | $-369.24 | $0.00 | $-339.24 | $0.00 | $-30.00 | $14,994.39 |
| System allocated payment Converted Regular Payment | | | | | |
| Oct 08, 2009 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,994.39 |
| Late charge assessment Late Fee | | | | | |
| Aug 10, 2009 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,994.39 |
| One month extension Extension | | | | | |
| Aug 10, 2009 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,994.39 |
| One month extension Extension | | | | | |
| Aug 07, 2009 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $14,994.39 |
| Late charge assessment Late Fee | | | | | |
| Jul 27, 2009 | $-42.14 | $-42.14 | $0.00 | $0.00 | $0.00 | $14,994.39 |
| System allocated payment Converted Regular Payment | | | | | |
| Jul 27, 2009 | $-372.86 | $-342.84 | $-30.02 | $0.00 | $0.00 | $15,036.53 |
| System allocated payment Converted Regular Payment | | | | | |
| Jul 21, 2009 | $-38.52 | $-38.52 | $0.00 | $0.00 | $0.00 | $15,379.37 |
| System allocated payment Converted Regular Payment | | | | | |
| Jul 21, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $15,556.84 |
| Miscellaneous fee payment Converted Regular Payment | | | | | |
| Jul 21, 2009 | $-15.00 | $0.00 | $0.00 | $0.00 | $-15.00 | $15,556.84 |
| Miscellaneous fee payment Converted Regular Payment | | | | | |
| Jul 21, 2009 | $-351.53 | $-138.95 | $-212.58 | $0.00 | $0.00 | $15,417.89 |
| System allocated payment Converted Regular Payment | | | | | |
| Jul 10, 2009 | $15.00 | $0.00 | $0.00 | $0.00 | $15.00 | $15,556.84 |

| Date | | | | | | Balance |
|---|---|---|---|---|---|---|
| Miscellaneous fee asessment NSF | | | | | | |
| Jul 10, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $15,281.42 |
| Reversal of miscellaneous fee payment Converted Regular Payment | | | | | | |
| Jul 10, 2009 | $366.53 | $275.42 | $91.11 | $0.00 | $0.00 | $15,556.84 |
| Non-cash adjustment Non-Cash Citi | | | | | | |
| Jul 10, 2009 | $44.85 | $44.85 | $0.00 | $0.00 | $0.00 | $15,281.42 |
| Non-cash adjustment Non-Cash Citi | | | | | | |
| Jul 01, 2009 | $-44.85 | $-44.85 | $0.00 | $0.00 | $0.00 | $15,236.57 |
| System allocated payment Converted Regular Payment | | | | | | |
| Jul 01, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $15,556.84 |
| Miscellaneous fee payment Converted Regular Payment | | | | | | |
| Jul 01, 2009 | $-366.53 | $-275.42 | $-91.11 | $0.00 | $0.00 | $15,281.42 |
| System allocated payment Converted Regular Payment | | | | | | |
| Jul 01, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $15,556.84 |
| Miscellaneous fee asessment Deficiency Payments | | | | | | |
| Jun 16, 2009 | $-29.90 | $-29.90 | $0.00 | $0.00 | $0.00 | $15,556.84 |
| System allocated payment Converted Regular Payment | | | | | | |
| Jun 16, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $15,665.77 |
| Miscellaneous fee payment Converted Regular Payment | | | | | | |
| Jun 16, 2009 | $-381.48 | $-79.03 | $-287.45 | $0.00 | $-15.00 | $15,586.74 |
| System allocated payment Converted Regular Payment | | | | | | |
| Jun 16, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $15,665.77 |
| Miscellaneous fee asessment Deficiency Payments | | | | | | |
| Jun 08, 2009 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $15,665.77 |
| Late charge assessment Late Fee | | | | | | |
| Apr 30, 2009 | $-14.95 | $-14.95 | $0.00 | $0.00 | $0.00 | $15,665.77 |
| System allocated payment Converted Regular Payment | | | | | | |
| Apr 30, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $15,876.25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Apr 30, 2009 | $-381.48 | $-195.53 | $-185.95 | $0.00 | $0.00 | $15,680.72 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Apr 30, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $15,876.25 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Mar 31, 2009 | $-14.95 | $-14.95 | $0.00 | $0.00 | $0.00 | $15,876.25 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Mar 31, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,035.24 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Mar 31, 2009 | $-381.48 | $-144.04 | $-237.44 | $0.00 | $0.00 | $15,891.20 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Mar 31, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,035.24 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Feb 28, 2009 | $-14.95 | $0.00 | $-14.95 | $0.00 | $0.00 | $16,035.24 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Feb 28, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,035.24 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Feb 28, 2009 | $-336.58 | $0.00 | $-336.58 | $0.00 | $0.00 | $16,035.24 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Feb 28, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,035.24 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Jan 30, 2009 | $-59.85 | $0.00 | $-59.85 | $0.00 | $0.00 | $16,035.24 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Jan 30, 2009 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,035.24 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Jan 30, 2009 | $-351.53 | $0.00 | $-321.53 | $0.00 | $-30.00 | $16,035.24 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Jan 30, 2009 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,035.24 |

| | | | | | |
|---|---|---|---|---|---|
| Miscellaneous fee asessment Deficiency Payments | | | | | |
| Jan 07, 2009 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,035.24 |
| Late charge assessment Late Fee | | | | | |
| Nov 21, 2008 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $16,035.24 |
| One month extension Extension | | | | | |
| Nov 21, 2008 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $16,035.24 |
| One month extension Extension | | | | | |
| Nov 07, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,035.24 |
| Late charge assessment Late Fee | | | | | |
| Oct 27, 2008 | $-44.90 | $-44.90 | $0.00 | $0.00 | $0.00 | $16,035.24 |
| System allocated payment Converted Regular Payment | | | | | |
| Oct 27, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,197.64 |
| Miscellaneous fee payment Converted Regular Payment | | | | | |
| Oct 27, 2008 | $-366.48 | $-117.50 | $-233.98 | $0.00 | $-15.00 | $16,080.14 |
| System allocated payment Converted Regular Payment | | | | | |
| Oct 27, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,197.64 |
| Miscellaneous fee asessment Deficiency Payments | | | | | |
| Oct 08, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,197.64 |
| Late charge assessment Late Fee | | | | | |
| Sep 20, 2008 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $16,197.64 |
| System allocated payment Converted Regular Payment | | | | | |
| Sep 20, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,380.82 |
| Miscellaneous fee payment Converted Regular Payment | | | | | |
| Sep 20, 2008 | $-366.48 | $-153.23 | $-198.25 | $0.00 | $-15.00 | $16,227.59 |
| System allocated payment Converted Regular Payment | | | | | |
| Sep 20, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,380.82 |
| Miscellaneous fee asessment Deficiency Payments | | | | | |
| Sep 08, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,380.82 |

Late charge assessment
Late Fee

| Date | | | | | | Balance |
|------|---|---|---|---|---|---------|
| Aug 20, 2008 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $16,380.82 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Aug 20, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,536.29 |
| Miscellaneous fee payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Aug 20, 2008 | $-366.48 | $-125.52 | $-225.96 | $0.00 | $-15.00 | $16,410.77 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Aug 20, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,536.29 |
| Miscellaneous fee asessment | | | | | | |
| Deficiency Payments | | | | | | |
| Aug 07, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,536.29 |
| Late charge assessment | | | | | | |
| Late Fee | | | | | | |
| Jul 16, 2008 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $16,536.29 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jul 16, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,685.69 |
| Miscellaneous fee payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jul 16, 2008 | $-342.91 | $-119.45 | $-208.46 | $0.00 | $-15.00 | $16,566.24 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jul 16, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,685.69 |
| Miscellaneous fee asessment | | | | | | |
| Deficiency Payments | | | | | | |
| Jul 08, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,685.69 |
| Late charge assessment | | | | | | |
| Late Fee | | | | | | |
| Jun 14, 2008 | $-53.52 | $-53.52 | $0.00 | $0.00 | $0.00 | $16,685.69 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jun 14, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,905.89 |
| Miscellaneous fee payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jun 14, 2008 | $-366.48 | $-166.68 | $-184.80 | $0.00 | $-15.00 | $16,739.21 |
| System allocated payment | | | | | | |
| Converted Regular Payment | | | | | | |
| Jun 14, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,905.89 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Miscellaneous fee asessment Deficiency Payments | | | | | | |
| Jun 09, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,905.89 |
| Late charge assessment Late Fee | | | | | | |
| May 17, 2008 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $16,905.89 |
| System allocated payment Converted Regular Payment | | | | | | |
| May 17, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $16,992.20 |
| Miscellaneous fee payment Converted Regular Payment | | | | | | |
| May 17, 2008 | $-396.43 | $-56.36 | $-325.07 | $0.00 | $-15.00 | $16,935.84 |
| System allocated payment Converted Regular Payment | | | | | | |
| May 17, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $16,992.20 |
| Miscellaneous fee asessment Deficiency Payments | | | | | | |
| May 08, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $16,992.20 |
| Late charge assessment Late Fee | | | | | | |
| Mar 29, 2008 | $-44.90 | $-44.90 | $0.00 | $0.00 | $0.00 | $16,992.20 |
| System allocated payment Converted Regular Payment | | | | | | |
| Mar 29, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,121.21 |
| Miscellaneous fee payment Converted Regular Payment | | | | | | |
| Mar 29, 2008 | $-366.48 | $-84.11 | $-267.37 | $0.00 | $-15.00 | $17,037.10 |
| System allocated payment Converted Regular Payment | | | | | | |
| Mar 29, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,121.21 |
| Miscellaneous fee asessment Deficiency Payments | | | | | | |
| Mar 15, 2008 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17,121.21 |
| One month extension Extension | | | | | | |
| Mar 10, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $17,121.21 |
| Late charge assessment Late Fee | | | | | | |
| Feb 18, 2008 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $17,121.21 |
| System allocated payment Converted Regular Payment | | | | | | |
| Feb 18, 2008 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,203.48 |

Notice of Removal
EXHIBIT F

| | | | | | | |
|---|---|---|---|---|---|---|
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Feb 18, 2008 | $-396.43 | $-52.32 | $-329.11 | $0.00 | $-15.00 | $17,151.16 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Feb 18, 2008 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,203.48 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Feb 07, 2008 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $17,203.48 |
| Late charge assessment<br>Late Fee | | | | | | |
| Dec 31, 2007 | $-44.90 | $-44.90 | $0.00 | $0.00 | $0.00 | $17,203.48 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Dec 31, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,491.94 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Dec 31, 2007 | $-366.48 | $-243.56 | $-122.92 | $0.00 | $0.00 | $17,248.38 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Dec 31, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,491.94 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Dec 13, 2007 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $17,491.94 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Dec 13, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,654.03 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Dec 13, 2007 | $-381.48 | $-132.14 | $-234.34 | $0.00 | $-15.00 | $17,521.89 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Dec 13, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,654.03 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | | |
| Dec 10, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $17,654.03 |
| Late charge assessment<br>Late Fee | | | | | | |
| Nov 09, 2007 | $-14.95 | $-14.95 | $0.00 | $0.00 | $0.00 | $17,654.03 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Nov 09, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,825.60 |

| Date / Description | | | | | |
|---|---|---|---|---|---|
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | |
| Nov 09, 2007 | $-366.48 | $-156.62 | $-194.86 | $0.00 | $-15.00 | $17,668.98 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Nov 09, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,825.60 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | |
| Nov 07, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $17,825.60 |
| Late charge assessment<br>Late Fee | | | | | |
| Oct 12, 2007 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $17,825.60 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Oct 12, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $17,939.94 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | |
| Oct 12, 2007 | $-351.53 | $-84.39 | $-252.14 | $0.00 | $-15.00 | $17,855.55 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Oct 12, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $17,939.94 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | |
| Oct 08, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $17,939.94 |
| Late charge assessment<br>Late Fee | | | | | |
| Sep 06, 2007 | $-44.90 | $-44.90 | $0.00 | $0.00 | $0.00 | $17,939.94 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Sep 06, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $18,180.97 |
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | |
| Sep 06, 2007 | $-366.48 | $-196.13 | $-170.35 | $0.00 | $0.00 | $17,984.84 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Sep 06, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $18,180.97 |
| Miscellaneous fee asessment<br>Deficiency Payments | | | | | |
| Aug 13, 2007 | $-29.95 | $-29.95 | $0.00 | $0.00 | $0.00 | $18,180.97 |
| System allocated payment<br>Converted Regular Payment | | | | | |
| Aug 13, 2007 | $-14.95 | $0.00 | $0.00 | $0.00 | $-14.95 | $18,319.25 |

| Date | | | | | | |
|---|---|---|---|---|---|---|
| Miscellaneous fee payment<br>Converted Regular Payment | | | | | | |
| Aug 13, 2007 | $-380.81 | $-108.33 | $-257.48 | $0.00 | $-15.00 | $18,210.92 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Aug 13, 2007 | $14.95 | $0.00 | $0.00 | $0.00 | $14.95 | $18,319.25 |
| Miscellaneous fee assessment<br>Deficiency Payments | | | | | | |
| Aug 07, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $18,319.25 |
| Late charge assessment<br>Late Fee | | | | | | |
| Jul 09, 2007 | $-15.62 | $-15.62 | $0.00 | $0.00 | $0.00 | $18,319.25 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Jul 09, 2007 | $-411.38 | $-201.52 | $-209.86 | $0.00 | $0.00 | $18,334.87 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Jun 09, 2007 | $-411.38 | $-169.98 | $-226.40 | $0.00 | $-15.00 | $18,536.39 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Jun 07, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $18,706.37 |
| Late charge assessment<br>Late Fee | | | | | | |
| May 09, 2007 | $-411.38 | $-102.65 | $-293.73 | $0.00 | $-15.00 | $18,706.37 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| May 08, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $18,809.02 |
| Late charge assessment<br>Late Fee | | | | | | |
| Mar 31, 2007 | $-411.38 | $-94.04 | $-317.34 | $0.00 | $0.00 | $18,809.02 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Mar 07, 2007 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $18,903.06 |
| One month extension<br>Extension | | | | | | |
| Feb 16, 2007 | $-411.38 | $-92.32 | $-304.06 | $0.00 | $-15.00 | $18,903.06 |
| System allocated payment<br>Converted Regular Payment | | | | | | |
| Feb 07, 2007 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $18,995.38 |
| Late charge assessment<br>Late Fee | | | | | | |
| Jan 05, 2007 | $-15.00 | $-15.00 | $0.00 | $0.00 | $0.00 | $18,995.38 |

| | | | | | | |
|---|---|---|---|---|---|---|
| System allocated payment Converted Regular Payment | | | | | | |
| Jan 05, 2007 | $-411.38 | $-208.79 | $-202.59 | $0.00 | $0.00 | $19,010.38 |
| System allocated payment Converted Regular Payment | | | | | | |
| Dec 11, 2006 | $-411.38 | $-124.51 | $-271.87 | $0.00 | $-15.00 | $19,219.17 |
| System allocated payment Converted Regular Payment | | | | | | |
| Dec 08, 2006 | $15.00 | $0.00 | $0.00 | $15.00 | $0.00 | $19,343.68 |
| Late charge assessment Late Fee | | | | | | |
| Nov 03, 2006 | $-411.38 | $-182.68 | $-228.70 | $0.00 | $0.00 | $19,343.68 |
| System allocated payment Converted Regular Payment | | | | | | |
| Oct 04, 2006 | $-411.38 | $-165.37 | $-246.01 | $0.00 | $0.00 | $19,526.36 |
| System allocated payment Converted Regular Payment | | | | | | |
| Sep 04, 2006 | $-411.38 | $-26.47 | $-384.91 | $0.00 | $0.00 | $19,691.73 |
| System allocated payment Converted Regular Payment | | | | | | |

**Confidentiality Notice:** The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual(s) or entity named in this document. If the reader is not the intended recipient, he/she is hereby notified that any dissemination, distribution or copy of this facsimile is strictly prohibited.

Notice of Removal
EXHIBIT F



# State Farm Insurance
# Total Loss Central

## Frederick Operation Center
PO Box 957
Frederick, MD 21705-0957

## Phone: 1-888-613-3966, Team 32
## Fax: 1-888-613-3969

To: Robin

Recipients Fax # █████████████

*Settlement Statement*
*VIN. 9301365*

From: Total Loss Central

# of Pages (including cover sheet): 6

Claim #: 48-6542-906

Comments:
Market/Nada Value:         $7,400.00
Base Price/Acv:            $7,400.00
Tax **(minimum VA tax is $35):   $370.00
Title, Tag Fees:           $15.50
Deductible:                $500.00
Settlement Amount:         $7,285.50
Amount Paid toward Lien:        $7,285.50 Payoff  11,983.81
Salvage Value:             $0.00
Loss of Use:               $0.00
Amount Paid to Owner:          0.00

# Exhibit C

Notice of Removal
EXHIBIT F

N.A.D.A.  Valuation Report
PREPARED FOR:
State Farm Insurance

Summary

Claim Information

| | |
|---|---|
| Claim Number: | 48-6542-906-01 |
| Policy Number: | |
| Owner: | HINKLE ,ROBIN |
| Version #: | 1 |
| Coverage Type of Loss: | Collision |
| Loss Date: | 06/01/2011 |
| Reported Date: | |
| Valuation Report Date: | 06/11/2011 07:49:28 |
| Valuation Report ID: | 2725972 |

*Evaluation Report*

*VIN: 9301365*

Vehicle Information

| | |
|---|---|
| Loss Vehicle: | 2006 CHEVROLET MONTE CARLO LS 2D CPE 3.5L 6 Cyl FLEXIBLE A 2WD |
| VIN: | 2G1WJ15K069301365 |
| Mileage: | 150,698 miles |
| Location: | WV 256709643 |
| Exterior Color: | |
| License Plate: | NA, West Virginia |

Valuation Summary

| | |
|---|---|
| Total Retail Value: | $7,400.00 |
| Loss Vehicle Adjustments | |
| Prior Damage Adjustment: | $0.00 |
| After Market Parts Adjustment: | $0.00 |
| Refurbishment Adjustment: | $0.00 |
| Market Value: | $7,400.00 |
| Settlement Adjustments | |
| Deductible: | -$500.00 |
| Settlement Value: | $6,900.00 |

Loss Vehicle Detail

Loss Vehicle:    2006 CHEVROLET MONTE CARLO LS 2D CPE 3.5L 6 Cyl FLEXIBLE A 2WD

Standard Equipment

Exterior

Automatic Headlights With Automatic On and Dusk Sensor

Black Rocker Panels
Body Color Front and Rear Bumpers
Daytime Running Lights
Front Air Dam
Halogen Headlights
Perimeter Lighting
Rear Spoiler
Steel Wheels, 16-In. X 6.5-In.

Interior

AM/FM Radio With Seek, Scan, Speed Sensitive Volume, and 6 Speakers Total; CD
Player
Cloth Seats
Cruise Control
Dual Black Power Adjustable Folding Exterior Rearview Mirrors
Easy Entry Seat
Front Driver Power Seat Adjusts 6 Ways Total
Front Driver Side Manual Lumbar Support
Front Dual Reclining Bucket Seats With Manually Adjustable Headrests and Driver
Adjustable Seat Height
Front Dual Sunvisors
Front Dual Vanity Mirrors
Interior Pollen Air Filter
Intermittent Windshield Wipers
Manual Air Conditioning
OnStar(R) Personal Calling Hands-Free Telephone
OnStar(R) Telematics System With 12 Months Safe and Sound Service Plan Includes
Automatic Collision Notification, Concierge Services, E-Mail, Emergency
Response, Internet Services, Personal Calling, Remote Unlocking, Roadside
Assistance, Security System
OnStar(R) Vehicle Location System
OnStar(R) Virtual Advisor E-Mail Access
OnStar(R) Virtual Advisor Internet Access
Power Window Lockout
Power Windows With Driver One-Touch Down
Pre-Programmed Equalizer
Rear 60/40 Split Folding Bench Seat With Integral Headrests and Fold-Down
Center Armrest
Rear In-Glass Radio Antenna
Rear Window Defroster
Solar-Ray(R) Tinted Glass
Steering Wheel Mounted Controls For Cruise Control
Telephone Antenna
Theater Style Rear Seating

Mechanical

Front Power 303-mm X 32-mm Disc and Rear Power 278-mm X 11-mm Disc Brakes
Power Rack and Pinion Steering
Tilt Steering Column

Safety

Crash Sensor Sends GPS Signal
Driver Airbag With Dual Stage Deployment
Front and Rear 3-Point Seatbelts
Front Passenger and Rear Automatic Locking Retractors

Created Payment                                    S3539F85
Clm: 48-6542-906   Ins: HINKLE, ROBIN      Pol: 2007-560-48L        DOL: 06-01-11

     Payment no: 121886922J              Total: 7,285.50           Issued: 06-22-11
Payment status: O/S       .  .            Chgd by:                  BMAP:
  Authorized by: Harford, Dawn                                Consol pymt: N
   Entered by: Harford, Dawn             Repl no:               EFT pymt: N
   Billing ref:                          Bill amt:            Begin bill:    .   .
                                         Adj code:              End bill:    .   .
        Remarks: By accepting payment, you agree to contingency letter terms.
                 Account:  3232653

     Payee: SANTANDER CONSUMER USA INC/DRIVE FINANCIAL SER ATTN:T/L ON BEHALF OF
            ROBIN L. HINKLE & JOHNNY HINKLE
            5201 RUFE SNOW STE 400
            N RICHLAND HILS TX  76180-6036


St & TIN:    .                              COL  1 to  1 of  1

   — COL —           Amount    Pay Cd   Reporting Party              Rsn Cd
   400  COLL        7,285.50      2     Named Insured(s)

Settlement Check Info
VIN: 9301365



RECEIVED
3-25-13

## IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

**ROBIN L. HINKLE,**
      Plaintiff,

    v.                                CIVIL ACTION NO. 12-C-202

**CASEY JOE MATTHEWS, TIMOTHY
MAY** and **CONNIE MAY,** husband and
wife, **SANTANDER CONSUMER, USA,
INC.,** an Illinois corporation; **SAFE-GUARD
PRODUCTS INTERNATIONAL, LLC,** a
Georgia limited liability company; and
**JOHNNY HINKLE,**
          Defendants.

