UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ROBIN L. HINKLE, individually
and on behalf of those similarly
situated,

        Plaintiff,

v.                              Civil Action No. 2:15-cv-13856

CASEY JOE MATTHEWS; TIMOTHY MAY
and CONNIE MAY, husband and wife;
SANTANDER CONSUMER, USA, INC., an
Illinois corporation; SAFE-GUARD
PRODUCTS INTERNATIONAL, LLC, a
Georgia limited liability
company; and JOHNNY HINKLE,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending is plaintiff Robin L. Hinkle's motion, filed

July 20, 2016, for reconsideration of the court's memorandum

opinion and order of July 19, 2016.


 I. Reconsideration Under Federal Rule of Civil Procedure 54(b)


        On July 19, 2016, the court entered a memorandum

opinion and order dismissing Hinkle's claims under the debt

collection provisions of the West Virginia Consumer Credit and

Protection Act ("WVCCPA"), West Virginia Code sections 46A-2-122

to 129a.  (ECF #52 at 6-9.)  In doing so, the court analogized

the definition of "claim" under the WVCCPA to the definition of

"debt" under the federal Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. §§ 1692 et seq., in accordance with the

prior practice of the Supreme Court of Appeals of West Virginia.

(Id. at 8 (citing Fleet v. Webber Springs Owners Ass'n, Inc.,

235 W. Va. 184, 193 (2015)).)

Turning to cases parsing the FDCPA, the court solely

relied upon dicta from the United States Court of Appeals for

the Third Circuit's opinion in Zimmerman v. HBO Affiliate Group,

834 F.2d 1163 (3d Cir. 1987). In Zimmerman, the Third Circuit

stated

> that the type of transaction which may give rise to a
> "debt" as defined in the FDCPA, is the same type of
> transaction as is dealt with in all other subchapters
> of the [FDCPA], i.e., one involving the offer or
> extension of credit to a consumer. Specifically it is
> a transaction in which a consumer is offered or
> extended the right to acquire 'money, property,
> insurance, or services' which are "primarily for
> household purposes" and to defer payment.

Id. at 1168-69. This court likewise "[saw] no reason that a

'claim' under the WVCCPA should not also require a deferral of

payment." (ECF #52 at 8-9.) Consequently, because there was no

deferral of payment in this case, as will be discussed in

greater detail below, the court dismissed Hinkle's debt

collection claim. (Id. at 9.)

The next day, Hinkle moved for the court to reconsider

its decision. Federal Rule of Civil Procedure 54(b) provides

that an interlocutory order "that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." There exist three circumstances under which a district court may revise an interlocutory order: "(1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017) (quoting Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003)). Hinkle asks the court to revise its July 19 dismissal order under the third circumstance, arguing that the court's reliance upon Zimmerman was clear error warranting reconsideration of the court's previous memorandum opinion and order.

Hinkle correctly notes that the Third Circuit later repudiated the deferral-of-payment portion of Zimmerman upon which this court relied. In Pollice v. National Tax Funding, L.P., the Third Circuit held as follows:

> We are not bound by the . . . statement in Zimmerman, as it was dictum. In our view, the plain meaning of [the FDCPA] indicates that a "debt" is created whenever a consumer is obligated to pay money as a result of a transaction whose subject is primarily for personal, family or household purposes. No "offer or extension of credit" is required.

225 F.3d 379, 401 (3d Cir. 2000).  Indeed, the Third Circuit observed that the dictum in Zimmerman "has been widely disavowed by several other courts of appeals."  Id. (citing, as examples, Romea v. Heiberger & Assocs., 163 F.3d 111, 114 n.4 (2d Cir. 1998); Brown v. Budget Rent-A-Car Sys., Inc., 119 F.3d 922, 924 n.1 (11th Cir. 1997); Bass v. Stolper, Koritzinsky, Brewster & Neider, 111 F.3d 1322, 1325-26 (7th Cir. 1997)); see also Duffy v. Landberg, 133 F.3d 1120, 1124 (8th Cir.), cert. denied, 525 U.S. 821 (1998); Snow v. Jesse L. Riddle, P.C., 143 F.3d 1350, 1352-53 (10th Cir. 1998); Charles v. Lundgren & Assocs., P.C., 119 F.3d 739, 741-42 (9th Cir.), cert. denied, 522 U.S. 1028 (1994).  The Fourth Circuit has not spoken on this issue.  See generally Mabe v. G. C. Servs. Ltd. P'ship, 32 F.3d 86, 88 (4th Cir. 1994) (citing a separate portion of Zimmerman for the proposition that administratively-ordered child support payments are not "debts" under the FDCPA).