## AMENDED TIME FRAME ORDER

On March 7, 2013, the Court held a hearing in the above-styled case with undersigned counsel in attendance. During the course of the aforesaid hearing, the Court supplemented the dates contained in its Time Frame Order entered on November 26, 2012, to set a briefing schedule for dispositive motions relating to the issue of whether or not the Guaranteed Asset Protection Coverage, issued by defendant Safe-Guard Products International, LLC, constitutes "insurance" under applicable West Virginia law:

      1.     All dispositive motions with respect to the aforesaid issue shall be filed with the Court by May 3, 2013.

      2.     Responses shall be filed by May 13, 2013.

      3.     Replies shall be filed by May 17, 2013.

      4.     A hearing to address the aforesaid motion(s) shall be held on May 20, 2013, at 10:30 a.m.

1

Notice of Removal
EXHIBIT F

All other dates contained in said November 26, 2012 Time Frame Order shall remain the same.

It is **SO ORDERED** this _____ 21st day of March, 2013.

The Clerk is hereby directed to transmit certified copies of this Order to counsel of record for all parties.

_____
HON. MICHAEL THORNSBURY, CIRCUIT JUDGE

Prepared By:

_____
HOWARD M. PERSINGER, III
WV Bar ID 6943
Persinger & Persinger, L.C.
Post Office Box 1258
Williamson, WV 25661
304/235-2000 Phone
304/235-3018 Fax
      Counsel for Plaintiff Robin L. Hinkle

A COPY TESTE

Grant Pierce

CIRCUIT CLERK, MINGO COUNTY, W.VA.

Reviewed and Approved By:

Daniel J. Konrad by / HMP3 w/ permission
_____
DANIEL J. KONRAD
WV Bar ID 2088
Huddleston Bolen, LLP
Post Office Box 2185
Huntington, WV 25722-2185
      Counsel for Defendant Santander Consumer USA, Inc.

2

Notice of Removal
EXHIBIT F

_Jeffrey Van Volkenburg_ by HMP3 / w/permission
**JEFFREY D. VAN VOLKENBURG**
*WV Bar ID 10227*
McNeer, Highland, McMunn & Varner, L.C.
Post Office Box 2040
Clarksburg, WV 26302
     *Counsel for Defendant Safe-Guard Products International, LLC*


_C. William Davis_ by HMP3 / w/permission
**C. WILLIAM DAVIS**
*WV Bar ID 946*
Richardson & Davis
Post Office Box 1778
Bluefield, WV 24701
     *Counsel for Defendant Casey Joe Matthews*


_David F. Nelson_ by HMP3 / w/permission
**DAVID F. NELSON**
*WV Bar ID 5754*
Allen, Kopet & Associates, PLLC
Post Office Box 3029
Charleston, WV 25331
     *Counsel for Defendants Timothy May and Connie May*


_Todd A. Mount_ by HMP3 / w/permission
**TODD A. MOUNT**
*WV Bar ID 6939*
Shaffer & Shaffer, PLLC
Post Office Box 38
Madison, WV 25130-0038
     *Counsel for State Farm Automobile Insurance Company*


3



## IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

**ROBIN L. HINKLE,**
PLAINTIFF,

**vs.**                                                    **CIVIL ACTION NO. 12-C-202**

**CASEY JOE MATTHEWS, TIMOTHY
MAY** and **CONNIE MAY**, husband and wife,
**SANTANDER CONSUMER, USA, INC.,** an
Illinois corporation; **SAFE-GUARD PRODUCTS
INTERNATIONAL, LLC**, a Georgia limited
liability company; and **JOHNNY HINKLE,**
DEFENDANTS.

## PLAINTIFF ROBIN L. HINKLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT, PURSUANT TO *W.Va.R.Civ.P. 56(d)*, ON THE ISSUE OF WHETHER THE "GUARANTEED ASSET PROTECTION ('GAP') PLAN" SOLD BY DEFENDANT SAFE-GUARD PRODUCTS INTERNATIONAL, LLC, TO PLAINTIFF ROBIN L. <u>HINKLE CONSTITUTES INSURANCE UNDER WEST VIRGINIA LAW</u>

Now comes plaintiff Robin L. Hinkle, by undersigned counsel, Howard M. Persinger, III, and Persinger & Persinger, L.C., and moves the Court for an order granting her partial summary judgment, pursuant to *W.Va.R.Civ.P.56(d),* and holding that the Guaranteed Asset Protection Plan ("GAP") sold by defendant Safe-Guard Products International, LLC, to plaintiff Robin L. Hinkle on July 14, 2006, in conjunction with her purchase of a 2006 Chevrolet Monte Carlo, constitutes "insurance" under applicable West Virginia statutes, regulations and caselaw.

### I. BACKGROUND

This case arises out of a car crash which occurred near Varney, Mingo County, West Virginia, on U.S. Route 52 on June 1, 2011. At the aforesaid time and place, plaintiff Robin L. Hinkle was operating a 2006 Chevrolet Monte Carlo, owned by her and

her then husband, defendant Johnny Hinkle, in a northerly direction when she was struck by a Jeep Liberty operated by defendant Casey Joe Matthews and owned by defendants Timothy May and Connie May.

In her complaint, plaintiff alleges that defendant Casey Joe Matthews was intoxicated at the time of the crash and did not possess a valid driver's license when he crossed the centerline and struck plaintiff (See Complaint at P's VIII – X).   Plaintiff further alleges that defendant Matthews was operating the aforesaid Jeep Liberty with the permission of its owners, the Mays, and that prior to the wreck, Mr. May and Mr. Matthews had been drinking together. (Id.)[1]  As a result of the crash, plaintiff alleges her 2006 Chevrolet Monte Carlo was damaged to the point that it was rendered a total loss (See Complaint at P. XII).  Nonetheless, even after plaintiff's insurer, State Farm Mutual Automobile Insurance Company, paid more than Seven Thousand Dollars ($7,000.00), representing the Monte Carlo's "actual cash value" to the lienholder, defendant Santander Consumer, USA, Inc., plaintiff was left allegedly owing an additional Four Thousand Six Hundred Ninety-eight Dollars and Eighty-one Cents ($4,698.81) to Santander (See Complaint at P's XIV and XX).

In her complaint, at paragraph XVI, plaintiff alleges that she and her ex-husband purchased the totaled Monte Carlo in July 2006 and financed the same by entering into a retail installment contract and security agreement with the dealer, C&O Motors, Inc., of Saint Albans, West Virginia (the "Contract").[2]   The Contract provided for a total

---

[1] Matthews immediately fled the crash scene and later pled guilty to leaving the scene of an accident and driving on a revoked license.  On or about August 13, 2012, defendant Timothy May filed a handwritten answer in which he denied giving permission to Mr. Matthews and said that he was unaware that Mr. Matthews had possession of the Jeep Liberty because he was "passed out drunk."

[2] C&O later assigned its rights and obligations under the "Retail Security Agreement" to Citifinancial and it was then transferred to Santander.

vehicle price of Twenty Thousand Five Hundred Fifty-two Dollars and Seventy Cents ($20,552.70) with Nineteen Thousand Seven Hundred Eighteen Dollars and Twenty Cents ($19,718.20) to be financed over a period of seventy-two (72) months or six (6) years at a yearly annual percentage rate of 14.25%. The "itemization of amount financed" shows a payment of Four Hundred Ninety-five Dollars ($495.00) to "Safe-Gap" (See **Exhibit A**). The "deal sheet" from C&O Motors, Inc. memorializing the transaction, similarly reflects that plaintiff and her husband were assessed a charge of $495 for "GAP" in conjunction with the purchase, and further shows that the salesman who handled the sale was Paul L. Waugh (See **Exhibit B**).

As is set forth in the affidavit attached hereto as **Exhibit C**, during the course of the transaction, Mr. Waugh, asked the Hinkles if they wanted to purchase "GAP Insurance." According to the affidavit, Mr. Waugh explained to the Hinkles that their payment of Four Hundred Ninety-five Dollars ($495) would protect them in the event the car was ever "totaled" and they owed more than its actual value under the Contract (See **Exhibit C**). The Hinkles accepted Waugh's offer and executed a so-called "GAP Contract" with defendant Safe-Guard Products International, LLC, a copy of which is attached hereto as **Exhibit D**.

Otherwise known as a Guaranteed Asset Protection Plan or "deficiency waiver addendum," the basic terms of the aforesaid GAP contract, which are consistent with what Mr. Waugh told the Hinkles, are conspicuously stated in large print on the front page of the document under the heading "Coverage":

> Due to this addendum being in effect, the dealer assignee agrees to cancel a portion of the customer's indebtedness in the event of a total loss of the vehicle as defined herein.   The deficiency waiver addendum will

<u>waive the amount equal to the unpaid net balance less the actual cash</u>
<u>value of the vehicle both as defined herein</u>. . .

(emphasis added).  On page 2 of the GAP, and in much smaller and less conspicuous print, are various definitions including that of "unpaid net balance" which is quoted on pages 3 and 4 of the Motion to Dismiss filed by defendant Safe-Guard.

Following the crash, when plaintiff determined that she owed more to the lienholder than the actual cash value of the Monte Carlo, she attempted to invoke coverage under the GAP Insurance Policy.  In response to her request, she received the letter attached to defendant Safe-Guard's Motion to Dismiss as Exhibit E. The letter indicates that following the crash, the amounts due under the Contract were suddenly "re-amortized," resulting in a "negative gap" and thereby negating "coverage" under the GAP, but still leaving plaintiff and defendant Hinkle personally liable for the Four Thousand Six Hundred Ninety-eight Dollar and Eighty-one Cent ($4,698.81) gap.

Plaintiff instituted the present action against defendants Safe-Guard and Santander to hold them to the terms of the GAP.  Count II of the complaint states claims against Safe-Guard and Santander for breach of contract, common law bad faith, unfair trade practices under *W.Va. Code 33–11–1, et seq.,* and punitive damages and asks for declaratory judgment enforcing the language of the GAP Insurance Policy.

On September 28, 2012, defendant Safe-Guard filed a Motion to Dismiss and Answer to the plaintiff's complaint.  In a footnote on page 3 of its Motion to Dismiss, Safe-Guard asserted that the GAP plan which it sold to plaintiff, also known as a "Total Loss Protection Plan," is merely a debt cancellation agreement and therefore does not constitute insurance. Safe-Guard cited no legal authorities in support of this proposition. At the request of plaintiff, at a hearing on March 7, 2013, the Court set a special briefing

4

schedule for determination of the preliminary issue of whether or not the GAP constitutes "insurance" under West Virginia law.

On April 23, 2012, plaintiff took the deposition of Gary Volino, Chief Operating Officer of Safe-Guard Products International, LLC, who was chosen by Safe-Guard as its 30(b)(7) representative and deponent (See Rough Transcript of Gary Volino Deposition, attached hereto as *Exhibit E,* at p. 8).  When asked to describe the GAP plan sold to the Hinkles, Mr. Volino testified that it was one (1) of the twelve (12) products marketed by Safe-Guard, and the only product which purported to waive or otherwise satisfy an outstanding loan balance on a vehicle following its destruction after the same has been declared a total loss (See *Exhibit E* at pp. 82-84).  Mr. Volino further testified that GAP is basically a four way agreement between the customer, the lender, who effectively agrees to waive the loan balance, Safe-Guard, who markets and then administers the agreements, and finally a separate insurer/indemnitor, in this case, National Specialty Company, of Texas, who, by separate agreement, indemnifies the lender in the event that a claim is approved (See *Exhibit E* at pp. 43-49).

Safe-Guard markets its products directly to auto dealers, whose salespeople (in this case, Mr. Waugh) function as Safe-Guard's sales force (See *Exhibit E* at pp.19-20, 51-52).  Volino admitted that prior to the sale, no employee of Safe-Guard has any contact with the customer, and that it is instead the dealer's sales person who offers, explains and closes the sale of the GAP plan, much like a traditional insurance agent (See *Exhibit E,* at pp. 78-80).  As such, Volino admits that Safe-Guard has no way of knowing what, if anything, plaintiff or any other customer was or is told by the sales person at the point of sale about the plan or the way it works (See *Exhibit E* at pp.33-

35). He also admitted, as he must, that it is reasonable for customers to rely upon what they are told by the salespeople/agents (See *Exhibit E* at pp. 78-79).

As Mr. Volino explained, the dealer generally also functions as the initial lender at the point of sale (See *Exhibit E* at pp. 33-34, 77-79). Later, once the initial loan package is sent from the dealer to a secondary lender, that lender reviews the terms and adjusts its own rates to reflect the inclusion or non-inclusion of a GAP Agreement (See *Exhibit E* at pp. 44-46).  Importantly, Mr. Volino further testified that under the terms of the GAP, in the event that a loan balance is forgiven pursuant to a GAP contract, the lender is then reimbursed or indemnified by the fourth-party insurance company, in this case, National Specialty Company. *Id.*

Although Mr. Volino denied strenuously that the GAP Product constituted insurance, he could assert no reasoning for his position beyond the opinion offered to him from Mr. Damon Weiner, Safe-Guard's General Counsel (See *Exhibit E* at pp. 127-132).  Moreover, he admitted that at least three (3) states, Montana, Nevada and Oregon, considered the product to be insurance and regulated it as such.  Id.

## II.     STANDARD FOR PARTIAL SUMMARY JUDGMENT

*W.Va. R.Civ.P.56(d)* provides, in relevant part:

> *(d) Case not fully adjudicated on motion.* - If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy . . .

*Id.*

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party. *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329, syl. pt. 2 (1995).  If the moving party makes a properly supported motion for summary judgment, and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary and will be beneficial, as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.  *McGraw v. St. Joseph's Hosp.*, 200 W.Va. 114, 488 S.E.2d 389 (1997) (citing *Williams, supra* at syl. pt. 3).

## III.   ARGUMENT

Insurance is defined in *West Virginia Code §33-1-1* as:

> a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies.

*Id.* The West Virginia Supreme Court of Appeals has further held that "insurance policies are generally issued by third-parties and are based on a theory of distributing risk among many customers." *See Riffe v. Home Finders Association, Inc.* 205 W.Va. 216, 517 S.E.2d 313, 318 (1999) ("*Griffin Systems, Inc. v. Washburn*, 153 Ill.App.3d 113, 505 N.E.2d 1121, 1124, (Ill.App.Ct.1987).  Although the West Virginia Supreme Court of Appeals has never directly considered the issue of whether a so-called "debt cancellation contract" is or is not a contract of insurance, both Federal District and State Circuit Courts have considered this question.  In *Justice v. Branch Banking and Trust*

7

Notice of Removal
EXHIBIT F

*Company, 2009 WL853993* (U.S.D.W.Va. 2009) (copy attached), District Judge

Copenhaver ruled that debt-cancellation or so-called "payment protection contracts"

may indeed constitute insurance under rules promulgated by the West Virginia

Insurance Commission, and further held that the "tribunals best suited to resolve this

question of state law are the state courts of West Virginia." *Id. at pp. 11-12.*

In reaching this conclusion, Judge Copenhaver noted that in some states:

> "over a dozen in fact including New York, take the position that so-
> called debt cancellation agreements are to be regulated as
> insurance."

*Id., at p. 10. (*citing James M. Cain, *Financial Institution Insurance Activities – Time for a*

*GLB Act Upgrade?*, 58 Bus.Law. 1339, 1345 (2003); 1 Lee R. Russ and Thomas F.

Segalla, *Couch on Insurance* § 1:23 (3d.Ed. 2008) ("An undertaking on the part of one

selling merchandise on the installment plan to cancel the debt in case buyer dies before

the installations are paid constitutes insurance as to an agreement to cancel the

balance due on a loan in the event of a death or disability of the borrower."); *Douglas v.*

*Dynamic Enterprises, Inc.* 315 Ark. 575, 869 S.W.2d 14, 15 (Ark. 1994) (the Supreme

Court of Arkansas determined that a debt cancellation contract extinguishing the

outstanding debt on a vehicle purchased and financed through the defendant if the

defendant is wrecked and totaled or stolen through no fault or negligence of the

purchaser to be a contract of insurance based on the fact that the defendant was

motivated by profit.*"); LUC Leasing Corp. v. Muhl,* 659 N.Y.Supp.2d 422 (N.Y.Sup.CT.

1997) ("it has long been the consistent position of this department that a debt

cancellation contract generally which the debt cancellation is dependent upon the

happening of a fortuitous event constitutes the doing of an insurance business in this state.").

In his analysis, Judge Cophenhaver, further cited a January 8, 2008 letter from the West Virginia Office of the Insurance Commissioner which provided in pertinent part,

> The office of the Insurance Commissioner Enforcement position that debt waiver/cancellation contracts are not considered insurance if they are issued by the creditor/lender and if the following factors are met: 1) the borrower (retail customer) is not required to enter into the debt cancellation contract; 2) the contracts are incidental to the lenders financially related services and are not a profit center; 3) the debt cancellation contract provides only for waiver of loan balance or debt for no other benefits to the borrower; 4) the lenders fee for the contract does not vary with the borrower's age, health or other underwriting standards; and 5) the lender neither states nor implies that the contract is insurance.

*Dalton, supra, at p. 10-11.*

In an opinion entered on June 1, 2009, in the case of *Dixon v. Branch Banking & Trust Company,* CA No. 07-C-0626 (Circuit Court of Mercer County, W.Va., June 2, 2009), the Honorable Derek C. Swope, Circuit Judge in Mercer County, West Virginia, followed in Judge Copenhaver's footsteps, analyzing the appropriate procedure for determining whether a particular debt cancellation product qualifies as insurance under *W.Va. Code §33-3-1* (copy attached). Citing both *W.Va. Code §§ 33-2-10(a) and 46A-3-109(c),* the Court found that although the Office of the Insurance Commissioner has both general and specific authority to promulgate regulations in regard to insurance products, the Commissioner had not used this power to provide a formal statutory/regulatory procedure for determining the difference between insurance

contracts and debt cancellation agreements.[3]  Accordingly, the Court also looked to the

five factor test previously cited in *Justice, supra.*, specifically holding that since there

was no definitive statutory/regulatory scheme,

> giving guidance for a claimant to pursue an administrative remedy . . . it
> is therefore left to the Trial Courts of West Virginia to determine whether
> the debt cancellation is insurance in accordance with the guidance given
> [by the five factors].

*Id.* at p. 11.

Three months later, in September 2009, the Office of the Insurance

Commissioner issued West Virginia Informational Letter No. 171 in which it attempts to

> provide practical and useful guidance to the insurance industry and to the
> public at large" distinguishing between "debt cancellation contracts/debt
> suspension agreements.

(copy attached hereto).