In light of the post-Zimmerman authority developed above – the Third Circuit's repudiation in particular – the court finds that its reliance on Zimmerman was clear error warranting revision.  Hinkle's motion for reconsideration is granted, and the court revises its memorandum opinion and order of July 19, 2016, as set forth herein.

4

## II. Factual and Procedural Background

Hinkle is a resident of Delbarton, West Virginia. (Am. Compl. ¶ 1.) Defendant Safe-Guard Products International, LLC ("Safe-Guard"), a Georgia limited liability company doing business in West Virginia, offered Guaranteed Auto Protection ("GAP") insurance to vehicle purchasers in West Virginia. (Id. ¶¶ 5, 17.) In the event of an accident resulting in the total loss of a vehicle, GAP insurance is alleged by Hinkle to cover any "gap" between the purchaser's outstanding balance owed on the vehicle and the amount paid by the purchaser's primary insurer. (See id. ¶ 26.)

In July 2006, Hinkle entered into a "Retail Installment Contract and Security Agreement" for the purchase of a vehicle. (Id. ¶ 25.) As part of that transaction, Hinkle also purchased GAP insurance from Safe-Guard by signing a "'Gap Contract Insurance Policy' or 'Deficiency Waiver Addendum.'" (Id. ¶ 26.) The Security Agreement and the Insurance Policy, both of which are referenced in the amended complaint, are attached to Safe-Guard's motion for partial dismissal as Exhibits A and B, respectively. Both documents show that Hinkle paid $495 upfront for the GAP insurance, which was the only payment due to Safe-Guard for the purchase of the policy. (See Mot. Partial Dismissal, Exs. A and B.)

On June 1, 2011, Hinkle was involved in an automobile accident resulting in the total loss of her vehicle. (Am. Compl. ¶¶ 7, 12, 29.) At the time, Hinkle's outstanding balance on the vehicle was $11,983.81. After Hinkle's primary insurer paid the vehicle's cash value, Hinkle still owed a "gap" of $4,698.81. (Id. ¶ 29.) By letter of July 21, 2011, Safe-Guard denied Hinkle's claim under the GAP policy and did not pay the deficiency, stating that Hinkle lacked coverage because of "inconsistencies in [her] payment history, such as late payments, [that caused] the loan [to be] re-amortized." (Id. ¶¶ 30-31; Mot. Partial Dismissal, Ex. E.) In effect, Safe-Guard asserts that had payments been timely made, the amount owing at the time of the accident would have been around $5 thousand, which is less than the $7 thousand insurance accident recovery, leaving no gap to be covered by the Safe-Guard policy. (See Mot. Partial Dismissal, Exs. B, E.)

Hinkle initiated this action on July 20, 2012, in the Circuit Court of Mingo County. In the state court, Safe-Guard sought a writ of prohibition from the Supreme Court of Appeals of West Virginia to prevent enforcement of an order finding that the GAP policy Safe-Guard sold to Hinkle was insurance. State ex rel. Safe-Guard Prods. Int'l, LLC v. Thompson, 235 W. Va. 197, 198 (2015). In that case, on March 11, 2015, the Supreme

Court of Appeals found as a matter of first impression that Safe-Guard's GAP policy is insurance under the laws of West Virginia.  See id. Syl. Pt. 2 ("[A] contract that requires a third party to indemnify a lender, as a result of a specified event that causes the lender not to be repaid by a borrower, . . . is an insurance contract that is governed by the insurance laws of the State of West Virginia.").

Following that ruling, on May 28, 2015, Hinkle moved to amend her complaint to include class claims against Safe-Guard on behalf of all purchasers of GAP insurance in West Virginia.  In the amended complaint,[1] Hinkle claims that Safe-Guard sold GAP insurance without a license in violation of West Virginia Code section 33-3-1.  (Am. Compl. ¶ 46.)  Hinkle alleges that this unlawful sale of insurance constituted a violation of various provisions of the WVCCPA's debt collection provisions of article 2 and general consumer protections of article 6.  (Id. ¶ 47.)  The operative paragraph of the amended complaint states as follows:

> By collecting premiums that [it was] not entitled to recover and selling an insurance product while not licensed to sell such product, Safe-Guard . . . violated West Virginia Code § 46A-2-127 and engaged in unfair or deceptive acts or practices as set forth in 46A-6-102, -104, and -106.