The informational letter goes on to provide

> the OIC does not consider debt cancellation contracts or debt suspension
> agreements to be insurance products because the contracts neither
> require the lender to indemnify another nor require a payment on a
> determinable contingency, in other words, the contracts do not require the
> lender to reimburse or make a payment to the borrower as a result of the
> occurrence of a certain event.  The contracts also do not require a third-
> party to reimburse the lender for its loss as a result of the borrower's
> failure to repay the loan after a certain event occurs.  Instead, the contract
> simply requires the lender to cancel or waive the borrower's debt upon the
> happening of a specified event.  In order to fall outside of the OIC
> regulation the cancellation or waiver of the debt must be directly provided
> by the lender.  **A contract at which a third-party is obligated to
> indemnify the lender as a result of a specified event causes the
> lender to not be repaid by the borrower is not a debt cancellation
> contract or debt suspension agreement.  This type of contract is an**

---

[3] In support of its conclusion, the Court also further cited *W.Va.CSR §106-11-6.3*, Banking
Regulation which states

> the commissioner of insurance retains the authority to determine whether any
> debt cancellation agreement constitutes insurance product.

The Court concluded that this was the only regulation present in the code of state regulations that
mentioned "debt cancellation agreements."

**insurance transaction and is subject to the insurance laws of the State of West Virginia.**   A third-party includes but is not limited to a subsidiary or an affiliated company of the lender.

*Id*. (emphasis added). Thus Informational Letter No. 171 added an additional factor: that in order to be considered a "debt cancellation" product as opposed to "insurance," the product at issue may not provide for indemnification or cash payments to the lender or purchaser in the event a debt is cancelled under its terms.

As set forth below, when the six factors that have been set out by the West Virginia Insurance Commission, and adopted by the Federal District and State Circuit Courts cited above are applied to the GAP plan which was sold to plaintiff, it becomes crystal clear that this plan is indeed "insurance" within the meaning of West Virginia law.

Although the customer is not required to enter into the GAP Agreement, from Mr. Volino's deposition testimony, it is clear that the GAP product is not incidental to any financial services provided by a lender. Indeed Volino freely admits that Safe-Guard is not in the business of making loans nor is it exclusively affiliated with or owned by a lender (See *Exhibit E* at pp. 20-21, 40-45).   Moreover, it is also undisputed that the GAP product is a stand alone profit center for not only Safe-Guard, but also the dealer, a third party agent who helps Safe-Guard market its products to dealers, and the fourth-party insurer, in this case National Specialty Company.  On pages 51 and 52 of his deposition, Mr. Volino testified that out of the Four Hundred Ninety-five Dollars ($495) charged to the Hinkles for the product approximately One Hundred Seventy-five Dollars ($175) would have been retained by Safe-Guard with all but about $7-$20 being forwarded to the insurer National Specialty Company.  He further testified that the remaining Two Hundred Seventy-five Dollars ($275) was paid out to the dealer and/or

the independent sales representative, in this case Roger Childers who marketed the Safe-Guard products to the dealer for sale (See *Exhibit E* at pp. 51-54, 105-107). Clearly, unlike the situation cited in both *Justice, supra,* and *Dixon, supra,* where an actual lender, in those cases, Branch Banking and Trust Corporation, offered its "debt cancellation policy" as an incidental, non-profit producing service in conjunction with a loan that it also made to the customer, the GAP product is a stand alone product and profit center for multiple entities, including defendant Safe-Guard Products International, LLC.

Additionally, Safe-Guard's GAP product offers benefits in addition to straight loan waiver.  As set forth in an internal document entitled "Frequently Asked Questions," which Safe-Guard provided to its employees for training purposes (attached hereto as *Exhibit F*) and later confirmed by Mr. Volino on pages 125-126 of his deposition, in addition to the waiver of the loan balance by the third-party lender, the GAP provides an option for the benefit of direct payment to the customer by Safe-Guard itself in situations where the loan balance is paid off (See *Exhibit E* at pp. 125-126).  Moreover, the indemnity payment to the lender by the fourth-party insurance company resulting from an approved claim would also qualify as a product benefit over and above the basic waiver of loan balance.  While Mr. Volino testified in his deposition that the GAP Agreement did not vary with the borrower's age, he also testified that the aforesaid rate does vary with the length of the loan relative to the car being financed (See *Exhibit E* at pp. 100-101).  This is analogous to underwriting an insurance policy based upon the age of the insured in that it takes into account the fact that the longer the term the more risk is incurred by the insurer/indemnitor. *Id.*

12

As set forth above, there are also several instances in this case alone where Safe-Guard and/or its agent, Paul L. Waugh, referred directly to this product as insurance.  The deal sheet attached hereto as *Exhibit B* clearly refers to the product as insurance which confirms the statement in the Hinkle Affidavit attached hereto as *Exhibit C*.  Moreover, in the document attached hereto as *Exhibit F,* the frequently asked questions document, Safe-Guard refers to the product again as insurance, and Mr. Volino, as set forth above, freely admits that in at least three (3) states it is currently classified as insurance (See *Exhibit E* at pp. 127-132).  As per plaintiff's affidavit this assertion was explicitly relied upon by plaintiff in purchasing the product (See *Exhibit C*).  Finally, the testimony of Mr. Volino cited above, clearly establishes that opposed to a classic debt cancellation or balance waiver product, this is an "indemnity" based product which is underwritten and funded by a third-party insurance company that agrees to provide a cash benefit to either the lender or directly to the purchaser in the case of an approved claim (See *Exhibit E* at pp. 44-46).

As such, it is simply beyond all argument that this product, the GAP Plan sold to Ms. Hinkle in 2006 does constitute insurance under the current factors that have been provided by the Office of the West Virginia Insurance Commissioner to distinguish between insurance and debt cancellation plans.

### IV. CONCLUSION

For all the reasons set forth above, plaintiff respectfully requests the Court enter an Order granting it Partial Summary Judgment in accordance with *W.Va.R.Civ.P.56(d)*

in declaring that the GAP at issue in this case does constitute insurance within the

statutes, regulations and case law of West Virginia.

                                        **ROBIN L. HINKLE,**
                                        By Counsel,


**HOWARD M. PERSINGER, III**
*W. Va. State Bar ID# 6943*
Persinger & Persinger, L.C.
101 Dickenson Street
Williamson, W.V 25661
(304) 235-2000 phone
(304) 235-3018 fax
Hmp3@persingerlaw.com

Notice of Removal
EXHIBIT F

| RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT | Seller | Buyer |
|---|---|---|
| No.<br>Date 07/14/2006 | C & O MOTORS, INC.<br>202 5TH STREET<br>ST. ALBANS WV 25177<br>"We" and "us" mean the Seller above, its successors and assigns. | JOHNNY L HINKLE<br>ROBIN L HINKLE<br>RT 3 BOX 435<br>DELBARTON WV 25670<br>"You" and "your" mean each Buyer above, and guarantor, jointly and individually. |

**SALE:** You agree to purchase from us, on a time basis, subject to the terms and conditions of this contract and security agreement (Contract), the Motor Vehicle (Vehicle) and services described below. The Vehicle is sold in its present condition, together with the usual accessories and attachments.

| Description of Motor Vehicle Purchased | Year 2006 | VIN 2G1WJ15K069301365 | Other: |
|---|---|---|---|
| | Make CHEVROLET | Lic. No./Year | |
| | Model MONTE CARLO | ☒New ☐ Used<br>☐ Rebuilt ☐ Demonstrator | |

Description of Trade-In   TR1: 2003 PONTIAC GRAND PRIX 1G2WK52J63F160753

**SECURITY:** To secure your payment and performance under the terms of this Contract, you give us a security interest in the Vehicle, all attachments, accessories, and equipment placed in or on the Vehicle, together called Property, and proceeds of the Property.

**PROMISE TO PAY AND PAYMENT TERMS:** You promise to pay us the principal amount of $ ___19718.20___ , plus sales finance charges accruing on the unpaid balance at the rate of ___14.25__ % per year from today's date until paid in full. Sales finance charges accrue on a ___365___ day basis. You agree to pay this Contract according to the payment schedule and late charge provisions shown in the TRUTH IN LENDING DISCLOSURES. You also agree to pay any additional amounts according to the terms and conditions of this Contract.

☐ **THIS CONTRACT IS NOT PAYABLE IN INSTALLMENTS OF EQUAL AMOUNTS:**
☐ **AN INSTALLMENT OF $ _____ WILL BE DUE ON _____ .**
☐ **LARGER INSTALLMENTS WILL BE DUE AS FOLLOWS:** _____

☐ **MINIMUM SALES FINANCE CHARGE:** You agree to pay a minimum sales finance charge of $ _____N/A_____ if you pay this Contract in full before we have earned that much in sales finance charges.

**DOWN PAYMENT:** You also agree to pay, or apply to the Cash Price, on or before today's date, any cash, rebate and net trade-in value described in the ITEMIZATION OF AMOUNT FINANCED. ☐ You agree to make deferred payments as part of the cash down payment as reflected in your Payment Schedule.

## TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid when you have made all scheduled payments. | TOTAL SALE PRICE<br>The total cost of your purchase on credit, including your down payment of $ 1400.00 |
|---|---|---|---|---|
| 14.25 % | $ 9901.16 | $ 19718.20 | $ 29619.36 | $ 31019.36 |

**Payment Schedule:** Your payment schedule will be

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | 411.38 | MONTHLY BEGINNING: 08/28/2006 |

**Security:** You are giving a security interest in the Motor Vehicle purchased.

**Late Charge:** If a payment is more than 10 days late, you will be charged a late charge in the amount of 5% of the payment due, not to exceed $15.

**Prepayment:** If you pay off this Contract early, you ☐ may ☒ will not have to pay a Minimum Sales Finance Charge.

**Contract Provisions:** You can see the terms of this Contract for any additional information about nonpayment, default, any required repayment before the scheduled date, and prepayment refunds and penalties.

EXHIBIT
A
tabbies

VIN: 9301365

Notice of Removal
EXHIBIT F

**CREDIT INSURANCE:** Credit life, credit disability (accident and health), and any other insurance coverage quoted below, are not required to obtain credit and we will not provide them unless you sign and agree to pay the additional premium. If you want such insurance, we will obtain it for you (if you qualify for coverage). We are quoting below ONLY the coverages you have chosen to purchase.

**Credit Life:** Insured
☐ Single ☐ Joint  Prem. $ _____N/A_____  Term _____N/A_____

**Credit Disability:** Insured
☐ Single ☐ Joint  Prem. $ _____N/A_____  Term _____N/A_____

Your signature below means you want (only) the insurance coverage(s) quoted above. If none are quoted, you have declined any coverages we offered.

Buyer _____ d/o/b __ Buyer _____ d/o/b

**PROPERTY INSURANCE:** You must insure the Property securing this Contract. You may purchase or provide the insurance through any insurance company reasonably acceptable to us. The collision coverage deductible may not exceed $ _____N/A_____ . If you get insurance from or through us you will pay $ _____ for _____ _____ of coverage.

This premium is calculated as follows:
☐ $ _____N/A_____ Deductible, Collision Coverage $ _____N/A_____
☐ $ _____ Deductible, Comprehensive Cov. $ _____N/A_____
☒ Fire, Theft and Combined Additional Coverage $ _____N/A_____
☐ _____ $ _____N/A_____

Liability insurance coverage for bodily injury and motor vehicle damage caused to others is not included in this Contract unless checked and indicated.

☐ **SINGLE-INTEREST INSURANCE:** You must purchase single-interest insurance as part of this sale transaction. You may purchase the coverage from a company of your choice, reasonably acceptable to us. If you buy the coverage from or through us, you will pay $ _____N/A_____ for _____ of coverage.

☐ **SERVICE CONTRACT:** With your purchase of the Vehicle, you ___ agree to purchase a Service Contract to cover _____

_____N/A_____ . This Service Contract will be in effect for _____

**ASSIGNMENT:** This Contract and Security Agreement is assigned to _____ (800)633-0413 _____ , the Assignee, phone _____ . This assignment is made
☐ under the terms of a separate agreement. ☐ under the terms of the ASSIGNMENT BY SELLER on page 2. ☐ This assignment is made with recourse.
Seller: By _____ Date __07/14/2006__

**WEST VIRGINIA** RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT
Express © 1995, 1996 Bankers Systems, Inc., St. Cloud, MN  Form RISIMVLF-WV  2/25/2004

## ITEMIZATION OF AMOUNT FINANCED

| | | | |
|---|---|---|---|
| Vehicle Price (incl. sales tax of $ _652.70_ ) | $ | 20552.70 |
| Service Contract, Paid to: _N/A_ | $ | N/A |
| | **Cash Price** | $ | 20552.70 |
| Manufacturer's Rebate | $ 2000.00 | | |
| Cash Down Payment | $ 500.00 | | |
| Deferred Down Payment | $ N/A | | |
| a. Total Cash/Rebate Down | | $ | 2500.00 |
| b. Trade-In Allowance | $ 7500.00 | | |
| c. Less: Amount owing | $ 8600.00 | | |
| Paid to (includes f.): TOYOTA MOTOR CREDIT | | |
| which will be paid by C & O MOTORS, INC. | | |
| d. Net Trade-In (b. minus c.) | $ -1100.00 | |
| e. Net Cash/Trade-In (a. plus d.) | | $ | 1400.00 |
| f. Amount to Finance line e. (if. e. is negative) | | $ | N/A |
| **Down Payment** (e.; disclose as $0 if negative) | | $ | 1400.00 |
| Unpaid Balance of Cash Price | | $ | 19152.70 |
| Paid to Public Officials - Filing Fees | | $ | 20.50 |
| Insurance Premiums* | | $ | N/A |
| To: DOCUMENTARY FEE | | $ | 50.00 |
| To: SAFE GAP | | $ | 495.00 |
| To: N/A | | $ | N/A |
| To: N/A | | $ | N/A |
| **Total Other Charges/Amounts Pd. to Others** | | $ | 565.50 |
| Less: Prepaid Finance Charges | | $ | N/A |
| **Amount Financed** | | $ | 19718.20 |

*We may retain or receive a portion of this amount.

## NOTICE TO BUYER
**(1)** Do not sign this agreement before you read it or if it contains any blank spaces. **(2)** You are entitled to a completely filled-in copy of this agreement. **(3)** Under the law, you have the right to pay off in advance the full amount due and under certain conditions to obtain a partial refund of the finance charge.

**BY SIGNING BELOW BUYER AGREES TO THE TERMS ON PAGES 1 AND 2 OF THIS CONTRACT AND ACKNOWLEDGES RECEIPT OF A COPY OF THIS CONTRACT.**

The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this Contract and retain its right to receive a part of the Finance Charge.

Buyer: _Johnny L. Hinkle_ _____ __07/14/2006__
Signature  JOHNNY L. HINKLE _____ Date

Buyer: _Robin L. Hinkle_ _____ __07/14/2006__
Signature  ROBIN L. HINKLE _____ Date

Seller: By _____

*(page 1 of 2)*
MOTOR VEHICLE – NOT FOR MANUFACTURED HOMES

VIN: 9301365

Notice of Removal
EXHIBIT F

# C & O MOTORS, INC.

DEAL NUMBER 74525

202 Fifth Street    P.O. Box 111
St. Albans, West Virginia 25177
Telephone (304) 727-2921

DATE 07/14/06

PURCHASER'S NAME JOHNNY L HINKLE OR ROBIN L HINKLE

STREET ADDRESS RT 3 BOX 435

CITY DELBARTON    STATE WV    ZIP 25670

RES. PHONE (304)475-3108    BUS. PHONE

## PLEASE ENTER MY ORDER FOR THE FOLLOWING

[X] NEW or [ ] USED — [X] CAR or [ ] TRUCK

| YEAR 2006 | MAKE CHEVROLET | MODEL MONTE CARLO LS COUPE | TYPE |
|---|---|---|---|

COLOR/TRIM DARK SILVER MET

SERIAL NO. 2G1WJ15KO69301365

STOCK NO. CF1789

SALESMAN PAUL L WAUGH

TO BE DELIVERED ON OR ABOUT JUL 14 2006

MILEAGE 36

### DESCRIPTION OF TRADE IN

| YEAR 2003 | MAKE PONTIAC | MODEL GRAND PRIX |
|---|---|---|

TYPE

SERIAL NO. 1G2WK52J63F160753

COLOR WHITE

TRIM

TITLE NO. BC74712

MILEAGE 76070

LIC. # 6HJ288

PAYOFF INFORMATION ON TRADE IN:

BALANCE OWED TO: TOYOTA MOTOR CREDIT CORP.

ADDRESS: 260 INTERSTATE N.CIR. N.W. 12T ATLANTA GA 30339-2111

GOOD UNTIL: 07/14/06    CONTACT:

BUYER HAS OBTAINED REQUIRED INSURANCE COVERAGE FROM:

AGENT LOUIE OLIVE    PHONE (304)235-1990

ADDRESS

COMPANY STATE FARM    EFF. DATE 02/14/06

POL. NO. 200 7560 B14 48G    EXP. DATE 08/14/06

### WARRANTY INFORMATION:

[ ] VEHICLE MANUFACTURER'S WARRANTY (OR BALANCE THEREOF), ISSUED SEPARATELY, SHALL APPLY.

[ ] A DISCOUNT OF ____ % FROM RETAIL PRICE OF PARTS AND ____ % OF LABOR IN OUR SHOP SHALL APPLY FOR _____ DAYS.

[ ] IMPLIED WARRANTIES ONLY.

IF VEHICLE PURCHASED IS A USED VEHICLE, THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

DEALER MAKES NO EXPRESSED WARRANTIES ON THIS VEHICLE EXCEPT THOSE SET FORTH WITHIN.

I ACKNOWLEDGE THE TERMS AND CONDITIONS SET FORTH ON THE BUYERS GUIDE.

PURCHASER'S SIGNATURE X

### Right side / pricing:

TRADING FOR CLEAR TITLE
TO 2003 PONTIAC
DIFFERENCE OF 12400.00

Loan Agreement
VIN: 9301365

| Item | Amount |
|---|---|
| CASH PRICE OF CAR | 19900.00 |
| RUSTPROOFING | |
| PAINT SEALANT | |
| DOCUMENTARY FEE | 50.00 |
| CASH PRICE | 19950.00 |
| TAX | 649.70 |
| TAX ON DOC. FEE | 23.50 |
| 1. TOTAL CASH PRICE DELIVERED | 20623.20 |
| 2. CASH DOWN PAYMENT — DEPOSIT ON ORDER | 500.00 |
| CASH ON DELIVERY | 2000.00 |
| 3. TRADE IN | 7500.00 |
| LESS BALANCE OWED | 8600.00 |
| 4. TOTAL DOWN PAYMENT (2 + 3) | 1400.00 |
| 5. UNPAID BALANCE OF CASH PRICE (1 – 4) | 19223.20 |
| 6. OTHER CHARGES — SERVICE AGREEMENT | N/A |
| GAP INSURANCE | 495.00 |
| 7. UNPAID BALANCE ( AMOUNT FINANCED ) (5 + 6) | 19718.20 |

LICENSE   TEMP   LIEN   TITLE   TRANS.   INS.

DEALER DOES NOT LOAN CARS. SUBSTITUTE VEHICLE COVERAGE IS INCLUDED IN EXTENDED SERVICE PLAN. EXTENDED SERVICE COVERAGE HAS BEEN EXPLAINED TO ME.

PURCHASER'S SIGNATURE

Purchaser agrees that this Order includes all of the terms and conditions on both the face and reverse side hereof, that this Order cancels and supersedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject matters covered thereby, and that THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE AND IN THE EVENT OF A TIME SALE, DEALER SHALL NOT BE OBLIGATED TO SELL UNTIL APPROVAL OF THE TERMS HEREOF IS GIVEN BY A BANK OR FINANCE COMPANY WILLING TO PURCHASE A RETAIL INSTALLMENT CONTRACT BETWEEN THE PARTIES HERETO BASED ON SUCH TERMS. Purchaser by his execution of this Order certifies that purchaser is of legal age to execute a binding contract in this state and hereby acknowledges the reading of the terms and conditions of this Order.

X _____    07/14/06

PURCHASER'S SIGNATURE    DATE

ACCEPTED BY: _____

DEALER OR HIS AUTHORIZED REPRESENTATIVE

C & O 100

EXHIBIT B

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

ROBIN L. HINKLE,

        PLAINTIFF,

vs.                                   CIVIL ACTION NO. 12-C-202

CASEY JOE MATTHEWS, TIMOTHY
MAY and CONNIE MAY, husband and wife,
SANTANDER CONSUMER, USA, INC., an
Illinois corporation; SAFE-GUARD PRODUCTS
INTERNATIONAL, LLC, a Georgia limited
liability company; and JOHNNY HINKLE

        DEFENDANTS.