_____

[1] The amended complaint was later entered onto the court's docket on December 23, 2015.

(Id.)  Hinkle seeks, <u>inter alia</u>, compensatory damages, a refund of premiums paid, punitive damages, and statutory penalties pursuant to the WVCCPA.  (<u>Id.</u> WHEREFORE Clause.)

After Hinkle moved to amend her complaint to add class allegations, Safe-Guard removed the action to this court on October 9, 2015, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1453.  (Not. Removal ¶ 19.)  On November 23, 2015, Safe-Guard filed a motion for partial dismissal, arguing that its alleged conduct falls outside the protections of the WVCCPA as a matter of law.  (Mot. Partial Dismissal ¶¶ 1, 5-6.)

### III. Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Correspondingly, Rule 12(b)(6) provides that a pleading may be dismissed for a "failure to state a claim upon which relief can be granted."

To survive a motion to dismiss, a pleading must recite "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>see also</u> <u>Monroe v. City of Charlottesville</u>, 579 F.3d

380, 386 (4th Cir. 2009) (quoting <u>Giarratano v. Johnson</u>, 521 F.3d 298, 302 (4th Cir. 2008)).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555 (citation omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); <u>Andrew v. Clark</u>, 561 F.3d 261, 266 (4th Cir. 2009) (quoting <u>Twombly</u>, 550 U.S. at 555).

"In resolving a motion pursuant to Rule 12(b)(6)[,] a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment." <u>Occupy Columbia v. Haley</u>, 738 F.3d 107, 116 (4th Cir. 2013) (citing Fed. R. Civ. P. 12(d)).  "A court may, however, consider a 'written instrument' attached as an exhibit to a pleading, 'as well as [documents] attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" <u>Id.</u> (alteration in original) (internal citation omitted) (quoting Fed. R. Civ. P. 10(c) and <u>Phillips v. Pitt Cty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009)); <u>see also</u> 5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u>, § 1357 (3d ed. 2017) ("Numerous cases . . . have allowed consideration of

matters incorporated by reference or integral to the claim . . . and exhibits attached to the complaint whose authenticity is unquestioned . . . ."); cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007) (stating that, when considering a 12(b)(6) motion to dismiss, courts may consider "documents incorporated into the complaint by reference" in deciding "whether the pleaded facts give rise to a 'strong' inference of scienter").

A district court's evaluation of a motion to dismiss is underlain by two principles. First, the court "must accept as true all of the factual allegations contained in the [pleading]." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Twombly, 550 U.S. at 555-56). In doing so, factual allegations should be distinguished from "mere conclusory statements," which are not to be regarded as true. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Second, the court must "draw[] all reasonable factual inferences . . . in the [nonmovant's] favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

IV. Discussion

Safe-Guard seeks wholesale dismissal of Hinkle's WVCCPA claims, arguing that the WVCCPA does not apply to the sale of insurance. (ECF #13 at 11.) Safe-Guard references West Virginia Code section 46A-1-105(a)(2), which provides that the WVCCPA "does not apply to . . . [t]he sale of insurance by an insurer, except as otherwise provided in this chapter." (ECF #13 at 11.)[2] Safe-Guard also contends that Hinkle's WVCCPA

---

[2] Safe-Guard also cites West Virginia Code section 46A-1-104(1), which states the following:

> This chapter applies if a consumer, who is a resident of this state, is induced to enter into a consumer credit sale made pursuant to a revolving charge account, to enter into a revolving charge account, to enter into a consumer loan made pursuant to a revolving loan account, or to enter into a consumer lease, by personal or mail solicitation, and the goods, services or proceeds are delivered to the consumer in this state, and payment on such account is to be made from this state.