---------------------------------------------

**AFFIDAVIT OF PLAINTIFF ROBIN L. HINKLE
AND DEFENDANT JOHNNY L. HINKLE**

---------------------------------------------

STATE OF WEST VIRGINIA,
COUNTY OF MINGO, TO-WIT:

    This day personally appeared before me, the undersigned notary public in

and for the county and state aforesaid, **ROBIN L. HINKLE** and **JOHNNY L. HINKLE**,

who, after first being duly sworn, depose and say as follows:

    1.      On July 14, 2006, we purchased a 2006 Monte Carlo from C&O Motors,

Inc., in Saint Albans, West Virginia, from a salesman named, Paul L. Waugh.

    2.      During the course of the purchase, we were asked if we wanted to

purchase "Gap Insurance" for an extra $495.00, in order to cover payment of any

amount owed on the car if it was ever totaled and more was owed for the car than the

value of the car.



EXHIBIT
C

3.      Since we had been in the same position several years earlier and we had to pay the difference, because we didn't have gap insurance, we readily opted to pay the extra for said coverage.

4.      Mr. Waugh told us that he could get us this coverage and we assumed he was working for both the car dealership and the insurance company like an agent. Several times during our conversation, Mr. Waugh referred to this coverage as "insurance."

5.      We were led to believe that we were purchasing an insurance policy that would protect us from continuing to owe any outstanding balance still owed on the loan after a total loss, whatever the circumstances.

6.      Neither Mr. Waugh, nor anyone else, ever explained to us that outstanding balances resulting from certain types of events, like late charges could be "re-amortized" and would not be covered by the insurance we were purchasing.

And further affiants saith naught.

_____
(Robin L. Hinkle, Affiant)

_____
(Johnny L. Hinkle, Affiant)

Taken, subscribed and sworn to before the undersigned Notary Public on this the 16th day of October, 2012.

My Commission expires: _____April 10, 2015_____

_____
(Notary Public)

(NOTARIAL SEAL)
OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PAUL E. PINSON
P. O. BOX 440
WILLIAMSON, WV 25661
My commission expires April 10, 2015

Notice of Removal
EXHIBIT F



SA (00 10 1...) R3917 4 3/27/2011

**SAFE-GAP**
**AV TOTAL LOSS PROTECTION PLA**

*Gap Contract*
*VIN 9301365*

## CUSTOMER (BORROWER/LESSEE) INFORMATION

HINKLE                                    JOHNNY

Last Name HINKLE          First Name ROBIN          Middle Initial L

Street Address _____          Apt # _____

City RT 3 BOX 435          State _____          Zip Code _____

Home Phone # DELBARTON          Bus. Phone # HV          25670
          304) 475-2109

## COVERED VEHICLE INFORMATION

Manufacturer _____          Model _____          Year _____

Vehicle ID # CHEVROLET          MONTE CARLO          2006
          2G1NJ15K069301365

Charge to CUSTOMER for DEFICIENCY WAIVER ADDENDUM $ _____          Original Date of CONTRACT _____
          495.00                                    07/14/2006

Installment Sales □   Balloon   Amount Financed/
Contract/Loan □   Loan/Lease □   Lease Cap $          Term (in Months)          New Vehicle ☑  Used Vehicle □
          19718.20          72          XX

## DEALER INFORMATION

Dealer # _____          Dealership _____

Street Address C & O MOTORS, INC.

City 202 5TH STREET          State HV          Zip Code 25177
          ST. ALBANS

## ASSIGNEE INFORMATION

Assignee CITIFINANCIAL AUTO          Installment Sales Contract/Loan/Lease Acct. # _____

Street Address P.O. BOX 3449

City COPPELL          State TX          Zip Code 75019

I (CUSTOMER), WHOSE SIGNATURE APPEARS BELOW, ACKNOWLEDGE THAT THE INFORMATION CONTAINED ABOVE IS, TO THE BEST OF MY KNOWLEDGE, TRUE. I HAVE READ THE FRONT AND BACK OF THIS DEFICIENCY WAIVER ADDENDUM IN ITS ENTIRETY, AGREE TO ALL OF ITS PROVISIONS, TERMS AND CONDITIONS, AND AM REQUESTING COVERAGE. **THE PURCHASE OF THE DEFICIENCY WAIVER ADDENDUM IS VOLUNTARY AND IS NOT REQUIRED TO OBTAIN CREDIT. I UNDERSTAND I MAY OBTAIN DEFICIENCY WAIVER/GAP PROTECTION FROM AN ALTERNATE SOURCE. I UNDERSTAND THAT A CANCELLATION REQUESTED WITHIN SIXTY (60) DAYS OF PURCHASE IS ELIGIBLE FOR A FULL REFUND. I UNDERSTAND THAT A CANCELLATION REQUEST RECEIVED AFTER SIXTY (60) DAYS OF PURCHASE WILL BE REFUNDED PRO-RATA, UNLESS OTHERWISE REQUIRED BY APPLICABLE LAW.**

Date _____  Customer's Signature _____          Dealer's Signature _____
07/14/06

## COVERAGE

The named Customer is responsible to the named Dealer/Assignee under the terms of the described Installment Sales Contract/Loan/Lease Agreement for the amount of any early termination liability resulting from a Total Loss of the Vehicle. Due to this Addendum being in effect, the Dealer/Assignee agrees to cancel a portion of the Customer's indebtedness in the event of a Total Loss of the Vehicle. The Deficiency Waiver Addendum will waive the amount equal to the Unpaid Net Balance less the Actual Cash Value (ACV) of the Vehicle, both as defined herein, subject to the ACV not having been reduced by more than $1,000 as a result of the application of the Customer's primary insurance deductible. Any deductible amount in excess of $1,000 remains the Customer's responsibility. There is no deductible coverage available for (a) vehicles financed or leased in Arkansas or (b) vehicles leased in Illinois. It is further agreed that the maximum claim payment is limited to $50,000.

## DECLINATION OF DEFICIENCY WAIVER ADDENDUM

□   I DO NOT CHOOSE TO PURCHASE THE DEFICIENCY WAIVER ADDENDUM. I UNDERSTAND THAT BY NOT ACCEPTING THE DEFICIENCY WAIVER ADDENDUM, I AM NOT ENTITLED TO ANY OF THE BENEFITS IN THE EVENT OF A TOTAL LOSS OF THE VEHICLE.

Date _____  Customer's Signature _____          Dealer's Signature _____

**SAFE-GUARD PRODUCTS INTERNATIONAL, INC.**
3500 Piedmont Road NE, Suite 400
Atlanta, Georgia 30305
800-742-7896

1335G7/25/00          White: CUSTOMER          Yellow: SAFE-GUARD          Pink: DEALER          Goldenrod: LENDER          Rev 3/05

015          PERSINGER & PINSON



**EXHIBIT**
tabbies

## TERMS AND CONDITIONS

**1.  DEFINITIONS:**

For the purpose of this Deficiency Waiver Addendum ("Addendum") the following terms shall mean:

**Customer** means the purchaser of the Vehicle, as listed in the application section of this Addendum.

**Vehicle** means the four-wheeled private passenger vehicle, van, pickup or light truck not to exceed 1 3/4 ton capacity, as listed in the application section of this Addendum.

**Date of Loss** means the date on which the actual physical loss or damage occurred to the Vehicle. If such date is indeterminable, the Date of Loss shall be either the date established by the primary insurance carrier or the date the occurrence was reported to the carrier, whichever is the earlier.

**Actual Cash Value** means the retail value of the covered Vehicle on the Date of Loss, prior to its physical damage or theft, as determined by the primary insurance carrier or the then current region-specific National Automobile Dealers Association (NADA) Official Used Car Guide, with the appropriate adjustments for mileage, options and condition, whichever is greater. If no primary insurance carrier exists or the primary insurance carrier has been declared insolvent, the retail value will be determined using the National Automobile Dealer's Association (NADA) Official Used Car Guide, based on the best information available on the Vehicle's options and condition.

**Total Loss** means a total or constructive total loss as defined by the individual Customer's primary automobile physical damage carrier. If no primary physical damage carrier exists, then a Total Loss shall mean when the repair cost exceeds the Actual Cash Value or, in the event of a theft, when the Vehicle has not been recovered after a minimum period of 30 days from the date of the original police theft report.

**Unpaid Net Balance** means the amount owed by the Customer to clear the outstanding Installment Sales Contract/Loan/Lease account as of Date of Loss subject to Paragraph 2(b). This amount shall not include any and all unearned and/or future interest or rental charges, finance or lease charges, late charges, delinquent payments, deferred payments, uncollected service charges, refundable prepaid taxes and fees, disposition fees, termination fees, penalty fees or any proceeds which may be recovered by cancelling any insurance coverages, service contracts and/or warranties, credit life, accident and health insurance or other cancelable items.

**2.  DISCLAIMERS:**

(a)  No coverage is provided for any Installment Sales Contract/Loan/Lease when the original term exceeds 84 months. Installment Sales Contracts/Loans/Leases must have uniform monthly repayment terms for the full period of the agreement with the exception of incidental differences in the first and/or last payments.

(b)  No coverage is provided for that portion of the Unpaid Net Balance that results from the amount financed/lease cap cost exceeding 150% of the Manufacturer's Suggested Retail Price (M.S.R.P.) for New Vehicles or 150% of N.A.D.A. Official Used Car Guide's "Retail" value for Used Vehicles, at the inception date of the Installment Sales Contract/Loan/Lease. These Installment Sales Contracts/Loans/Leases will not be disqualified from coverage, however, the Unpaid Net Balance will be determined based on this maximum limit.

(c)  Primary Insurance: Should the Customer not have collectible physical damage insurance on the Date of Loss, it is the responsibility of the Customer to advise Safe-Guard Products in writing immediately when the loss is discovered and Safe-Guard Products will calculate the Actual Cash Value of the Vehicle immediately prior to the loss.

(d)  This Deficiency Waiver Addendum is transferable if there is a transfer of the Vehicle. However, this Addendum is valid only while payments are due to the original Assignee lender under the original Installment Sales Contract. This Addendum terminates upon (a) refinancing the Vehicle's Installment Sales Contract with an Assignee lender who is not the original one or (b) payment in full of the original Installment Sales Contract.

(e)  This Deficiency Waiver Addendum is cancelable upon written notice to Safe-Guard Products. The effective date of such cancellation is the date such written notice is received by Safe-Guard Products. This Addendum may be canceled with full refund within sixty (60) days of the date of this Addendum. After sixty (60) days any refunds will be calculated pro-rata, unless otherwise required by applicable state law. However, in the event of Total Loss to the Covered Vehicle, this Addendum will be deemed as fully earned and no refund will be due or paid to the Customer.

(f)  This Addendum shall be void if any material fact(s) have been concealed or misrepresented, or in the case of fraud.

**3.  EXCLUSIONS:**

This Addendum does not apply to loss of or damage to the Vehicle:

(a)  Resulting directly or indirectly from fraudulent act or due to the legal confiscation of the Vehicle by a public official;

(b)  Resulting directly or indirectly from any dishonest, fraudulent or illegal act by the Customer;

(c)  Caused by a wilful, wanton or recklessly negligent act by the Customer;

(d)  That is part of a fleet that is intended for use as a public or livery conveyance, or any vehicle for commercial use;

(e)  Due to wear and tear, freezing, mechanical or electrical breakdown or failure; or

(f)  Which occurs outside the United States, its territories or Canada.

(g)  GAP Waiver does not apply when the total loss or theft is resulting directly or indirectly from forgery or any dishonest, fraudulent or criminal act by you.

**4.  CLAIM REQUIREMENTS:**

IN THE EVENT OF A CLAIM, the Customer must provide, within 90 days of the Date of Loss, to Safe-Guard Products at 3500 Piedmont Road NE, Suite 400, Atlanta, GA 30305, 800-890-7211, the following documentation before any payment under this Addendum can be processed. Failure to provide this documentation within 90 days of the Date of Loss will VOID this Addendum.

(a)  Complete documentation from the Customer's primary insurance company substantiating the date of and cause of the Total Loss of the Vehicle, gross settlement amount, deductible, the net settlement amount and proof of payment. Should the Customer not have collectible physical damage insurance on the Date of Loss, it is the Customer's responsibility to advise Safe-Guard Products in writing immediately when the Total Loss is discovered and Safe-Guard Products will calculate the Actual Cash Value of the Vehicle immediately prior to the Total Loss. The cost of the appraisal will be deducted from the amount of any claim settlement and will be payable to Safe-Guard Products from the Customer in the event no claim settlement is due.

(b)  Complete documentation from the Dealer/Assignee showing the exact Unpaid Net Balance as defined herein.

(c)  Copy of Deficiency Waiver Addendum.

(d)  Copy of Bill of Sale (Invoice) for the purchase of the Vehicle substantiating Vehicle make, model, year, options, and accessories, any cancelable items purchased, total purchase price and amount financed.

(e)  Copy of the police report (theft losses only).

(f)  Documentation showing refund amounts of any cancelable items purchased.

PLEASE MAKE SURE all documents are totally legible, otherwise payment will be suspended until legible copies can be obtained.

IN THE CIRCUIT COURT OF MINGO COUNTY, WEST VIRGINIA

ROBIN L. HINKLE,

      Plaintiff,

v.                Civil Action No. 12-C-202

CASEY JOE MATTHEWS, TIMOTHY MAY
and CONNIE MAY, husband and wife,
SANTANDER CONSUMER, USA,INC.,
an Illinois corporation; SAFE-GUARD
PRODUCTS INTERNATIONAL, LLC,
a Georgia limited liability company;
and JOHNNY HINKLE,

      Defendants.

VIDEOTAPED DEPOSITION OF GARY VOLINO

The videotaped deposition of Gary Volino
was taken on April 23, 2013, at 8:32 a.m., at
237 Capitol Street, Charleston, West Virginia.

ELITE COURT REPORTING, LLC
5010 Dempsey Drive
Cross Lanes, West Virginia   25313
(304) 415-1122

Monica Thomas, CR



# A P P E A R A N C E S

Howard M. Persinger, III

Attorney at Law

Persinger & Persinger, LC

237 Capitol Street

Charleston, West Virginia   25301


Jeffrey D. Van Volkenburg

Attorney at Law

McNeer, Highland, McMunn & Varner, LC

Post Office Box 2040

Clarksburg, West Virginia   26302


Daniel J. Konrad

Attorney at Law

Huddleston Bolen, LP

Post Office Box 2185

Huntington, West Virginia   25722

Page 5

I N D E X

Witness

    Gary Volino

Examination

    by Mr. Persinger

Exhibits

| | |
|---|---|
| Exhibit A | Page  07 |
| Exhibit B | Page  22 |
| Exhibit C | Page  23 |
| Exhibit C1 | Page  55 |
| Exhibit C2 | Page 166 |
| Exhibit D | Page  25 |
| Exhibit E | Page  36 |
| Exhibit F | Page  58 |
| Exhibit G | Page  92 |
| Exhibit H | Page ** |
| Exhibit I | Page  95 |
| Exhibit J | Page 111 |
| Exhibit K | Page 119 |
| Exhibit K1 | Page 123 |
| Exhibit K2 | Page 132 |
| Exhibit L | Page 138 |
| Exhibit L1 | Page 145 |
| Exhibit M | Page 154 |

| | |
|---|---|
| Reporter's Certification | Page 171 |
| Errata Sheet/Signature Page | Enclosed |

Page 4

1            VIDEOGRAPHER:  This is the

2    videotaped 30(b)(7) of Safe-Guard Products

3    International, taken by the Plaintiff's in

4    the matter of Hinkle versus Matthews et. al.,

5    being Civil Action Number 12-C-202, in the

6    Circuit Court of Mingo County, West Virginia,

7    held at the offices of Persinger and Persinger

8    in Charleston, West Virginia, on the 23rd day

9    of April 2013.

10           My name is Jennifer Minnich.

11   I am a legal video specialist for Katz

12   Consulting Group.

13           The court reporter is Monica

14   Thomas.

15           We are now on the record.  The

16   time is approximately 8:32 a.m.

17           Would counsel please introduce

18   themselves and who they represent?

19       MR. PERSINGER:  Howard M. Persinger,

20   III, Persinger and Persinger, for the Plaintiff,

21   Robin L. Hinkle.

22       MR. VAN VOLKENBURG:  Jeff

23   Van Volkenburg on behalf of Safe-Guard.

24       MR. KONRAD:  Daniel J. Konrad on

1       behalf of Santander.

2               THE LEGAL VIDEO SPECIALIST:  Will the

3       court reporter please swear in the witness.

4                       GARY VOLINO,

5       called as a witness, first being duly sworn

6       by the Court Reporter/Notary Public,

7       testified as follows, to wit:

8                       EXAMINATION

9    MR. PERSINGER:

10       Q.  Good morning.  Would you state your

11    full name for the record, please?

12       A.  Gary David Volino.

13       Q.  Would you spell your last name?

14       A.  V, as in Victor, O-L-I-N-O.

15       Q.  Thank you.  Mr. Volino, I want to

16    welcome you to my office here today.  Thank

17    you for coming here today to be deposed.  I

18    don't know how many times you've been deposed

19    before.  But just a few basic rules we try to

20    follow here.  One is that since the court

21    reporter is taking down everything that we

22    say, try not to speak over each other.  I

23    have a particular problem with that.  And I'm

24    going to do my best to wait and listen to

Page 6

1   your entire answer.  If you would do the same

2   for me I would very much appreciate it.

3              If at any time that you want

4   to take a break for bathroom reasons or

5   whatever, please just let me know.  That's

6   totally okay with me.  I would ask that -- or

7   also to confer with your counsel.  I would

8   ask that if you do want to take a break to

9   confer with counsel that you answer any

10  question that's on the table before the

11  break.

12              Also, if for any reason you

13  feel that you want to just take a break to

14  rest or eat or do anything like that just let

15  me know.  We can do that.  It's very casual.

16  I don't think we have any time constraints

17  today.

18              The purpose of this deposition

19  is actually what we call under our rules here

20  in West Virginia a 30(b)(7) deposition.  And

21  did your counsel go over what that means with

22  you before the deposition today?

23  A.   Yes.

24  Q.   Okay.  That's another thing.  I

```
 1    don't -- if at any point -- I don't want to

 2    get into privileged communications between

 3    you and counsel.  So I will try to refrain

 4    from that.  But I'm not interested in any

 5    sort of communications you had with your

 6    counsel for purposes of legal advice or

 7    obtaining legal advice.  But there will be

 8    times when I ask questions kind of like that.

 9                  I want to give you what I'll

10    show to your counsel, and then have the court

11    reporter mark as Exhibit 1 -- or excuse me --

12    Exhibit A.  And that's going to be the

13    30(b)(7) notice for the deposition today.

14                  (Exhibit A marked.)

15        Q.  Ask you to take a look at that and

16    tell me if you're familiar with it.

17                  (Witness reviews document.)

18        A.  Yes.

19        Q.  You've seen it before?

20        A.  Yes.

21        Q.  Okay.  And in the notice are 13 points

22    that we have designated as areas of inquiry

23    today.  And under the rules you were to

24    inform yourself on these points and be
```

1    prepared to testify to them today.  So my

2    first question is, are there any of these

3    points in this notice that you're not

4    prepared to testify to?

5         A.  No.

6         Q.  Okay.  Very good.  Would you please

7    state your current business address and

8    title?

9         A.  Current business address is Two

10   Concourse Parkway, Suite 500, Atlanta,

11   Georgia, 30328.  And my current title is

12   chief operating officer.

13        Q.  Is that for Safe-Guard Products

14   International, LLC?

15        A.  It is.

16        Q.  How long have you worked at Safe-Guard

17   Products International, LLC?

18        A.  A little over eight years.

19        Q.  Okay.  And have you held different

20   titles at the company in that span of time?

21        A.  I was vice-president of operations and

22   then I was made chief operating officer.

23        Q.  Okay.  What did you do before you

24   worked at Safe-Guard?  Describe briefly your

Page 9

1    employment background for me, if you could.

2        A.   Sure.   I was a vice president for a

3    company called STI Knowledge.   And then prior

4    to that I was with a consulting company.   So

5    I've been a consultant mostly NIT **space,

6    computer consulting and operations, financial

7    consulting.

8        Q.   Okay.   Could you describe briefly for

9    us your educational background?

10       A.   Sure.   I graduated Auburn University

11   with a computer science degree in 1984.

12       Q.   And went right into consulting after

13   that?