W. Va. Code Ann. § 46A-1-104(1). Safe-Guard argues that this section provides the exclusive list of transactions to which the WVCCPA applies. (See ECF #61 at 3-4.) Hinkle aptly counters that this court has previously dispensed of that argument in Rhoades v. W. Va. Credit Bureau Reporting Servs., 96 F. Supp. 2d 528 (S.D. W. Va. 2000). (ECF #64 at 2.) In Rhoades, the court explained that "Section 104 does not say [that] the WVCCPA only applies to such transactions. [Instead], this section merely clarifies coverage of Chapter 46A for these . . . limited contacts, which might otherwise create choice-of-law issues. [A] narrow interpretation would wipe out almost all of the WVCCPA, except those relatively minor portions dealing with revolving charge accounts." 96 F. Supp. at 534 (emphasis omitted).

claims are preempted by West Virginia's insurance laws. (ECF #13 at 15-17.)

Hinkle highlights the caveat in section 46A-1-105(a)(2), "except as otherwise provided," and contends that various provisions of the WVCCPA provide for the coverage of insurance. (See ECF #29 at 4-8.) First, Hinkle argues that the unlicensed sale of insurance is covered by the WVCCPA's debt collection provisions. (Id. at 4-7.) Second, Hinkle insists that the statute's general consumer protections apply to insurance sales. (ECF #29 7-8.) Third, Hinkle argues that the WVCCPA allows for recovery for violations of other laws, including the insurance laws. (Id. at 8-9.)

A. Debt Collection Provisions

Hinkle claims that Safe-Guard is a "debt collector" subject to the WVCCPA's debt collection provisions. (Am. Compl. ¶ 47.) In particular, Hinkle alleges that Safe-Guard violated West Virginia Code section 46A-2-127, (id.), which provides that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers." W. Va. Code Ann. § 46A-2-127 (LexisNexis 2018) (effective 1997).

In West Virginia, "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Hammons v. W. Va. Office of Ins. Comm'r, 235 W. Va. 577, 584 (2015) (quoting Syl. Pt. 1, Smith v. State Workmen's Comp. Comm'r, 159 W. Va. 108 (1975)). This analysis begins with the plain language of the statute. Ancient Energy, Ltd. v. Ferguson, 806 S.E.2d 154, 157 (W. Va. 2017). If the plain language is unambiguous, no further interpretation is necessary. Id. Furthermore, the court's analysis is guided by the Supreme Court of Appeals of West Virginia's instruction that the WVCCPA be liberally construed in accordance with its remedial nature. See State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc., 194 W. Va. 770, 777 (1995).

With these considerations in mind, determining whether Safe-Guard is a "debt collector" first requires careful review of the following statutory definitions:

"Debt collector" is defined as "any person or organization engaging directly or indirectly in debt collection." Id. § 46A-2-122(d) (effective 1996).

"Debt collection" is "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer." Id. § 46A-2-122(c).

A "claim" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes,

whether or not such obligation has been reduced to
judgment." Id. § 46A-2-122(b).

"Services" are defined to "include[]: (a) Work, labor
and other personal services; (b) privileges with
respect to transportation, use of vehicles, hotel and
restaurant accommodations, education, entertainment,
recreation, physical culture, hospital accommodations,
funerals, cemetery accommodations, and the like; and
(c) insurance." Id. § 46A-1-102(47).

And a "consumer" is defined as "any natural person
obligated or allegedly obligated to pay any debt."
Id. § 46A-2-122(a).

For reasons stated below, the court finds that the plain
language of the statute is unambiguous and that, even liberally
construed, Safe-Guard is not a "debt collector" within the
protections of the WVCCPA's debt collection provisions.

As an initial matter, section 46A-2-127 plainly
overcomes the WVCCPA's exception of insurance sales because a
"claim," defined specifically for the debt collection
provisions, expressly encompasses insurance. See id. § 46A-2-
122(b). Thus, reading the above definitions together, the
inquiry becomes whether Safe-Guard engaged in "debt collection"
when it sold GAP insurance to Hinkle, that is, whether Safe-
Guard collected a "claim" from a "consumer." Because a "claim"
must be "of a consumer," id., the inquiry collapses into the
following issue: whether Safe-Guard's sale of GAP insurance
involved or gave rise to a "claim."

14

A "claim" is, in turn, essentially defined as an "obligation" to pay a "debt" "arising out of" a "transaction."[3] None of those terms is statutorily defined. The Supreme Court of Appeals holds that "[e]ach word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." Syl. Pt. 4, Osborne v. United States, 211 W. Va. 667 (2002).