14       A.   No.   I worked for a company called

15   Scientific Atlanta.

16       Q.   Is that the company that makes cable

17   boxes?

18       A.   It is.

19       Q.   I think I have one of their cable

20   boxes.

21                      How long did you work for

22   Scientific Atlanta?

23       A.   Approximately two years.   From '84 to

24   probably '86, maybe '87.

Page 10

1          Q.   And from there into the consulting

2      business?

3          A.   Yes.   Price Waterhouse Consulting.

4          Q.   Okay.   Do you have any background in

5      accounting?

6          A.   I do have some background in

7      accounting, yes.

8          Q.   From your days at Auburn?

9          A.   From my days at Auburn and from my

10     days at Price Waterhouse.

11         Q.   Okay.   Are you a CPA?

12         A.   I am not.

13         Q.   Okay.   Do you have any professional

14     designations akin to a CPA in any other

15     fields?

16         A.   I do not.

17         Q.   Okay.   What are the responsibilities

18     that Safe-Guard Products International, LLC

19     of the chief operating officer?

20         A.   I manage contract processing, claim

21     processing and cancellation processing for

22     Safe-Guard.

23         Q.   Okay.   Tell me a little bit about

24     Safe-Guard products International LLC.   When

1    was it formed to the best of your knowledge?

2       A.   To the best of my knowledge formed in

3    1994.

4       Q.   Okay.   Where is it headquartered?

5       A.   Atlanta, Georgia.

6       Q.   Would that be the same address that

7    you work at, your business address?

8       A.   We've moved a couple of times.

9       Q.   Okay.

10      A.   So the current address -- the address

11   I gave you is the current address.

12      Q.   All right.   Are there any branch

13   offices besides the Atlanta office in the

14   country or in the world?

15      A.   We do have an office in Toronto,

16   Canada.

17      Q.   Okay.   Do you offer products for sale

18   in the country of Canada?

19      A.   We market our products in Canada.

20      Q.   Okay.   Anywhere else in the world?

21      A.   Currently, no.

22      Q.   Within the headquarters in Atlanta,

23   what are the different departments of the

24   company that are housed there?

Page 12

1      A.   Operations, as I've stated.

2   Accounting, client relations, sales and

3   marketing, IT, and then training and quality

4   assurance.

5      Q.   Is Safe-Guard Products International,

6   LLC a publicly traded corporation?

7      A.   It is not.

8      Q.   Okay.  And I realize it's a limited

9   liability company, not a corporation.  But is

10  it privately owned?

11     A.   It is.

12     Q.   Okay.  Is it owned at this time by

13  Goldman Sachs?

14     A.   Yes.

15     Q.   When was that ownership transaction

16  completed?

17     A.   December of 2012.

18     Q.   Who was the previous owner before

19  Goldman Sachs?

20     A.   HIG Capital.

21     Q.   Okay.  Is that also -- is that a

22  private equity company?

23     A.   It is.

24     Q.   All right.  Do you know the terms of

1    the deal by which HIG sold the company to

2    Goldman Sachs?

3         A.   I don't know all the details of the

4    deal.

5         Q.   Okay.  Do you know any of the details?

6         A.   I do know most of the details.  I just

7    don't know, you know, all the details.

8         Q.   All right.  Can you tell us what you

9    do know?

10        A.   Yes.  I know we sold -- the majority

11   of the company was sold to Goldman Sachs in

12   2012.  Goldman Sachs formed the board of

13   directors.  Goldman Sachs is interested in

14   managing the company and perhaps taking it,

15   you know, further than the United States and

16   Canada.  You know, it's a new venture for

17   them into this space.  Those are -- you know,

18   I'm not sure exactly what details you want.

19        Q.   I guess -- well, okay, let me be a

20   little more specific.  Do you know how much

21   cash or what, if not cash, stock -- what was

22   paid for the company?

23        A.   I don't know the exact amount.  But

24   it's approximately 375 million dollars.

Page 14

1     Q.   Okay.   And, again, what -- was that in

2     2011 that was completed?

3     A.   2012.   December 2012.

4     Q.   All right.   Can you describe the --

5     so -- let's see.   December 2012.   We're

6     talking about less than three months ago.

7     Well, less than four months ago.

8     A.   Right.

9     Q.   I'm still stuck in March.   Has the

10    management structure of the company changed

11    at all since that happened, since the

12    transaction?

13    A.   No.   We -- the management company

14    stayed the same.   We did add a chief

15    marketing officer since then.

16    Q.   Okay.   So would you describe for me

17    the management structure of the company and

18    then any changes that are --

19    A.   Okay.

20    Q.   -- how the new marketing person fits

21    in?

22    A.   We have a CEO.   We have a chief

23    financial officer.   We have a president.   We

24    have recently this chief marketing officer.

1    And then we have a chief information officer,

2    a vice president of risk management, and

3    myself, chief operating officer.   And those

4    are the individuals that make up the

5    executive team.

6         Q.   Okay.  Do you have a sales force

7    within the corporate structure or a director

8    of sales and -- is that included within the

9    operation?

10        A.   No.

11        Q.   Okay.  Do you have an in-house legal

12   department?

13        A.   We do.

14        Q.   Do you have a general counsel?

15        A.   Yes.  I should have mentioned Damon

16   Wiener.  Yes.

17        Q.   Okay.  His name is Damon Wiener?

18        A.   Damon Wiener.  Yes.  Damon is our vice

19   president of legal compliance.

20        Q.   Okay.  Does he have a staff or does he

21   kind of --

22        A.   He's not going to be happy I forgot

23   him.

24        Q.   Well, it's easy to forget lawyers

1    sometimes.  I'm sure Jeff will agree with

2    that.  We're, what do they call it, **back

3    office types?

4              MR. VAN VOLKENBURG:  Probably most

5      people want to forget about the lawyers.

6         Q.  Okay.  Tell me about Damon's

7    department.  How many lawyers work in his

8    department?

9         A.  Just one.  It's Damon.

10        Q.  Just Damon.  Okay.  What does he do to

11   the best of your knowledge?

12        A.  Sure.  Damon reviews our contracts and

13   our marketing materials from a legal

14   compliance standpoint.

15        Q.  Okay.  Does he do regulatory work in

16   terms of state administrative regulatory

17   framework that you must comply with?

18        A.  Yes.

19        Q.  Okay.  From time to time do you

20   receive complaints from state administrative

21   agencies regarding your operations?

22        A.  Yes.

23        Q.  Okay.  Would Damon be the one that

24   deals with those?

Page 17

1      A.   Yes.

2      Q.   **Okay.  Do you have any knowledge of**

3   **the types of complaints that he receives?**

4      A.   No.   That was sort of my hesitation in

5   my previous response.   I know we've received

6   some complaints.   But I don't know the nature

7   of all of those.

8      Q.   **Do you know the nature of any of them?**

9      A.   I do know the nature of one of them.

10   You know, that was a while ago.   Probably

11   five years ago.

12      Q.   **Okay.  Would you go ahead and describe**

13   **that for me?**

14      A.   Sure.   We market a product in

15   California.   It was a tire and wheel product.

16   And at that time the department of

17   California -- Department of Insurance of

18   California asked us to stop marketing it.

19   And we did.   And then they later came back

20   and passed some regulations within the

21   department of insurance and we were allowed

22   to market it again.

23      Q.   **What is a tire and wheel product, just**

24   **so we're -- I can understand that?**

Page 18

1          A.   Sure.   Tire and wheel product is a

2     product that covers a consumer from a flat

3     tire or damaged wheel by hitting a road

4     hazard.

5          Q.   Okay.   So would come in and buy you a

6     new tire or a wheel when that happens?

7          A.   Yes.

8          Q.   Okay.   So under the product you send a

9     check to the person that has purchased the

10    policy to pay for the repairs to the tire and

11    wheel?

12         A.   Yes.

13         Q.   Okay.   Do you know why California

14    wanted you to stop marketing that product at

15    that time?

16         A.   I think it was a new product.   And

17    they wanted us to -- they wanted to better

18    understand it and determine, you know, the

19    benefits to the consumer and make sure the

20    consumers were protected, you know, by that

21    product and it was, you know, doing what it

22    said it was supposed to do, so...

23         Q.   And that product fell within the

24    jurisdiction of the California Department of

Page 19

1    the Insurance?

2                    MR. VAN VOLKENBURG:  Object to form.

3         A.  It did.

4         Q.  Okay.  How was that product marketed

5    exactly?  Did you collect a premium at the

6    point of sale of the car or did you sell --

7    did you collect a premium at some other point

8    in the sales process?

9         A.  At the point of sale, the car dealer

10   will offer the consumer these products that

11   are marketed by Safe-Guard.  And the dealer

12   will then remit payment of that product to

13   Safe-Guard.

14        Q.  Okay.  Are all Safe-Guard's products

15   marked that way?  Are there any that are not

16   marketed just as you just described?

17                   MR. VAN VOLKENBURG:  Object to form.

18        A.  The products are marketed as I

19   described.

20        Q.  Okay.  And that would include the

21   guaranteed asset protection plan that we're

22   here to discuss today.  Is that true?

23        A.  Yes.

24        Q.  Okay.  Is Safe-Guard Products LLC --

Page 20

1    International, LLC - excuse me - a lender in

2    any capacity?

3        A.   No.

4        Q.   You're not in the business of loaning

5    money to purchase vehicles or anything else?

6        A.   Correct.

7        Q.   Okay.  All right.  Part of the reason

8    that I wanted you to come here today is

9    because I've received a lot of discovery from

10   Mr. Van Volkenburg that I assume came from

11   your company.  But I wanted to make sure that

12   we have everything and that everything we

13   have is authentic and valid.  And so what I'm

14   going to do now is I'm going to put in front

15   of you various documents and discovery

16   responses I received from Mr. Van Volkenburg,

17   have you look through them, and then ask you

18   some general questions about the documents.

19   And then from there we'll go to more specific

20   questions.

21       A.   Okay.

22       Q.   I want to show you first what we'll

23   mark as Exhibit 2, which is -- I think those

24   are the first responses.

Notice of Removal

Case 2:15-cv-13856   Document 1-6   Filed 10/09/15   Page 87 of 166   PageID #: 171
EXHIBIT F          .

Page 21

1          MR. KONRAD:   Did you say Exhibit 2

2     or B?

3          MR. PERSINGER:   B.   Good point, Dan.

4     We're going to letters and then, you know, the

5     letters are going to be sometime a big stack

6     of documents.   And then if I want to go to a

7     specific document within the stack I'll say

8     B1, B2, B3, something like that.

9          MR. VAN VOLKENBURG:   I would just

10    ask -- I know this is the first set of

11    responses that we filed.   Just to the extent

12    that you're asking for specific content,

13    specific issues on questions that he would

14    have the opportunity to review any

15    supplemental responses at the same time.

16         MR. PERSINGER:   Absolutely.   And I'm

17    not going to ask him so much about the

18    responses.   There will be a few.   But mostly

19    what I'm going to do is the documents.

20         MR. VAN VOLKENBURG:   All right.

21    That's fine.

22         MR. PERSINGER:   It's going to be like

23    an authentication thing more or less.   But,

24    yeah, he can have all the time he wants to

Notice of Removal
EXHIBIT F

Page 22

```
 1      stop.  I've got -- I'm going to do all of

 2      them, so...

 3              MR. VAN VOLKENBURG:  Okay.

 4              MR. PERSINGER:  -- that shouldn't be

 5      an issue.

 6              (Exhibit B marked.)

 7      Q.  Just look through those and tell me if

 8      you are familiar with them.

 9              (Witness reviews documents.)

10      A.  I'm familiar.

11      Q.  Okay.  Now, what I've handed you,

12      Exhibit B, is Safe-Guard Products responses

13      to Plaintiff's joint interrogatories and

14      request for production of documents.  And

15      over on page 8 is request number one, in

16      which we've requested the production of the

17      complete investigative files and claim files

18      in connection with the Plaintiff, Robin L.

19      Hinkle and her GAP total loss protection plan

20      number 713096.  And let's see.  What we

21      produced was -- I'm going to hand you now was

22      Exhibit A.

23              MR. VAN VOLKENBURG:  I can't say this

24      is every document.
```

1            MR. PERSINGER:  Yeah.  I know.

2            MR. VAN VOLKENBURG:  But it appears as

3      though it's the set that we produced.

4            MR. PERSINGER:  I'll need that marked

5      as Exhibit C.

6                 (Exhibit C marked.)

7            MR. PERSINGER:  Yeah.  And, you know,

8      if you want to put a caveat on the record

9      that --

10            MR. VAN VOLKENBURG:  Yeah.  That's

11      fine.

12            MR. PERSINGER:  Because copying

13      errors are certainly possible.

14            MR. VAN VOLKENBURG:  Yeah.  I mean,

15      just to the extent -- it appears as though

16      the documents are what they are.  I just -- I

17      can't sit here and validate that that's

18      everything we've produced at this point.

19            MR. PERSINGER:  Can we go off the

20      record for a second?  I'm going to get a cup

21      of coffee.  What I'd like for you to do is

22      look through those.  And I'm going to ask you

23      if you're familiar with them.

24            THE WITNESS:  Okay.

Page 24

```
 1            LEGAL VIDEO SPECIALIST:  It is 8:53

 2       and we are going off the record.

 3              (Break in proceedings.)

 4            LEGAL VIDEO SPECIALIST:  The time is

 5       8:58 a.m.  We are back on the record.

 6       BY MR. PERSINGER:

 7         Q.  Mr. Volino, I handed you before the

 8       break what we have marked as Plaintiff's C,

 9       which is what I believe to be a complete

10       Exhibit A which was produced by Safe-Guard in

11       this case in request to our request for

12       production that asked for the complete

13       investigative and claims file associated with

14       the claim of Robin -- Plaintiff Robin L.

15       Hinkle.

16                        Have you had a chance to

17       look through it?

18         A.  Yes.

19         Q.  Did you participate in the preparation

20       of these discovery responses?

21         A.  No.

22         Q.  Okay.  Who at your company would have

23       done that?

24         A.  Damon.
```

Page 25

1       Q.   Okay.   Are you satisfied that what you

2    have in front of you is a Safe-Guard

3    Products, LLC investigative file -- claims

4    file?

5             MR. VAN VOLKENBURG:   Object to form.

6       Q.   Okay.

7       A.   Yes.

8       Q.   Are those copies -- do they appear to

9    be genuine, authentic copies of claims

10   records that are kept in the regular course

11   of business of Safe-Guard Products?

12      A.   Yes.

13      Q.   Okay.   All right.   Now, back to

14   Exhibit B.   In request number 3, we requested

15   the policy application relative to the GAP

16   total loss protection plan number 713096.

17   And we received Exhibit B, which I'm going to

18   have marked as Exhibit D.

19             (Exhibit D marked.)

20      Q.   Same question to you.   Does that

21   appear to be an authentic, genuine copy of a

22   Safe-Guard Products International, LLC

23   document kept in the regular course of

24   business?

Page 26

1        A.   Yes.

2        Q.   Okay.   As far as this exhibit, we had

3    asked for a policy application.   And we were

4    given this document as the only application

5    that would have been completed in conjunction

6    with the purchase of the guaranteed asset

7    protection plan.   To your knowledge is that

8    correct?   Is there any other types of

9    paperwork that would have been completed at

10   the point of sale or otherwise relative to

11   the purchase of this plan?

12       A.   No.

13       Q.   Okay.   Now, I note that that

14   particular product is something that would

15   have been -- or excuse me -- that particular

16   document is something that would have been

17   presented to Mrs. Hinkle by the salesman at

18   the car lot, C&O Motors; is that correct?

19       A.   Correct.

20            MR. VAN VOLKENBURG:   Object to form.

21   You mean employee of the car dealership itself,

22   car salesman?

23            MR. PERSINGER:   The car salesman, yes.

24            MR. VAN VOLKENBURG:   Okay.   I just

1       wanted to make sure.

2           MR. PERSINGER:  Yeah.  That's fine.

3       A.  Yes.  This would have been presented

4       by an employee at C&O Motors.

5       Q.  And that's how these products are

6       generally marketed, is it not, through the

7       employees of the car dealerships?

8       A.  Correct.

9       Q.  Are they the ones that actually talk

10      to the customer about the benefits of the

11      plan and ask them if they want to purchase

12      it?

13      A.  Yes.

14      Q.  And I note that an employee of the

15      dealership signed that document as well

16      almost -- isn't that the case, that an

17      employee of the dealership signed on behalf

18      of Safe-Guard, LLC?

19      A.  There is a signature where it sales

20      dealer signature.  I can't read it.  But yes.

21      Q.  Do the dealers function in the

22      capacity of -- employees function in the

23      capacity of agents of Safe-Guard in binding

24      the customer to the terms of these plans?

Page 28

1              MR. VAN VOLKENBURG:  Object to form.

2         A.   No.

3         Q.   Okay.  How are they bound to the terms

4    of -- how is Safe-Guard bound to the terms of

5    the plan or the contract?

6              MR. VAN VOLKENBURG:  Object to form.

7         A.   Safe-guard bound to this?

8         Q.   Right.

9         A.   Yeah.  It's a Safe-Guard administered

10   contract.  So the terms and conditions that

11   the consumer receives are what we follow.

12        Q.   It is a contract, is it not?

13        A.   It is.

14        Q.   It needs to be signed by the person

15   buying it?

16        A.   Correct.

17        Q.   Okay.  Bear with me a second here.

18   I'm in the wrong stack.  All right.  Here we

19   go.

20                   And this particular one,

21   Exhibit B, is signed by the customer,

22   Johnny L. Hinkle in the appropriate place.

23   Is it not?

24        A.   Correct.

1       Q.  It says I, customer, whose signature

2    appears below, acknowledge that the

3    information contained above is to the best of

4    my knowledge true.  I've read the front and

5    back of the deficiency waiver in its

6    entirety, agree to all of its provisions,

7    terms and conditions, and am requesting

8    coverage.  Correct?

9       A.  Correct.

10       Q.  Okay.  It's signed by Johnny L.

11    Hinkle.  And it's countersigned by someone on

12    behalf of the dealer?

13       A.  Correct.

14       Q.  Okay.  Much in the manner that an

15    insurance agent would countersign a policy

16    for an insurance company?

17          MR. VAN VOLKENBURG:  Object to form.

18     That's outside the scope of his 30(b)(7)

19     designation to testify as to what insurance

20     agents would do.

21       Q.  Okay.  Do you agree that the counter

22    party signing as the dealer and not anyone

23    from Safe-Guard Products International, LLC

24    on this application?

Page 30

1        A.   Correct.

2        Q.   Okay.  So my question is, the dealer

3    binds Safe-Guard to this policy.

4             MR. VAN VOLKENBURG:   Object to form.

5        Q.   Is that not true?

6             MR. VAN VOLKENBURG:   Object to form

7    and object to legal conclusion.

8        Q.   You can answer?

9             MR. VAN VOLKENBURG:   Answer if you

10    can.

11        A.   No.  I mean, we receive contracts that

12    are sometimes not signed by the dealer.  The

13    customer's signature is what we look for.

14    If this was not signed by a dealer, we would

15    still accept this contract.

16        Q.   Okay.  And in your -- you would be

17    bound by the terms whether or not the dealer

18    signed.

19        A.   Right.

20        Q.   Is that your testimony?

21        A.   Correct.

22        Q.   That's the way Safe-Guard approaches

23    it?

24        A.   Yes.

Draft Copy

1        Q.   Well, then why is there a line on the

2     paper for the dealer to sign?

3               MR. VAN VOLKENBURG:   Object to form.

4        That's outside the scope of his 30(B)(7)

5        designation.

6               MR. PERSINGER:   I don't think it is.

7        I asked him, you know, if their operations

8        and their products are clearly stated within

9        the designations, which this is a Safe-Guard

10       form.

11       Q.   Can you tell me why there is a line

12    there for the dealer's signature?

13       A.   I don't know why there's a line for

14    dealer's signature.

15       Q.   It appears, does it not, that someone

16    at Safe-Guard thought that was a necessary

17    item.   Is that a fair statement?

18       A.   Yes.

19       Q.   Okay.   When does Safe-Guard Products

20    International, LLC consider the SAFE-GAP

21    agreement, such as the one shown in

22    Exhibit B, to be binding upon all parties?

23    At what point?

24       A.   When we receive this contract, either

Page 32

1    via paper or electronic, we now know that we

2    have a valid contract.

3         Q.   Okay.

4         A.   And so, you know, I'm a little -- I

5    need you to clarify binding because --

6         Q.   Okay.

7         A.   If we didn't receive this contract,

8    but -- for whatever reason, lost in the mail,

9    but Johnny L. Hinkle produced this contract,

10   you know, we would honor this contract.