A superficial reading of the four undefined terms suggests that Safe-Guard's sale of GAP insurance is outside the scope of the statute. The sale was a point of sale or point of purchase exchange, meaning Hinkle paid a one-time, upfront payment in exchange for the GAP insurance. No other payment was required. A simultaneous exchange of this character does not invoke an impression of debt collection in the normal sense.

Nevertheless, Hinkle argues that a "claim" encompasses a point of sale exchange. Hinkle offers the following example to illustrate her position:

Suppose, for argument's sake, a person makes a point of sale purchase at any every day retailer. After the sales person rings up the purchase, she "solicit[s]" a

_____

[3] A "claim" must also be of a "natural person," id. §§ 46A-2-122(a) and (b), which is not an issue here.

"claim" by telling the consumer what amount is "due,"
and the consumer pays for the purchase.

(ECF #64 at 2.)  Yet, in this illustration, no debt is created.
If the consumer decides at the point of sale not to make the
purchase and leaves the goods on the counter, no debt is owed.

Hinkle nonetheless looks for support in the debt
collection provisions' repeated used of the word "any," see W.
Va. Code Ann. § 46A-2-122, and the decision of the Supreme Court
of Appeals "that the word 'any,' when used in a statute, should
be construed to mean, in a word, any."  (ECF #59 at 4 (quoting
Thomas v. Firestone Tire & Rubber Co., 164 W. Va. 763, 769
(1980)).)[4]  Thus, Hinkle draws the conclusion "that the
Legislature's use of the word 'any' requires application of the

_____

[4] Hinkle notes that the Supreme Court of Appeals in Firestone
Tire also stated the following in dictum:

> [T]he provisions of Chapter 46A, article 2 of the West
> Virginia Code specifically apply to transactions which
> may properly be classified as "consumer credit sales"
> under W. Va. Code § 46A-1-102(12).  This is made clear
> by the language of W. Va. Code § 46A-1-103(3), which
> specifies that consumer protection in a non-"consumer
> credit sale" situation is provided exclusively by the
> provisions of articles six [§ 46A-6-101 et seq.] and
> seven [§ 46A-7-101 et seq.] of Chapter 46A.

164 W. Va. at 765.  As Hinkle points out, the WVCCPA was later
amended to remove the express references to articles six and
seven.  The statute now provides, in more general terms, that
"[t]his chapter also prescribes in various articles protective
measures for consumers in transactions not necessarily involving
consumer credit."  W. Va. Code Ann. § 46A-1-103(3).

WVCCPA to all obligations arising from a transaction, whether
that obligation is paid for at the point of sale or at a later
time." (Id. (emphasis in original); see also id. 2-4; ECF #29
at 6; ECF #64 at 4.)

Safe-Guard counters that, if Hinkle's argument were
accepted by the court, "every single transaction for a good or
service in West Virginia would be brought within the [WVCCPA's]
debt collection provisions." (ECF #32 at 6.) Instead, Safe-
Guard insists that "a natural reading of the statute would
require [Hinkle] to owe a debt to Safe-Guard and be 'obligated'
to pay it as a prerequisite to" debt collection. (Id. at 8.)
Because there is no amount outstanding or owed after a point of
sale exchange, Safe-Guard contends that no "debt" existed. (See
id. 7-8; see also ECF #13 at 13-14; ECF #32 at 7; ECF #61 at 5-
6.)

To begin, the court returns to the fundamental
definition of "claim" under the WVCCPA's debt collection
provisions: an "obligation" to pay a "debt" "arising out of" a
"transaction." See W. Va. Code Ann. §§ 46A-2-122(a), (b). In
legal parlance, a "debt" - the term of most import here in
parsing a debt collection statute - is a "[l]iability on a
claim; a specific sum of money due by agreement or otherwise."
Debt, Black's Law Dictionary (10th ed. 2014). The ordinary

17

meaning of "debt" is "something owed; obligation," or "a state
of being under obligation to pay or repay someone or something
in return for something received; a state of owing."  Debt,
Merriam-Webster, https://www.merriamwebster.com/dictionary/debt.
These definitions indicate that the plain meaning of "debt"
contemplates money due another as a result of a prior agreement
or exchange.  Thus, payment in a point of sale exchange, as is
the case here, is not a "debt" or a "claim" inasmuch as payment
is simply required to complete the exchange.