11        Q.   Okay.  So is it fair to say that when

12   Johnny L. Hinkle signed the contract,

13   Safe-Guard Products considers itself bound by

14   the agreement?

15             MR. VAN VOLKENBURG:   Object to form.

16        A.   Yes.

17        Q.   With the caveat that, you know, it

18   needs to be advised that he has signed the

19   contract, usually by receiving a copy?

20        A.   We -- let me clarify this a little

21   bit.  because we seem to be spending a lot of

22   time about the signatures.  We often receive

23   contracts -- data where there are no

24   signatures.  And so when we receive that

Page 33

1    data, we then know that we have a customer --

2    figuring the data is all correct, a customer

3    that has this contract in their possession.

4         Q.   Correct.

5         A.   So the signatures on the contract --

6    on the paper contract, we don't require these

7    to be sent into Safe-Guard.  We require the

8    data off of this contract to be sent into us.

9         Q.   **What kind of -- or in what format do**

10   **you receive the data?**

11        A.   Electronic.  Data interface.

12        Q.   **Is it akin to an e-mail?**

13        A.   No.  It's more electronic than that.

14   It's usually the computer system of the

15   dealer that is transmitting the data to us.

16        Q.   **Okay.  Receipt of the data though**

17   **would indicate that there should be a signed**

18   **contract somewhere.  Is that a fair**

19   **statement?**

20        A.   Correct.

21        Q.   **All right.  Okay.  I think we**

22   **understand each other.  Now, it's fair to**

23   **say, is it not, that no direct -- or no**

24   **employee of SAFE-GAP has any interaction with**

Page 34

1    the customer prior with the contract being

2    executed?

3         A.   Correct.

4         Q.   Okay.   That is handled completely by

5    the dealer and its employees?

6         A.   Correct.

7         Q.   Safe-Guard Products International, LLC

8    has no way of knowing what these customers

9    where told by the dealer and the agents, does

10   it, before these contracts are entered into?

11        A.   Correct.

12        Q.   Okay.   And you didn't have any

13   knowledge of what they were told by -- what

14   the Hinkle's were told before this contract

15   was signed.   Is that a fair statement?

16        A.   Correct.

17        Q.   Okay.   But nonetheless, you're bound

18   by the terms of the contract --

19        A.   Yes.

20        Q.   -- once the data hits?

21             Okay.   Let's move on.   I'm

22   going to hand you -- let's see.   In response

23   to request number 4, we requested memoranda,

24   diary entries, notes or other writings,

Page 35

1     other data entries between representatives of

2     Safe-Guard and Santander relating to the

3     claim which was made by Robin L. Hinkle under

4     Total Loss Protection Claim 713096?

5            MR. VAN VOLKENBURG:  Mo, just to be

6     sure, you're going back to Exhibit B with

7     reference to that last question, the discovery

8     request that you put in front of him?

9            MR. PERSINGER:  What do you mean?

10          MR. VAN VOLKENBURG:  Well, just because

11    you were -- you're talking about Exhibit B.

12    And then you just went back and started

13    asking him about discovery requests.  So I

14    just want to make sure it's clear for the

15    record that last question you just asked was

16    going back to Exhibit B, which was the actual

17    discovery --

18          MR. PERSINGER:  Yes.  Yes.  You are

19    correct.

20          MR. VAN VOLKENBURG:  Okay.

21          MR. PERSINGER:  Yeah.  Sorry about

22    that.

23     Q.  We received a two-page document,

24   Exhibit C, which will be Plaintiff's E, I

Page 36

1    supposed.

2                    (Exhibit E marked.)

3         Q.   Okay.   Does Exhibit E appear to you to

4    be a genuine, authentic copy of a document

5    produced by Safe-Guard Products, LLC kept in

6    the regular course of business?

7         A.   Yes.

8         Q.   Okay.   Could you tell me what it is?

9         A.   It is our claim notes.

10        Q.   Okay.   Is this done on a particular

11   computer program?

12        A.   It is.

13        Q.   What's the name of that program?

14        A.   The system name is called CMS.   Stands

15   for Contract Management System.

16        Q.   Okay.   And what does it attempt to

17   record?

18        A.   Contract cancellation and claim

19   information.

20        Q.   All relation to one claim?

21        A.   On a claim by claim basis it captures

22   that information.

23        Q.   Okay.   This particular came relates to

24   the claim of Robin L. and Johnny L. Hinkle.

Draft Copy

1    Am I correct?

2        A.  Correct.

3        Q.  All right.  What date does this show

4    that the claim was initiated?

5        A.  The first date in this note is --

6    appears to be 6/20/2011.  Or is that

7    6/28/2011?  Do you have a clearer copy?

8        Q.  I don't.

9            MR. VAN VOLKENBURG:  I think it's 28.

10   But I'll be honest, I'm -- off that copy, I'm

11   not sure.

12       A.  It does look like an 8.  6/28.  The

13   one below it is 6/28.  So I bet you that's

14   the same as the one that's kind of

15   highlighted.

16       Q.  Okay.

17       A.  6/28/2011.

18       Q.  Now, each of those course entries

19   after would correspond to some action or

20   something happening with the claim; is that

21   correct?

22       A.  Correct.

23       Q.  And then the user would be the person

24   who entered the information?

Page 38

1      A.   Correct.

2      Q.   And each of these people that's

3  depicted here are employees of Safe-Guard, I

4  guess hhendric, tnunez, nharris, lmontoya, so

5  on and so forth?

6      A.   Correct.

7      Q.   Okay.  You probably know all these

8  people personally?

9      A.   I do.

10     Q.   All right.  What date does this

11 reflect that the claim was resolved?

12     A.   Give me a second.  I'm just trying to

13 read through all these dates.

14     Q.   Sure.  Take all the time.

15          MR. VAN VOLKENBURG:  Mo, I think --

16 just -- I don't mean to jump in here, but I

17 think this is the same version on the front

18 of Exhibit A.  It's a little bit of a clearer

19 copy.

20          MR. PERSINGER:  Okay.  All right.

21 Yeah.

22          MR. VAN VOLKENBURG:  That will be a

23 little bit more helpful.

24          MR. PERSINGER:  Sure.

Page 39

1          A.   Between 7/18 and 7/21.  It looks like

2     on 7/18 we e-mailed Robin at

3     persingerlaw.com.  And then we -- which we

4     probably indicated what was the status of the

5     claim.  And then the -- on 7/21 we e-mailed

6     the denial letter to customer and mailed copy

7     to customer.

8          Q.   Okay.  Is it Safe-Guard's policy to --

9     when it denies claims to use written

10    communications to communicate that denial?

11         A.   Yes.

12         Q.   Are they in the form of e-mails,

13    letters, or is there any standardized policy

14    on that?

15         A.   Letters.  And sometimes the customers

16    request to e-mail.

17         Q.   Okay.  So if the letter was sent on

18    7/21, wouldn't that be the date of the denial

19    being effectively transmitted?

20              MR. VAN VOLKENBURG:  Object to form.

21         A.   Well, yeah.  I just can't -- I can't

22    tell if the e-mail sent to customer on

23    7/18 -- you know, what was in that e-mail.

24         Q.   All right.  You would agree with me

Page 40

1   though, would you not, that the claim would

2   not be resolved one way or the other until an

3   effective written communication of either

4   acceptance or denial is given to the policy

5   holder, claim holder?

6           MR. VAN VOLKENBURG:  Object to form.

7       A.  No.  I don't agree with that.

8       Q.  Okay.  Why not?

9       A.  Because, you know, the GAP contract

10  states that -- well, it's absent to -- it

11  doesn't say anything about sending a letter.

12  It just states that we'll process per the

13  terms and conditions and we'll communicate

14  them back.  You know, it looks like Robin,

15  the customer, called in on 7/14 and we

16  advised her at that point in time to cancel

17  the contract because there was no benefit.

18  And then she called back for a letter on

19  7/18.

20      Q.  Okay.

21      A.  So on 7/14, she knew there was no

22  benefit.

23      Q.  All right.  So oral communication of

24  denial of a claim is sufficient under

1    Safe-Guard's polices.   Is that true?

2         A.   If the customer -- we prefer to have

3    written communication back and forth --

4         Q.   Right.

5         A.   -- you know.  But, you know,

6    oftentimes if she understood the -- you know,

7    that you cancel the contract and there's no

8    benefit, then she would -- then the customer

9    would just cancel the contract and go about

10   their business.

11        Q.   Okay.  So a written denial is not

12   something that you require in all cases?

13        A.   Correct.

14        Q.   Okay.  Does a customer have to request

15   that in order to usually get it?

16        A.   No.

17        Q.   Well, I guess I'm a little confused

18   here.  I'm asking about not this particular

19   claim so much as the general policy of the

20   claims handling at Safe-Guard Products

21   International.  Do you -- when you begin your

22   claims analysis and you arrive at a

23   conclusion, benefit, no benefit, do you as a

24   matter of general business practice send a

Page 42

1    written communication of that decision to the

2    claims maker, policy holder?

3         A.   Oftentimes in the case of these

4    contracts, and especially in the case of this

5    one, you know, the lender, you know, would be

6    the one interested in the outcome of these --

7    of this claim.

8         Q.   Okay.

9         A.   Because they're the ones waiving, you

10   know, the outstanding balance if there was

11   one to waive.

12        Q.   Okay.   Yeah.   Let's talk about that

13   for a second.   The lender is a party to this

14   agreement, is it not?

15        A.   Yes.

16        Q.   Okay.   The lender is agreeing

17   effectively under the GAP plan to under

18   certain circumstances waive all or a portion

19   of its owed balance on the loan.   Am I

20   correct?

21        A.   Under certain circumstances, yes.

22        Q.   What benefit does the lender receive

23   from the SAFE-GAP product?   Do they receive a

24   portion of the premium you collect?

Page 43

1              MR. VAN VOLKENBURG:   Object to form.

2         A.   No.

3         Q.   Okay.   Why would they agree to waive

4    their indebtedness without any returned

5    benefit?   If you could, enlighten me on that.

6         A.   The lender doesn't receive any benefit

7    from the sale of the contract.   They'll

8    receive benefit if there's benefit to be paid

9    because of a total loss of the vehicle and

10   there's a loan balance remaining.   So they

11   only receive a benefit when there's a claim

12   that would be made by the customer and

13   oftentimes by the lender to waive the loan

14   balance.

15        Q.   Right.   And the lender, in that case

16   that you've just described, loses its right

17   to collect that remaining balance?

18        A.   Correct.

19        Q.   All right.   So how is that a benefit

20   to them?

21        A.   Because they will be reimbursed for

22   that loan balance that's outstanding.   And

23   that's their benefit.

24        Q.   Who reimburses them for that?

Page 44

1       A.   The folks -- well, the way -- so let

2   me explain the way GAP works.  It sounds like

3   that's where we're going.

4       Q.   **That's where we're going.**

5       A.   So the dealer is a lender at a point

6   in time when the customer is buying the car.

7   And at that point in time, the dealer is

8   offering GAP to the customer.  They're

9   offering maybe extended warranties to the

10  customer.  And that becomes a loan package -

11  okay - that will then go to the lender.  The

12  lender will review those documents.  Okay.

13  And they'll look for SAFE-GAP for instance,

14  this particular document.  And when they look

15  for this SAFE-GAP, they usually know that --

16  in this case Citi Financial knew that this

17  GAP contract, if, you know, it comes down to

18  a benefit is -- has an insurance company

19  behind it.

20      Q.   **Okay.**

21      A.   And so therefore, Safe-Guard -- when

22  they look at this, they go Safe-Guard is a

23  third-party administrator.  So they're the

24  ones administrating -- think of it as they're

Page 45

1    being outsourced to administer this contract

2    on behalf of the insurance company behind

3    this GAP contract.

4        Q.  So as I understand what you're saying,

5    there's even a fourth party, an insurance

6    company, that's not -- that's out there

7    that's going to pay the lender what it loses

8    when it waives the loan balance?

9        A.  There is a -- I don't know about

10   fourth party.  But there is an insurance

11   company behind this GAP, if you will.

12       Q.  Okay.

13       A.  Behind this GAP policy.

14       Q.  Okay.

15       A.  Safe-Guard is just a third-party

16   administrator acting on behalf of the

17   insurance company.

18       Q.  But regardless of whether or not the

19   balance is waived as per the customer, and in

20   this case Robin Hinkle, the lender is still

21   going to be indemnified by an insurance

22   company if that loan is approved.  Is that a

23   fair statement?

24       A.  Indemnification -- you need to, you

Page 46

1    know, clarify.

2         Q.   They're going to be paid by an

3    insurance company for that amount that they

4    forgive in accordance with the SAFE-GAP

5    product?

6         A.   They will waive the balance and seek

7    reimbursement from that insurance company.

8    That's the way it works.

9         Q.   That's the way it works.

10        A.   Okay?

11        Q.   Okay.   So the loan is not actually

12   forgiven?

13        A.   It's --

14        Q.   It's transferred to another party?

15        A.   No.   The loan isn't transferred to

16   another party.

17        Q.   Okay.

18        A.   It's not transferred.

19        Q.   Okay.   Well, the responsibility to pay

20   the loan balance falls to another party?

21             MR. VAN VOLKENBURG:   Object to form.

22        Pay the balance to whom?

23        A.   Yeah.

24        Q.   To the lienholder, the lender who is

Page 47

1    forgiving -- who is quote unquote forgiving

2    the loan as per the customer, is going to

3    receive payment for that amount from another

4    party?

5          MR. VAN VOLKENBURG:  Maybe -- and

6       I don't -- I'm not trying to tie you up here.

7       Maybe you could just restate that question.

8          MR. PERSINGER:  Yeah.

9       Q.   What I'm saying is that the lender

10   goes into this transaction with a reasonable

11   expectation that even though it may release

12   its loan obligation as per the customer

13   buying the car that it will receive the

14   forgiven amount from another party, in this

15   case an insurance company?

16      A.   They -- yes.  They will receive an

17   amount to -- for that balance, if the terms

18   and conditions of this contract are followed,

19   yes.

20      Q.   Okay.

21      A.   They will seek reimbursement from that

22   insurance company.

23      Q.   Is this always the same insurance

24   company?  Is it a different collection of

Page 48

1    insurance companies?  Does it vary from

2    lender to lender?

3         A.   It can.

4         Q.   Do you know who the insurance company

5    involved in this situation is or would have

6    been?

7         A.   I do.

8         Q.   Okay.  Could you state that for the

9    record, please?

10        A.   National Specialty.

11        Q.   Okay.  Do you know where their

12   headquartered?

13        A.   Texas.

14        Q.   Okay.  Do they provide any other sorts

15   of coverage besides this type of coverage or

16   are they a larger company with many products?

17        A.   I don't know much about --

18        Q.   Okay.

19        A.   -- National Specialty.

20        Q.   Who is responsible for -- well, is the

21   arrangement between National Specialty and in

22   this case Santander Citi Financial, is that

23   something that Safe-Guard International, LLC

24   arranges or has any hand in?

Page 49

1      A.  Well, Citi Financial doesn't have an

2   arrangement with National Specialty.  You

3   know, Safe-Guard has an arrangement with

4   National Specialty to honor this contract,

5   you know, at -- and if there's a claim and

6   there's, you know, a balance to be waived.

7      Q.  Okay.  Does Safe-Guard Products

8   International, LLC pay National Specialty a

9   premium for that?

10      A.  Does Safe-Guard Products, LLC pay

11   National Speciality a premium for that?

12   We -- National Specialty will set the rates.

13   And remember we're a third-party

14   administrator.  So it's a pass through --

15      Q.  Right.

16      A.  -- to us, you know.

17      Q.  Okay.

18      A.  So we're just administrating these

19   contracts.  Which take a set fee from these

20   contracts.

21      Q.  Right.  Let's talk about that.  That

22   may be a better way to slice this apple.

23   Back in Exhibit A -- give me a second here.

24          MR. PERSINGER:  Actually, let's go

Page 50

```
1        off the record briefly.  I want to dig out a

2        document and get a cup of coffee and then

3        we'll --

4               THE WITNESS:  Okay.

5               MR. PERSINGER:  If anyone needs to

6        take a bathroom break.

7               LEGAL VIDEO SPECIALIST:  The time is

8        9:30 a.m.  We are going off the record, ending

9        DVD 1.

10              (Break in proceedings.)

11       BY MR. PERSINGER:

12           Q.  I wanted to follow up on some of the

13       questions that we were talking about, the --

14       and what SAFE-GAP really does.  And I'm going

15       to -- I've put in front of you there what

16       we're going to mark as C1, which is a

17       document that's a subset of Exhibit C.  And

18       it's the retail installment contract and

19       security agreement that Hinkle signed at C&O

20       Motors on -- oh, July 14th, 2006.  And if you

21       look on page 2, you see a breakdown of --

22       it's called itemization of amount finance.

23       And there's various -- the unpaid balance

24       that's been financed and the trade-in
```

Page 51

1   allowance and other things.  But one of the

2   items that's listed down there is SAFE-GAP,

3   $495.  And my question to you first is, is

4   that the amount -- the total amount that

5   would have been paid by the Hinkle's for the

6   SAFE-GAP product that they purchased, the GAP

7   protection plan?

8       A.  I would assume so.  I mean, it says

9   SAFE-GAP $495, so...

10      Q.  Okay.  Now, within that $495, would

11  some of that amount have been remitted to the

12  dealer?

13      A.  Safe-Guard would not have received

14  $495.

15      Q.  Okay.  Well, why don't you explain to

16  me how that $495 would have been split and

17  among which parties?

18      A.  So we market our products to

19  manufacturers of automobiles.  We market them

20  to large dealership groups, called

21  consolidators.  They consolidate dealerships.

22  And then we market our products to

23  independent representatives.  Think of it as

24  manufacturer reps selling products into --

Page 52

1    marketing products into a dealership.  So

2    when we market our products to those three

3    entities, we offer that product to those

4    three entities for a cost.  You know, in

5    particular, this 495 breaking it down, I

6    believe that cost was $175.

7    **Q.  The -- in other words, the amount that**

8  **Safe-Guard would have received?**

9    A.  Safe-Guard would have received $175.

10    **Q.  Is that a formula kind of split?  Is**

11  **that -- or is it the same in every case?  Or**

12  **is it dependent on certain factors?  And if**

13  **so, what are those factors, I guess?**

14    A.  You know, the factors are, you know,

15  the company -- the insurance company behind

16  the GAP contract that I mentioned, what

17  they're going to charge.

18    **Q.  Okay.**

19    A.  That's probably the biggest factor in

20  it.  Our -- you know, then we have an

21  administration fee.  That's where we make our

22  money is administration fee.  That on average

23  is, you know, $20.  I looked at this

24  particular contract.  And for whatever

Page 53

1    reason, our admin fee was $7.

2         Q.  Okay.

3         A.  So that is -- you know, like I said,

4    the average is usually 20 -- you know,

5    between 15 and 20.  Seven was -- I was

6    surprised, you know, that that was what it

7    was.

8         Q.  Why was that in this case?  Do you

9    have any feel for that?

10        A.  I think it has to do -- some of the

11   factors that the insurance company charges.

12   It's all -- you know, it's market driven.

13        Q.  Sure.

14        A.  So in order to be competitive -- you

15   know, if we had to offer 175 as, you know,

16   the market price -- and therefore, my

17   feelings are the insurance company wasn't

18   going to offer it less so we --

19        Q.  So you guys get squeezed in other

20   words?

21        A.  We got squeezed --

22        Q.  Yeah.

23        A.  -- is what I'm thinking.

24        Q.  Well, what -- do you know the factors

Page 54

1    the insurance company uses to set its rate?

2    Do you have any feel for that?

3         A.  Not in great detail.  But, I mean,

4    I -- you know, I need to -- what do you mean

5    by feel for that?  I mean --

6         Q.  Well, do they consider the credit

7    history of the person?

8         A.  No.

9         Q.  Okay.  Do they consider the person's

10   age?

11        A.  No.

12        Q.  Do they consider the length of the

13   length?

14        A.  They consider the length of the loan,

15   yes.

16        Q.  Okay.  Why is that?

17        A.  The longer the loan means that this

18   contract is enforced longer.  So the chances,

19   you know, of having a claim are longer.

20        Q.  Okay.  All right.  Now, of that 495,

21   you're saying that 175 comes as a

22   pass-through through SAFE-GAP of which

23   SAFE-GAP in this case kept $7 in other cases

24   might keep as much as $15?