The remaining three terms support that conclusion.
"Obligation" is vaguely defined and generally means a duty to
act.  See Obligation, Black's Law Dictionary; Obligation,
Merriam-Webster.  Indeed, the legal definition acknowledges that
"[t]he word has many wide and varied meanings.  It may refer to
anything that a person is bound to do or forbear from doing."
Obligation, Black's Law Dictionary.  "Transaction" and "arise,"
however, provide more clarity.  "Transaction" is defined as
"[t]he act or an instance of conducting business or other
dealings; esp[ecially], the formation, performance, or discharge
of a contract."  Transaction, Black's Law Dictionary; see also
Transaction, Merriam-Webster (meaning "something transacted;
especially an exchange or transfer of goods, services, or
funds").  And "arise" means "[t]o result (from)."  Arise,

Black's Law Dictionary; see also Arise, Merriam-Webster (meaning "to originate from a source").  Thus, "arising out of" a "transaction" – rather than, suppose, within a transaction - indicates that a "claim" must follow the formation of a contract.

Reading the four above definitions together, a "claim" is fairly and most logically read as a duty to pay money resulting from a prior contract.  Accordingly, a point of sale exchange is not a "claim."

The court's conclusion is illustrated by basic contract principles.  In West Virginia, "[t]he elements of a contract are an offer and an acceptance supported by consideration."  Dan Ryan Builders, Inc. v. Nelson, 230 W. Va. 281, 287 (2012) (citing, inter alia, Syl. Pt. 1, First Nat. Bank of Gallipolis v. Marietta Mfg. Co., 151 W. Va. 636 (1967)). Performance under a contract is unenforceable until those elements are met.  See Syl. Pt. 3, id. (quoting Syl. Pt. 5, Virginian Export Coal Co. v. Rowland Land Co., 100 W. Va. 559 (1926)).

Appropriating Hinkle's example of a point of sale exchange involving the "every day retailer" described above, the consumer's payment constitutes his acceptance of the retailer's offer.  (See ECF #64 at 2.)  Only then is there a contract upon

which the retailer could collect on a subsequent duty to pay, if any such duty exists. Under a point of sale contract, however, there is no additional duty to pay and, as a consequence, no "claim."

Turning to the circumstances of the present case, it is a general tenet of contract law that "[t]he offeror is the master of his offer." Restatement (Second) of Contracts § 30 cmt. a (Am. Law Inst. 1981). As such, the offeror may invite or even require a particular mode of acceptance, and further may impose the terms of acceptance within the offer. See id. § 30 cmts. a-c. Here, both the Security Agreement and the Insurance Policy provide signature lines for the purchaser. (See Mot. Partial Dismissal, Exs. A and B.) Above the signature line, the Security Agreement states, in pertinent part, that "by signing below buyer agrees to the terms . . . of this contract." (Id. Ex. A.) Similarly, the Insurance Policy states, in pertinent part, that "I (customer), whose signature appears below, . . . agree to all of [the Insurance Policy's] provisions, terms and conditions, and am requesting coverage." (Id. Ex. B.)

The contract was accepted and the sum of $495 was earmarked then for payment to Safe-Guard through financing when Hinkle (or Hinkle's then-spouse on her behalf) signed the Security Agreement and the Insurance Policy. Hinkle's agreement

with Safe-Guard was, as she concedes, a point of sale exchange.
(See, e.g., ECF #59 at 1 (arguing "that the [WVCCPA] applies to
point of purchase debt collection"); ECF #64 at 4-5 (stating
that "no money actually changed hands at the point of sale
between Plaintiff and Safe-Guard").)  Accordingly, because she
had no duty to pay Safe-Guard money as a result of a prior
purchase of GAP insurance, Safe-Guard's sale of GAP insurance is
not a "claim" under the WVCCPA's debt collection provisions.