1       A.  15 to 20.

2       Q.  The rest of that 175 goes on to

3   National Specialty or whoever the, for lack

4   of a better term, the fourth party

5   indemnitor, insurer is.  What happens to the

6   rest of the $495?  That leaves, you know,

7   over half the amount?

8       A.  It's retained by the dealership.

9       Q.  The dealership.  And what does the

10  dealership bring to the table in this

11  transaction?

12      A.  They're the ones actually selling the

13  product to the consumer.

14      Q.  Okay.  So that's sort of like a sales

15  commission?

16      A.  Correct.

17      Q.  Okay.  All right.

18              (Pause in proceedings.)

19              (Exhibit C1 marked.)

20          MR. PERSINGER:  I apologize for the

21      delay here.

22          MR. VAN VOLKENBURG:  Do you want to

23      go off the record for a second?

24          MR. PERSINGER:  Yeah.  That might not

Page 56

1       be a bad idea.

2                  LEGAL VIDEO SPECIALIST:  The time is

3       9:46 a.m.  we are going off the record.

4                  (Break in proceedings.)

5                  LEGAL VIDEO SPECIALIST:  The time is

6       9:47 a.m.  We are back on the record.

7       BY MR. PERSINGER:

8          Q.  Okay.  We're almost through the end of

9       this first set of joint responses.  And

10      there's was one more exhibit that was

11      attached.  And it was Exhibit D.  And I'm

12      looking for the question here.  It's -- okay.

13      We requested copies of all correspondence and

14      any other documents, including those which

15      exist in electronic formats relating to

16      communications between Santander and

17      Plaintiff's.  And we were provided a copy of

18      one document and I believe several wave files

19      that had recorded phone calls on them.  But

20      here's what -- and show that to your counsel,

21      please.  But that's what I have for the

22      documents that were provided.

23                  (Counsel reviews document.)

24                  MR. VAN VOLKENBURG:  Gary, can you

Page 57

1          hand me the actual discovery responses there?

2                    THE WITNESS:  This?

3                    MR. VAN VOLKENBURG:  Yeah.  Thank you.

4          Q.  I'm showing there may have been like a

5    document that was mistakenly put in there by

6    me in another case on notice of hearing.

7                    MR. PERSINGER:  Are you satisfied

8          with that, Jeff?  Or do you want to follow up

9          on it?

10                   MR. VAN VOLKENBURG:  Just so I'm sure,

11         you were asking about correspondences between

12         Safe-Guard and Santander.  Is that --

13                   MR. PERSINGER:  Eight asks for

14         actually communications between either

15         Santander or Safe-Guard and the Plaintiff's.

16         When these interrogatories were done, it was

17         kind of to both.  That's why they were joint.

18                   MR. VAN VOLKENBURG:  Yeah.

19                   MR. PERSINGER:  I served the same

20         on Mr. Konrad.

21                   MR. VAN VOLKENBURG:  Yeah.  I mean,

22         do you understand what's being asked, Gary?

23                   THE WITNESS:  Yeah.  Communication

24         between Safe-Guard and Santander.

1        MR. VAN VOLKENBURG:  Yeah.

2        MR. PERSINGER:  Sure.

3    Q.  Okay.  Take a look at that and just

4    tell me the same question I've been asking

5    you.  Does that look like a genuine,

6    authentic copy of a document that Safe-Guard

7    produced and keeps in the regular course of

8    its business?

9    A.  Yes.

10   Q.  Okay.

11       MR. PERSINGER:  We'll mark that one

12   as -- are we up to F?

13       COURT REPORTER:  Uh-huh.  Yes.

14       MR. PERSINGER:  Okay.  We'll mark

15   that one as F.

16            (Exhibit F marked.)

17   Q.  Now, that is a copy of two different

18   letters, one of which is what I'll call the

19   denial letter that was sent to Robin Hinkle.

20   Am I correct?

21   A.  Correct.

22   Q.  And then the other one is a copy of a

23   letter that she received asking for more

24   information I think with her handwriting on

1     it going back to Safe-Guard, correct?

2        A.   Correct.

3        Q.   All right.   Now, the denial letter --

4     I want to talk about that one first.   It

5     states that there's no benefit available

6     under the terms of the contract.   And then

7     concludes a definition of unpaid net balance.

8     Am I correct about that?

9        A.   Correct.

10       Q.   All right.   And then it says, due to

11    inconsistencies in your payment history, such

12    as late payments, the loan was reamortized to

13    lower the GAP calculations.   What did you

14    mean -- what does the letter mean when it

15    says the loan was reamortized?

16       A.   So the definition of unpaid net

17    balance basically details that finance

18    charges, late charges, delinquent payment,

19    deferred payments, uncollected services

20    charges are -- need to be taken out of the

21    balance owed on the loan.

22       Q.   Okay.

23       A.   The terms and conditions of the GAP

24    contract specifies that the customer needs to

Page 60

1    make their car payments on a timely and

2    regular basis, just like the terms and

3    conditions of the loan agreement asked them

4    to.  So if the loan contract is not followed,

5    meaning that the customer does not make a

6    payment or the customer makes a late payment

7    and there's fees charged by the lienholder,

8    then this is going to add to the balance of

9    the loan.

10       Q.  Okay.

11       A.  So what reamortized is is looking at

12    the loan balance and removing those charges

13    and really taking the loan balance -- or

14    taking the loan in itself and playing it out

15    over time as if the customer made all those

16    payments on time and there were no late

17    payments.  So if the customer was to make all

18    their payments on time --

19       Q.  Uh-huh.

20       A.  -- and not have these fees, then that

21    would -- at the end, the loan balance

22    would -- and the reamortized balance would be

23    the same.  So that's what reamortized means.

24    It's taking the loan and applying all the

1    payments as they should have been up to the

2    point of the loss.  And then now that's

3    truly your loan balance.

4         Q.   Okay.  Who does the reamortizing?  Is

5    that Safe-Guard?  Is it the lender?

6         A.   Safe-Guard does.

7         Q.   Okay.  And is that done in each case

8    that a claim is made?

9              MR. VAN VOLKENBURG:  Object to form.

10     Are you just asking about the Safe-Guard

11     Product?  Or are you asking kind of all their

12     products, I guess?

13             MR. PERSINGER:  Let's start with this

14     particular product.

15        Q.   When you have someone that makes a

16   claim under the SAFE-GAP product that Mr. and

17   Mrs. Hinkle purchased, and there's a claim

18   made, is it standard procedure to reamortize

19   the loan?

20        A.   The standard procedure is to receive

21   the payment history.  And then when you see

22   the payment history you can see where there's

23   late charges or missed payments in that

24   payment history.

1      Q.  Right.

2      A.  And then we would know, okay, that we

3  need to reamortize this loan.  If the payment

4  history shows that there have been no missed

5  payments and, you know, it looks clean,

6  everything has been filed per the terms and

7  conditions of the -- of paying the loan back,

8  the loan agreement, then we will not

9  reamortize.

10     Q.  Okay.  So it's only in those

11  situations where the payment history that you

12  receive indicates one of these items that's

13  spelled out in the unpaid net balance

14  definition?

15     A.  That would be, yes, a reason for

16  reamortizing.

17     Q.  Okay.  Let's talk about these items.

18  What exactly is an unearned or a future

19  interest or rental charge?

20     A.  Future interest, you know, is a term

21  in the lienholder world where they may defer

22  some interest on this loan.  So it's future

23  interest, you know, almost like a balloon

24  payment.

Draft Copy

Notice of Removal
EXHIBIT F

Page 63

1      Q.   Who does that?

2      A.   The lien holders will.

3      Q.   The lien holders do.   Is that

4   something that's between the lienholder and

5   the borrower?

6      A.   Yeah.   It would be between the

7   lienholder and the borrower.   Same with the

8   rental charges, if there's any type of rental

9   agreement and the lienholder -- they can rent

10  a car.

11     Q.   So these products apply to cars that

12  are rented and not just cars that are

13  purchased?

14     A.   No.   No.   No.   No.   No.   It applies to

15  cars that are purchased.

16     Q.   Okay.   Why is rental charges in the

17  definition?

18     A.   I don't know.   I'd only be giving my

19  best educated business guess on why rental

20  charges are in there.

21     Q.   What's an unearned interest payment

22  versus a future interest payment?

23     A.   Where are you?

24     Q.   I'm looking at the letter where it

Page 64

1    reprints the definition of unpaid net balance

2    from the SAFE-GAP agreement.

3         A.   Okay.

4         Q.   And it says shall not include any and

5    all unearned and/or future interest or rental

6    charges, which indicates to me that maybe

7    unearned and future interest are different

8    things.

9         A.   No.   They're basically the same.

10   What happens is, you know, when your loan

11   stops -- in this particular case, when she

12   totaled her car, there's another payment due.

13   Well, that payment is still due per the terms

14   and conditions of the loan document.   And

15   there's interest associated with that.   So

16   that's future and unearned interest.   Okay?

17   So it's not earned by Santander.   They

18   haven't -- no one has made that payment yet.

19        Q.   So even though -- is it true that in

20   the amortize payments, if you make every

21   payment on time, each payment is going to

22   have a component of principle and a component

23   of interest?

24        A.   Right.   Principle and interest.

1        Q.   So you're saying that once the car is

2    totaled the component of that interest on the

3    payments that are -- have not yet been paid

4    are not part of the unpaid net balance?

5        A.   What I'm saying is, we're not -- we

6    are -- we're not -- so if you pay your -- if

7    you pay your loan off early -- maybe this is

8    the best way to explain this.  If you pay

9    your loan off early --

10        Q.   Uh-huh.

11        A.   -- they'll give you a pay out amount.

12    And, you know, you call up your lender and

13    you'll say, hey, you know --

14        Q.   Right.

15        A.   -- what's my pay off amount.

16        Q.   Right.

17        A.   You call that -- you call today,

18    you're going to get a number.  You call a

19    month from now, you're going to a get a

20    different number.  The difference in those

21    numbers is unearned or future interest.

22        Q.   Right.

23        A.   Okay.  So that's what we're looking

24    for is we're saying -- we're looking for what

1    is the balance as of the date of loss at that

2    point in time.

3         Q.  Right.

4         A.  The lienholder -- if you pay it off,

5    they're going to make less interest on that

6    because you're not -- right?

7         Q.  Correct.

8         A.  So that's the future interest.

9         Q.  Okay.

10        A.  We're not responsible for that.  So if

11   your lienholder has, hey -- you know, some

12   sort of guaranteed clause that says I'm going

13   to make this amount of interest then

14   you're -- you know --

15        Q.  **Then you wouldn't be responsible for**

16   **that?**

17        A.  We wouldn't be responsible for that.

18        Q.  Okay.

19        A.  But those are, you know --

20        Q.  **What about finance and lease charges?**

21   **What does that pertain to?**

22        A.  They're just various charges that a

23   lienholder would have in the contract, that,

24   you know, may -- may be in there for various

1    reasons.  I mean, they're contract terms and

2    conditions in the lien holder's agreement.

3         Q.  Late charges?

4         A.  Late charges is one of those, you

5    know, charges that you don't make your

6    payment there can be a fee charged by a

7    lienholder, you know.  It's maybe, you know,

8    $15 or some nominal fee to say, hey, you're

9    penalized for making this late payment.

10        Q.  And that's regulated by state law

11   usually, is it not?

12        A.  Yes.

13        Q.  All right.  Delinquent payments.

14        A.  I want to -- you know, I don't know

15   state law, so --

16        Q.  Right.

17        A.  -- I assume --

18        Q.  Right.

19        A.  -- a lot of this is -- the lien

20   holders have terms and conditions.  And a lot

21   of these things that you're asking me about

22   are in the terms and conditions of the

23   lienholder documents.

24        Q.  Damon Wiener keeps up with that kind

Page 68

1     of stuff?

2         A.   Damon Wiener keeps up with that kind

3     of stuff, yes.

4         Q.   Because that's a part -- that a core

5     part of the business that you're in, is it

6     not, staying abreast of the laws and the

7     jurisdictions that you sell your product in?

8         A.   It is an important part of our

9     business that -- the terms and conditions of

10    the contract.  And, you know, we can honor

11    them based on the laws of the state, you

12    know.

13        Q.   Sure.  Okay.  Now, delinquent

14    payments.  That's something that I assume

15    means where they fail to make a payment on

16    time?

17        A.   It's similar -- it's the same thing as

18    late charges in my eyes.

19        Q.   All right.

20        A.   Delinquent or late.

21        Q.   This is my question.  If the payment

22    is made ten days late and it's delinquent,

23    does that mean that it becomes not part of

24    the unpaid net balance, even though it's made

Page 69

1    ten days late?

2         A.  Just the -- yes.  Yes.  If they don't

3    make the payment at all, if they don't make

4    the payment at all.  Delinquent could mean,

5    you know, it's a little late or it's just not

6    made at all.  Then if it's not made at all

7    then that would absolutely increase the

8    balance.

9         Q.  All right.  But if it is made but it's

10   late, it's credited to the balance?

11        A.  It is credited to the balance.

12        Q.  The interest component and the

13   principle component?

14        A.  I'm not sure how the lien holders do

15   that.

16        Q.  But you're the one doing the

17   reamortizing.  So I'm asking you when you

18   reamortize it do you look at each payment

19   that's not on time and exclude that?

20        A.  Oh, I see.  I think I see the

21   confusion.  When we do reamortization, we're

22   not -- there aren't -- reamortization is if

23   you did the loan per the term -- or you did

24   your payments per the terms and conditions of

1      the contract, meaning you made every payment

2      on time as you're supposed to up to the date

3      of loss.

4          Q.  Right.

5          A.  So in that particular case, we

6      reamortize to -- we can't go off of this.

7      When you reamortize late charges, ** don't

8      come into effect.  They're strictly, you

9      know, payment one made on time, payment two

10     made on time, payment three made on time,

11     payment four made on time.  We're looking at

12     it -- reamortizing it as it was made on time,

13     it was a perfect loan.  So...

14         Q.  **What if it's payment one made on time,**

15     **payment two made 15 days late, payment three**

16     **made on time?  All those payments --**

17         A.  We don't -- we're reamortizing it

18     meaning we're starting from scratch.

19         Q.  **Right.**

20         A.  You get a loan.  Make a payment.  Get

21     a loan.  Make a payment.  Get a loan.  Make a

22     payment.  Get a loan.  Make a payment.  We

23     just run it all the way through.

24         Q.  **Right.**

Page 71

1    A.   Okay.   So the loan history at that

2    point in time on delinquent payments doesn't

3    come into play because you're reamortizing

4    it, you know, all the way through.   So you

5    don't have -- you're not looking at the loan

6    history at that point in time.

7    Q.   **So payment two in my example would be**

8    **part of the balance that you would be subject**

9    **to waiver?**

10    A.   But what's --

11    Q.   **Even though it was made 15 days late?**

12    A.   I don't know if we're looking at this

13    right.

14    Q.   **Okay.**

15    MR. VAN VOLKENBURG:   I think you're

16    talking past each other.

17    A.   Yeah.   We're talking past each other

18    in this one.   Reamortization.   All right.

19    What we're doing there is we're looking at

20    the loan an starting with a balance of day

21    one.   And then we say, all right, let's apply

22    the first payment to that balance.

23    Q.   **Right.   And the balance is reduced?**

24    A.   And the balance is reduced.   And you

Page 72

1    keep applying it.  You're now going to end

2    up -- when it comes to the date of loss -- we

3    do it all the way through the date of loss.

4    At that point in time, you now have a loan

5    balance.  That's what we're looking at.

6    During that whole time there are no -- you

7    know, during that -- what we're doing there

8    are no late payments.  They're not

9    delinquent.  So we just ran the loan as it

10   was perfectly made in time.  That's the loan

11   balance that we're looking at.

12        Q.  So even delinquent payments would

13   reduce the balance in that scenario?

14        A.  Delinquent payments would reduce the

15   balance --

16        Q.  Okay.

17        A.  -- yes.

18        Q.  All right.

19             MR. VAN VOLKENBURG:  Maybe the issue

20   is -- and I don't -- I'm not trying to ask

21   my own deponent questions in the middle of the

22   deposition, but maybe explain how then the

23   lenders figure comes into play after you

24   reamortize the debt.

Page 73

1        A.   So we're going to reamortize and we

2   end up with a loan balance.   The lienholder

3   has their own loan balance, right?

4        Q.   Right.

5        A.   If the consumer made all their

6   payments on time, the reamortization would be

7   the same.   We'd end up with the same balance.

8        Q.   Right.

9        A.   Okay.   So when we reamortize and the

10  loan balance is higher let's say by the

11  lienholder, then more than likely there was a

12  delinquent payment or there was a missed

13  payment or something along those lines.

14       Q.   Right.

15       A.   That the consumer did not fulfill the

16  contract per the lienholder.

17            If it was lower, that means

18  the consumer may have made an extra payment

19  in there.   Okay?   So we're looking at the

20  reamortization as the loan balance per the

21  terms and conditions of the GAP contract

22  saying you need to make all your payments

23  because we're not covering late payments.   We

24  not covering delinquent payments.   You need

1    to make your payments, you know, just like

2    you're contracted to per the terms and

3    conditions of the loan.  You're going to end

4    up with a balance.  That's the balance we're

5    looking at.

6        Q.  Okay.  All right.  What are deferred

7    payments?

8        A.  Deferred payments are like balloon

9    payments.  You know, payments in the future.

10       Q.  Uncollected service charges?

11       A.  You know, if there is a -- if there

12   was a late fee and -- charged but they

13   actually paid that late fee, then, you know,

14   it would be collected.  And we would -- we're

15   not worried about those, you know.  We're

16   worried about the ones that are uncollected

17   by the lienholder.

18       Q.  Okay.

19       A.  Because that's all adding to the loan

20   balance.

21       Q.  Refundable prepaid taxes and fees?

22       A.  Refundable prepaid taxes and fees.

23   Per, you know, certain lienholder agreements

24   there can be some taxes and fees that are

Page 75

1    prepaid.  And if they're refundable, then

2    that's going to go towards the loan balance.

3    So when the loan terminates, you get the

4    refunded portions back and it's going to

5    lower your loan balance.

6         Q.  Disposition fees?

7         A.  Those are fees that are charged by

8    lien holders, you know, to initiate a loan

9    and those types of things.

10        Q.  Termination fees?

11        A.  Some lien holders will have a

12   termination fee if you terminate your loan

13   early then you owe a fee.

14        Q.  Penalty fees?

15        A.  Similar to just, you know, late

16   charges.

17        Q.  Okay.  Would you expect an average car

18   buyer consumer to understand what each of

19   these charges refers to reading that

20   definition?

21             MR. VAN VOLKENBURG:  Object to form.

22        A.  They -- yes.  They -- you know,

23   they're pretty clear from -- you know, in

24   that definition to me that there's -- you

Page 76

1    know, what's a late charge, a delinquent

2    payment, a deferred payment.  They go back to

3    the loan document, you know.

4        Q.  Okay.  Unearned interest.  You expect

5    them to be familiar with that concept?

6    Balloon payments?

7        A.  I would.  They're part of a -- you

8    know, a loan document.  You know, so if you

9    read the loan document, which is part of the

10   contract, and this is an addendum to the

11   contract, they go hand in hand.

12       Q.  I assume you've bought a car before --

13       A.  I have.

14       Q.  -- in your life, probably several

15   times given that you appear to be about my

16   age.  You're familiar with that process?

17       A.  Yes.

18       Q.  You're familiar with the number and

19   volume of paper that's put in front of

20   someone at the time they're buying a car in a

21   short amount of time?

22       A.  Yes.

23       Q.  And you think that someone should be

24   able to read that and clearly understand

Page 77

1    exactly what each of those things is --

2             MR. VAN VOLKENBURG:   Object to form.

3        Q.   -- that we just discussed?

4        A.   I mean -- yes.   I mean, it's part

5    of -- when you sign a document you should

6    understand what you're signing.   Yes.

7        Q.   Okay.   If you don't understand it, who

8    would be the person that would explain it to

9    you in the context of this contract being

10   presented to a buyer?

11            MR. VAN VOLKENBURG:   Object to form.

12       Are you talking about the finance agreement

13       or are you talking about the Safe-Guard?

14            MR. PERSINGER:   I'm talking about

15       the Safe-Guard, the definition of unpaid net

16       balance in the SAFE-GAP contract.

17       Q.   Who would be the person on the front

18   line of the car purchase transaction to

19   explain to a consumer like Robin Hinkle as to

20   what each of those means if she didn't

21   understand them?