Hinkle seeks support in case law parsing the WVCCPA
and the federal FDCPA.  Before turning to those cases, the court
notes that none of the cases cited by Hinkle and Safe-Guard
address the point of sale issue here, and the court's own
thorough search did not yield any on-point opinions.[5]  This is
unsurprising with respect to the FDCPA because, as Hinkle points
out, "the FDCPA, unlike the [WVCCPA], does not apply to original
creditors.  Therefore, it is virtually impossible to imagine a

---

[5] In the court's view, the closest analogy to be drawn from the
case law is the instance of a dishonored check.  For example, an
Illinois state appellate court, reading a statute that was
similar at the time to the WVCCPA, "conclude[d] that when a
check is given in payment for goods or services and is
dishonored, the relation of debtor-creditor is established
between the drawer and the payee of the check."  Int'l Bureau of
Fraud Control, Ltd. v. Clayton, 544 N.E.2d 416, at 420 (Ill.
App. Ct. 1989).  Thus, in Clayton, it would appear that a "debt"
or "claim" did not exist when the check was used at the point of
sale, but rather when the check was dishonored at a later time.
The court is hesitant, however, to rely on that analogy here.

scenario in which a point of sale purchase . . . gives rise to a claim under the FDCPA." (ECF #64 at 6.) As for West Virginia and the remaining jurisdictions with similar debt collection provisions, the point of sale issue has not been addressed.[6]

Hinkle argues that the Third Circuit's decision in Pollice rejecting Zimmerman's deferral-of-payment requirement indicates that "[o]nce a transaction gives rise to the obligation, timing of payment is irrelevant." (ECF #59 at 3, 3 n.1.) In Pollice, as noted above, the Third Circuit held that "the plain meaning of section 1692a(5) indicates that a 'debt' is created whenever a consumer is obligated to pay money as a result of a transaction whose subject is primarily for personal, family or household purposes." 225 F.3d at 401. Hinkle highlights the word, "whenever," insisting that the Third Circuit intended to encompass point of sale transactions. (ECF #59 at 3 n.1.)

---

[6] A California state court addressed a similar issue in Gouskos v. Aptos Village Garage, 94 Cal. Rptr. 2d 558 (Cal. Ct. App. 2001). California's state debt collection statute applies only to a "consumer credit transaction," which requires, inter alia, that "property, services or money is acquired on credit." Id. at 561 (emphasis in original and other emphasis omitted). The WVCCPA does not impose a similar "acquired on credit" requirement before a transaction falls within the purview of the debt collection provisions.

Hinkle also contends that the Supreme Court of Appeals has similarly indicated support for her position. In Dan's Carworld, LLC v. Serian, it is held that "when a consumer purchases a motor vehicle from a dealership, and the dealership accepts the trade in of another motor vehicle as payment, or partial payment, of the purchase price of the vehicle being purchased, subsequent efforts by the dealership to collect from the consumer any amounts due the dealership by virtue of the dealership's payment of the loan secured by the trade-in vehicle must comply with the [WVCCPA]." Syl. Pt. 8, 223 W. Va. 478 (2009). "Thus," Hinkle argues, "the initial point of sale created the 'claim.'" (ECF #59 at 3 n.1.) And so it did - by virtue of the prior agreement for the purchase of a vehicle. See Syl. Pt. 8, 223 W. Va. 478.

Additionally, in Fleet v. Webber Springs Owners Ass'n, Inc., the Supreme Court of Appeals decided, in accordance with the federal circuit courts reading the FDCPA, that certain homeowners association assessments are "claims" under the WVCCPA. Syl. Pt. 2, 235 W. Va. 184 (2015); see also id. 193-94. Hinkle asserts that because "[a]ssociation fees are assessed on a regular basis for services which are not yet provided at the time of the assessment and do not involve any deferred payment,"

they are "materially indistinguishable from a point of sale"
exchange.  (ECF #59 at 6-7.)

Nor does Fleet conflict with the court's decision
herein.  In Pollice, the Third Circuit acknowledged that the
obligations at issue resulted from a prior agreement: homeowners
agreed to make periodic payments in the future in exchange for
ongoing water and sewer service.  See 225 F.3d at 400.  The
decision in Fleet was made along similar lines, wherein the
assessments "arose in connection with the purchase of the homes
themselves, even if the timing and amount of particular
assessments was yet to be determined."  235 W. Va. at 193
(quoting Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d
477, 479 (7th Cir. 1997)).[7]

Accordingly, Hinkle's claim under West Virginia Code
section 46A-2-127 is dismissed.