22       A.   The lienholder because this is an

23   addendum to that contract can certainly

24   explain this to her.

Page 78

1      Q.   Does the lienholder generally have a

2 rep on site at a car dealership?

3      A.   They -- not generally.   A lot of

4 times, you know, the dealer is the

5 lienholder.   So the dealer, you know, acts on

6 behalf of the lienholder.

7      Q.   So wouldn't it be the dealer?

8      A.   Yeah.   The dealer can explain some of

9 these to her.

10      Q.   Okay.

11      A.   But, you know, the point that I'm

12 trying to make is this an addendum to the

13 lienholder agreement --

14      Q.   Okay.

15      A.   -- you know, so it's -- okay.

16      Q.   But it's reasonable, is it not, for a

17 car consumer to rely on what they're told by

18 the dealer and its representatives in terms

19 of how these contracts work, what the

20 definitions in them might mean and how

21 they're going to apply to that particular

22 case?

23          MR. VAN VOLKENBURG:   Object to form.

24      Q.   Is that reasonable?

1       A.   Yeah.   I mean, you know, I smile

2   because, you know, when you go buy a car, you

3   know, a lot of consumer advocates will tell

4   you that car dealers, you know, are great

5   sales people.   And so, you know --

6       Q.   Yeah.   They are generally, the good

7   ones?

8       A.   So, you know, you need to read all the

9   documents they put in front of you.   You

10  know, that's --

11      Q.   So you're saying you need to be aware

12  of what you sign and what you're told by the

13  car dealers?

14              MR. VAN VOLKENBURG:   Object to form.

15      A.   No.   You don't need to be aware of

16  what you're saying to car dealers.   This is a

17  business transaction.   You're buying a car.

18  So what I'm saying is go to a reputable car

19  dealer and the reputable car dealer will, you

20  know, present these documents and explain

21  them to you.

22      Q.   But you testified -- oh, I'm sorry.   I

23  didn't mean to speak over you.   You testified

24  earlier, and I want to be crystal clear on

1    this, the dealer functions as Safe-Guard's

2    sales force in this transaction?

3              MR. VAN VOLKENBURG:  Object to form.

4        Q.  Is that fair?

5        A.  The dealer is the one selling the

6    consumer the products.

7        Q.  Does Safe-Guard only deal with

8    reputable dealers?

9        A.  Yes.

10        Q.  Okay.  All right.  Do you have a

11   screening process for dealers that you go

12   through to decide who you're going to deal

13   with and who you're not going to deal with?

14        A.  Yes.

15        Q.  Who handles that?

16        A.  Our legal and compliance department.

17   Falls under Damon.

18        Q.  And what does Damon do to determine

19   whether a car dealer is reputable, whether

20   they're up to the standards that you demand?

21        A.  Several things.  One of them is an

22   **Holofax, you know, ** on dealership

23   principle, years in business, better business

24   bureau.  We get pictures oftentimes of the

1    dealer's lot, the cars they're selling.

2        Q.  Okay.

3        A.  You know, so those types of things.

4        Q.  All right.

5            MR. VAN VOLKENBURG:  Mo, do you

6    mind if we take a quick break?  I want to get

7    a glass of water.

8            MR. PERSINGER:  Not at all.  Not at

9    all.  That will give me a nice transition

10   point too.

11           LEGAL VIDEO SPECIALIST:  The time is

12   10:15 a.m.  We're going off-the-record.

13           (Break in proceedings.)

14           LEGAL VIDEO SPECIALIST:  The time is

15   10:24 a.m.  We are back on the record.

16   BY MR. PERSINGER:

17       Q.  Mr. Volino, I want to refer you now to

18   what we've previously marked as Exhibit D,

19   Plaintiff's D, which is the Safe-Guard GAP --

20   what I'll call the GAP contract, total loss

21   protection plan.  And maybe I should start

22   there.  Is this a product that was sold to

23   Robing and Johnny Hinkle a total loss

24   protection plan, a guaranteed asset plan or

Page 82

1    is it both or what -- how would you

2    characterize it?

3          A.   They're most commonly known in the

4    market as a guaranteed asset protection, GAP.

5          Q.   Okay.  Is that different than total

6    loss protection or is it just two names for

7    the same thing?

8          A.   It's two names for the same thing.

9          Q.   Okay.  What distinguishes this from

10   the other products that you sell?  Maybe I

11   should start there.

12                   What -- how many products does

13   Safe-Guard sell or offer -- market to car

14   dealers?

15         A.   We market approximately 12 products.

16         Q.   Okay.  And this being one of them?

17         A.   Correct.

18         Q.   Can you go through the other ones and

19   just state them for the record?

20         A.   Sure.  They're vehicle service

21   contracts.  There's a lease wear and tear

22   contract.  There is a tire and wheel product.

23   There is a paint less dent repair product.

24   There is a windshield product.  There's a key

Page 83

1    product.  There's a -- GAP, which we're

2    talking about here.  There's a roadside

3    assistance product.  There is some variations

4    of these products that add to other products

5    such as a combo product that would combine

6    tire, wheel, windshield and PDR products.

7         Q.  Sure.

8         A.  That add to those products.  Let me

9    think if I'm leaving a product or two off.

10   There's a prepaid maintenance product.

11   There is a -- I mentioned the lease wear and

12   tear.  I think I've got about ten products

13   there.  And I can't really recall --

14        Q.  That's good enough.  I don't want try

15   to try to make you do that cold.  Let me ask

16   you this.  Are there any other products

17   besides the total loss protection slash GAP

18   product that deal with unpaid balances on

19   loans?  Or is that the only one?

20        A.  This is the only one.

21        Q.  Okay.  Now, I want to turn to the

22   exhibit which we've --

23        A.  There's a theft product.  It's king

24   me.

Page 84

1          Q.   No problem.  No problem.  The GAP

2     contract, I want to look at that.  We

3     previously identified this as the application

4     for the coverage.  And it's also the

5     contract, is it not, that spells out the

6     terms of the arrangement?  Am I correct?

7          A.   We're on Exhibit D?

8          Q.   Yes.

9          A.   We don't call this an application.

10         Q.   Right.

11         A.   No one is applying for anything here.

12    They're just signing this contract.  And it's

13    active.  And then we're just requesting the

14    dealer to send us the data behind this

15    contract, along with the payment.  And it's

16    an active contract.

17         Q.   All right.  Is this the entire

18    contract?

19         A.   This is the entire contract.

20         Q.   Okay.  There's no other terms or --

21         A.   No other terms.

22         Q.   -- written -- okay.

23         A.   It is an addendum to the loan

24    agreement.

Page 85

1       Q.  Am I correct that the active or what I

2   would term the operative language is about --

3   a little more than halfway down the page and

4   it states, coverage -- it's entitled

5   coverage.

6           MR. VAN VOLKENBURG:  Which page are

7       you looking at?

8           MR. PERSINGER:  I'm looking at the

9       front page.

10          THE WITNESS:  Oh, the front page.

11      Sorry.  I was on the back page.  Coverage.

12      Okay.

13      Q.  That appears to me to be the operative

14  language -- do you agree with that -- of the

15  agreement?

16      A.  I consider all the language on this

17  document, you know, part of the document.

18  So when you say operative --

19      Q.  Fair enough.  That's probably a bad

20  way to term that.  Let's go through what it

21  says.  To the named customer is responsible

22  to the named dealer/assignee under the terms

23  of the described installment sales

24  contract/loan/lease agreement for the amount

1    of any early termination liability resulting

2    from a total loss of the vehicle.  Due to

3    this addendum being in effect, the

4    dealer/assignee agrees to cancel a portion of

5    the customer's indebtedness in the event of a

6    total loss of the vehicle as defined herein.

7    The deficiency waiver addendum will waive the

8    amount equal to the unpaid net balance less

9    the actual cash value of the vehicle, both as

10   defined herein.  And then there's some

11   language about reduction -- no reduction by

12   more than $1,000 as a result of the

13   application of primary insurance deductible.

14               Did I state that correctly?

15       A.   Correct.

16       Q.   So the basic terms of the deal are,

17   the dealer will agree -- or the assignee of

18   the dealer will agree to waive the amount,

19   the difference between the unpaid but net

20   balance less the actual cash value at the

21   time of the total loss?

22       A.   Correct.

23       Q.   All right.  Now, over on page 2 there

24   are terms and conditions.  And there's some

1  definitions.

2      A.   Uh-huh.

3      Q.   Okay.   The actual cash value is

4  defined as the retail value of the covered

5  vehicle on the date of loss prior to its

6  physical damage or theft as determined by the

7  primary insurance carrier of the then current

8  region specific national automobile dealers

9  association official used car guide, which I

10 think is what we call The Blue Book, with

11 appropriate adjustments for mileage options

12 and conditions, whichever is greater,

13 correct?

14     A.   Correct.

15     Q.   Fairly straight forward, right?   It's

16 whatever the insurance company says it was

17 worth at the time of the loss?

18     A.   Correct.

19     Q.   Okay.   So that's the one important

20 definition.   The other one is the unpaid net

21 balance.

22     A.   Uh-huh.

23     Q.   Which is exactly what was cited in the

24 letter that we referred to earlier, correct?

1      A.  Correct.

2      Q.  And do you see any further definitions

3  in here for the terms unearned or future

4  interest?

5      A.  No.

6      Q.  Rental charges?

7      A.  I mean, they're in the unpaid net

8  balance.

9      Q.  Right.  But are they defined any

10  further?

11      A.  No, they're not.  They're not even

12  capitalized in there.  So they're not defined

13  terms.

14      Q.  Finance or lease charges?

15      A.  No.

16      Q.  Late charges?

17      A.  No.

18      Q.  Delinquent payments?

19      A.  No.

20      Q.  Deferred payments?

21      A.  No.

22      Q.  Okay.  Uncollected service charges?

23      A.  No.

24      Q.  Refundable prepaid taxes and fees?

Page 89

1       A.  No.

2       Q.  Disposition fees?

3       A.  No.

4       Q.  Termination fees?

5       A.  No.

6       Q.  Penalty fees?

7       A.  No.

8       Q.  But it's your testimony that anyone

9   who reads that should know exactly what it

10   means?

11       A.  Yes.  I mean, it's they're

12   responsibility to know what those mean.  Yes.

13       Q.  And if they don't know with it means,

14   what should they do?

15       A.  They should seek an answer to them

16   either from the lienholder or addendum to the

17   contract or from the dealership, sales

18   representative that we spoke about earlier.

19       Q.  All right.  I'm going to show you what

20   I'm going to mark as --

21              MR. PERSINGER:  What are we up to, G?

22              COURT REPORTER:  G.

23              MR. PERSINGER:  You can mark that

24   one as G.

Page 90

1      Q.  And ask you if you've seen this

2   document before.

3      A.  Yes.

4      Q.  Okay.  This is an affidavit that Robin

5   Hinkle signed in this case that describes the

6   interaction that she had on the day that she

7   purchased this 2006 Monte Carlo from C&O

8   Motors with a salesman named Paul L. Waugh.

9   And it states during the course of the

10  purchase we were asked if we wanted to

11  purchase GAP insurance for an extra $495 in

12  order to cover payment of any amount owed on

13  the car if it was ever totaled and more was

14  owed for the car than the value of the car.

15          Paragraph four, it says,

16  Mr. Waugh told us he could get this coverage

17  and we assumed he was working for the car

18  dealership and he insurance company like the

19  an agent.

20          Five, we were led to believe

21  we were purchasing an insurance policy that

22  would protect us from continuing to owe any

23  outstanding balance still owed on the loan

24  after a total loss, whatever the

Page 91

1    circumstances.

2                    Now, do you find that -- those

3    statements to be inconsistent with the terms

4    of the contract as you understand them?

5            MR. VAN VOLKENBURG:  Object to form.

6      Those are her statements.  He can't testify as

7      to her statement.

8            MR. PERSINGER:  Sure he can.

9            MR. VAN VOLKENBURG:  Not as a

10    30(b)(7) witness.

11           MR. PERSINGER:  I'm asking him to **

12     that those are true.  Okay?  And we'll put

13     aside the issue of whether they're true.  But

14     reading them and assuming they're true, does

15     he find them consistent with the terms of the

16     contract?

17           MR. VAN VOLKENBURG:  Okay.

18     A.   These phrases are paraphrased --

19     Q.   Okay.

20     A.   -- you know.  So the terms and

21    conditions stand on their own.  And these

22    statements stand on their own.

23     Q.   Right.

24     A.   So I can only testify -- and I feel

Page 92

1    comfortable testifying that the person who

2    signed this, Robin Hinkle and Johnny Hinkle,

3    made true statements here.

4         Q.   Okay.   Are they inconsistent with the

5    terms of your contract?   In other words, if

6    Mr. Waugh --

7         A.   Yes.   They are inconsistent.

8         Q.   Okay.

9              COURT REPORTER:   May I see that,

10        please?

11             THE WITNESS:   Sure.

12             COURT REPORTER:   Thank you.

13             (Exhibit G marked.)

14        Q.   All right.   Let's move on.   I'm going

15   to move now to the supplemental answers that

16   Jeff was kind enough to provide me back in --

17   These were provided after he and I met and

18   talk about -- worked out some deals in

19   December of 2012.

20             MR. PERSINGER:   And we'll mark these

21        as -- actually, I'm having a little trouble

22        keeping up with all my stacks here, so...

23        Q.   All right.   If you'll move through

24   this document, I think the first supplemental

1    response comes on page 5.  And it was a --

2    basically in the form of an objection.  So we

3    don't need to talk about that one.

4                    And then on over to the

5    request for production, beginning on page 9.

6    There was a privilege log produced that we

7    don't need to deal with.

8                    Paragraph -- or request

9    number 2 we asked for the complete

10   underwriting file, including the original

11   folder and binder of all documents therein of

12   Santander Consumer USA and/or Safe-Guard

13   Products, LLC, in connection with the claim

14   of Robin Hinkle which is the subject of this

15   lawsuit.  Any such files are to be produced

16   in their entirety and original state.  So

17   what was produced to us at that point was

18   labeled Exhibit A -- or Exhibit E, basically

19   the same document as I think Exhibit D.  It's

20   the GAP contract.  And so I wanted to ask you

21   about the underwriting function at

22   Safe-Guard.  And can you describe what, if

23   any, procedures Safe-Guard goes through when

24   they set the rates for a particular

1    transaction or for a Safe-Guard product?

2         A.   So I think we mentioned earlier that

3    we market SAFE-GAP to car dealers.  And in

4    order to market SAFE-GAP -- to represent, to

5    market to car dealers.  In order to have that

6    contract rated with a carrier behind it, we

7    will ask a carrier to provide us the fees

8    that they're going to charge for that

9    particular contract.  They will give us rates

10   and GAP -- it's usually rated between zero

11   and 60 months loan length and 61 to 72 month

12   loan length and 73 to 84 loan lengths of

13   time.

14        Q.   Okay.

15        A.   And so it will give us three rates.

16   And then we'll add our admin fee to it and

17   then we'll market it to our representatives.

18        Q.   Okay.  I want to show you -- actually,

19   pardon me.  Because in request number 12 we

20   also asked for the Defendant's underwriting

21   manuals in effect.  And we got Exhibit G,

22   which I'm going to mark --

23             MR. PERSINGER:  I think we're up to H?

24             COURT REPORTER:  I.

Page 95

1          MR. PERSINGER:  Or I.  Thanks.  Clip

2     that and hand it to him.

3               (Exhibit I marked.)

4          Q.  Okay.  Does that appear to you -- do

5     you recognize that document?

6          A.  Yes.

7          Q.  Is that an authentic and genuine copy

8     of a document that Safe-Guard generated and

9     keeps in the regular course of its business?

10         A.  Yes.

11         Q.  Okay.  What is it exactly?

12         A.  It's the rates, as I just described,

13    of the insurance company's fees, plus our

14    fees.  And then this is what would be given

15    to the representative for, in this particular

16    case, franchise dealers, ones that have ** is

17    a dealer like Chevy -- Chevrolet.

18         Q.  Okay.  And then an independent dealer

19    would be someone that is not affiliated with

20    a national brand?

21         A.  Correct.

22         Q.  Okay.  Would it be a used car dealer

23    or preowned?

24         A.  Yeah.  I smile because dealers don't

Page 96

1      like to use the term used, you know.

2          Q.   Right.   Right.

3          A.   So they're -- you know, and franchised

4      dealers sell pre-owned cars also.   So it's --

5      for somebody who is not a franchise.   Put it

6      that way.

7          Q.   **Believe it or not my brother is**

8      **married to a car dealer.   So I understand**

9      **completely.**

10         A.   Oh, okay.

11         Q.   **Used car salesman is a term that's**

12     **fallen into abuse and disuse over the years.**

13             **But anyway, the -- so the**

14     **franchise dealers appear to get better rates**

15     **than the independent dealers.   Is that a fair**

16     **statement?**

17         A.   Yes.

18         Q.   **And why is that?**

19         A.   The -- a lot of it has to do with

20     volume.   I mean, they'll sell more cars than

21     independents in most cases.

22         Q.   **Okay.**

23         A.   And the franchise dealers usually are

24     selling new cars.   So this is for new cars.

1    And new cars -- you know, the buyers at new

2    cars are going to have relationships, you

3    know, with that new car sales person in a

4    bigger town or -- you know, new cars usually

5    attract folks that have a desire to purchase

6    a brand new car.

7        Q.  Right.

8        A.  And they're going to -- you know, so

9    it's just a different buyer all together.

10        Q.  Okay.  Do you find that buyer to be a

11    more attractive person for your products,

12    that type buyer?

13        A.  No, not necessarily.

14        Q.  Okay.

15        A.  You know, it's just -- you know, new

16    car -- they just attract more buyers I guess

17    is the best, you know way to put it --

18        Q.  Okay.

19        A.  -- you know.

20        Q.  Let me ask you this kind of out of

21    left field.  Would you describe your business

22    as a volume business?

23        A.  Oh, yeah.  Yes.

24        Q.  Okay.  When you told me about the $7

Page 98

1       margin I thought maybe --

2                     So the key to your business, I

3       would -- and correct me if I'm wrong, is the

4       more buyers the better because it's -- the

5       economy is a scale sort of?

6           A.   Yes.

7           Q.   Okay.

8           A.   I mean, that's exactly right.

9           Q.   All right.

10          A.   We are a volume business.

11          Q.   Now, are these three documents that

12      I've handed you and we've marked as Exhibit I

13      the only documents that Safe-Guard has that

14      related to the setting of fees?

15          A.   Yes.  This is our schedule of fees,

16      you know, costs if you will, to our

17      representatives.

18          Q.   Okay.  Page 1 says 150 percent MSRP

19      slash NADA.  What does that mean?

20          A.   Oh.  So our representatives know that

21      we will cover GAP, total protection loss

22      product, up to 150 percent of MSRP.  So if

23      someone wants to buy a $10,000 vehicle --

24          Q.   Uh-huh.

Page 99

1      A.  -- and the loan was 15,000, we would

2      cover that vehicle.

3          Q.  I'd be shocked if a loan -- if a

4      lender would make a loan like that, but

5      that's --

6          A.  Well, these haven't changed since

7      the -- you know, these product have been

8      around for a while.  And there's been some,

9      you know --

10          Q.  Well, I knew that was the case with

11      homes.  But vehicles I always thought were a

12      little different.  It appears to me that the

13      dealers make more money on these products the

14      longer the term of the loan.  Is that a fair

15      statement?

16          A.  The dealers?

17          Q.  Yeah.

18          A.  No.  That's not a fair statement.

19          Q.  All right.  Well, then let's go back.

20      This first document applicable to franchise

21      dealers, page 1, it's got a little table.

22      And it says zero to 60 month terms --

23          A.  Right.

24          Q.  -- $29.  What does that refer to?

Notice of Removal
EXHIBIT F

Page 100

1          A.   That's the insurance company fees and

2     our administration fees.

3          Q.   Okay.  So...

4          A.   So there's no dealer component in

5     here.

6          Q.   All right.  These are the rates that

7     you charge?

8          A.   These are the rates that we charge to

9     our representatives.

10          Q.   Okay.  Well, that's -- thank you for

11     clearing that up.

12          A.   Okay.

13          Q.   All right.  And the rates are a little

14     higher for the independent dealers for

15     reasons you've described.

16               Now, they charge more -- you

17     charge more for the longer length of -- the

18     longer the length of the loan, the more you

19     charge.  Why is that?

20          A.   The insurance company charges us more

21     because the exposure to that loan is longer.

22          Q.   Okay.

23          A.   So there's -- it's a risk component,

24     right?