--------

[7] Hinkle also looks for support in two additional decisions of
the Supreme Court of Appeals: Dunlap v. Friedman's, Inc., 213 W.
Va. 394 (2003), and State ex rel. U-Haul Co. v. Zakaib, 232 W.
Va. 432 (2013).  Dunlap pertained to a statute of limitations
issue, 213 W. Va. at 396, and Zakaib addressed the
enforceability of an arbitration agreement, 232 W. Va. at 438.
Hinkle nonetheless insists that the underlying facts involved
WVCCPA "claims" similar to a point of sale exchange, thus
ostensibly indicating the Supreme Court of Appeals' tacit
acknowledgment that point of sale exchanges are "claims" under
the WVCCPA.  (See ECF #59 at 6.)  The court disagrees.  Simply
stated, neither decision discusses the WVCCPA in any detail.
Consequently, Dunlap and Zakaib are not relevant here.

## B. General Consumer Protections

Hinkle alleges that Safe-Guard violated the WVCCPA's general consumer protections contained in article six of the statute. (Am. Compl. ¶ 47.) West Virginia Code section 46A-6-104 makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade" and "commerce" are defined together to include "services." W. Va. Code Ann. § 46A-6-102(6). "Services," in turn, include a number of activities, including "insurance." Id. § 46A-1-102(47)(c). And as earlier noted, the WVCCPA "does not apply to . . . [t]he sale of insurance by an insurer, except as otherwise provided in this chapter." Id. § 46A-1-105(a)(2).

Hinkle does not point to anything about article six in the court's previous order that warrants reconsideration under Rule 54(b). See Carlson, 856 F.3d at 325 (listing the three circumstances under which reconsideration is proper). Instead, Hinkle simply restates her argument that, in view of the definitions produced immediately above, Safe-Guard's sale of insurance falls within the purview of article six because "services" is defined by the WVCCPA to include "insurance." (See ECF #59 at 8.)

The court reiterates its prior decision that the sale of insurance is not encompassed within the WVCCPA's general consumer protections of article six. As noted in the court's prior order, article six's exclusions supplement, rather than supplant, the WVCCPA's generally-applicable exclusions in section 46A-1-105(a)(2). This is underscored by the subject matter of article six's exclusions, which merely shield news media from liability for innocently publishing "false, misleading or deceptive" advertisements. See W. Va. Code Ann. § 46A-6-105.

As also noted in the court's prior order, the inclusion of insurance in the definition of "services" does not bring the sale of insurance within the general consumer protections. "Services" is ubiquitously used throughout the WVCCPA, and its use alone is not enough to overcome the statute's general exclusion of insurance sales. To hold otherwise would all but eviscerate the exclusion. Moreover, other provisions of the WVCCPA expressly provide for their applicability to the sale of insurance. See, e.g., id. § 46A-3-109 (prescribing rules related to insurance purchases when charges for credit life and health insurance are made in addition to finance charges); id. § 46A-3-109(a) (prescribing rules related to the purchase of collateral insurance).

As in the previous order, the court also notes that the West Virginia Legislature, after enacting the WVCCPA, has twice added consumer protections to title 33 of the West Virginia Code, which regulates insurance transactions in the State.  In 1997, the Legislature enacted the Insurance Sales Consumer Protection Act "to regulate the business of insurance in West Virginia when engaged in by financial institutions and to protect the interests of consumers."  Id. § 33-11A-2.  In 2001, the Legislature enacted the Unauthorized Insurance Act "to subject certain persons and insurers to the jurisdiction of the commissioner and to the courts of this state in suits by or on behalf of the state."  Id. § 33-44-2.  The Legislature also declared that its intent in passing the Unauthorized Insurance Act was, inter alia, "that [the Legislature] is concerned with the protection of residents of this state against unscrupulous acts by insurers not authorized to transact an insurance business in this state."  Id.  Although neither of these Acts altered the earlier-enacted WVCCPA, they suggest that the Legislature intended to fill a void of consumer protections relating to the sale of insurance - particularly the Unauthorized Insurance Act since it addresses the unlicensed sale of insurance in the State.

Because the court has dismissed Hinkle's debt collection and general consumer protection claims for the reasons stated herein, the court need not address Safe-Guard's preemption argument or Hinkle's contention that the WVCCPA allows for recovery for violations of West Virginia's insurance laws.

## V. Conclusion

Accordingly, for the foregoing reasons, it is ORDERED that

1. Hinkle's motion for reconsideration of the court's memorandum opinion and order of July 19, 2016, be, and hereby is, granted, and

2. Safe-Guard's motion for partial dismissal, which the court construes as limited to the issues adjudicated herein, be, and hereby is, granted.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: August 31, 2018

John T. Copenhaver, Jr.
United States District Judge